

FILED
2013 Feb-27  PM 12:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| Marisol Melo Peñaloza; Ana Gregoria Palomino Romero; Luz Marina Castillo Manjarres; Milagro Bolano Marquez; Maria Otilia Aguirre Ballesteros; Aminta Domitila Lazcano Junco; Isabel Maria Lazcano de Calderon; Hildemaro Melgarejo Molina; Yolanda del Carmen Santiago Ossa; Claudina Rosa Orozco; Fatiniza Isabel Gutierrez Buelvas; Carlos Enrique Carbono Azuaga; Martha Josefa Hernandez Martinez; Luzlenid Silva Munoz; Francia Coll de Tovar; Dominga Gutierrez Caballero; Juana Maria Contreras de Lopez; Maria Felicia Meza Garcia; Everely Palomino Vanegas; Gina Paola Santana Gutierrez; Adelaida Isabel de la Rosa Rodriguez; C.N.G.R.; Hermelinda Sarmiento de la Cruz; Ana Virginia Ochoa Navarro; Ana Cecilia Pastor Barrios; Edys Correa Cervantes; Manuel Gregorio Tapia Vega; Armando Rafael Candanoza Guzman; Luz Marina Anaya Royero; N.S.M.A.; Maria Sureya Suescun Botello; Edilma Isabel Torres Ozuna; Alba Luz Caballero Gomez; Amparo De Jesus Florez Torres; J.A.G.F.; Luz Marina Pacheco Cantillo; Merilsa Francisca Daza Amaya; Jhon Alfer Padilla Daza; Marcos Jose Padilla Daza; Gicela Margarita Padilla Daza; Adriana Cristina Padilla Daza; Yarlenys Rosmira Padilla Daza; Carmen Inelma Alfredo Campo Medina; and Ana Cristina Campo Medina; | CIVIL ACTION NUMBER:_____ |
| | |
| | COMPLAINT |
| | |
| | JURY TRIAL REQUESTED |
| **Plaintiffs,** | |
| vs. | |
| | |
| Drummond Company, Inc.; Drummond Ltd.; Drummond USA, Inc.; Garry Drummond; and James Michael Tracy, | |
| | |
| **Defendants.** | |

## **COMPLAINT**

## I. **INTRODUCTION**

1.      Plaintiffs are all lawful legal representatives for and/or wrongful death beneficiaries of the decedents described herein who were executed by members of the Northern Block of the United Self Defense Forces of Colombia ("AUC"), the umbrella paramilitary group in Colombia. Plaintiffs, in their capacities as legal representatives of the estates of the decedents and/or as wrongful death beneficiaries, bring claims for damages on behalf of the decedents and for their own damages incurred as a result of the executions of the decedents based on war crimes and extrajudicial killings under the Alien Tort Statute ("ATS") and for extrajudicial killing under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, against Defendants Drummond Company, Inc. ("DCI");   Drummond Ltd. ("DLTD"); Drummond USA, Inc. ("DUSA"); Garry Drummond, Chairman and Chief Executive Officer of DCI; and James Michael Tracy ("Mike Tracy"), who held executive positions at DCI and DLTD, and was on DUSA's board of directors (hereinafter collectively referred to as "Drummond" or "Defendants" unless otherwise specified).

2.      Drummond's Colombian coal mine is located in La Loma, Cesar Province, and "Puerto Drummond", where it ships the coal, is located 120 miles

away in Santa Marta, Magdalena Province. Drummond obtained the mining rights in the mid 1980's, but did not start real production until 1995. By then, both mine and port areas were essentially under the control of the main leftist guerilla group in Colombia, the FARC (the Revolutionary Armed Forces of Colombia). From the outset of its operation, Drummond, like virtually all landowners and large businesses in these areas of Colombia, suffered attacks by the FARC. As a communist-inspired organization, the FARC sought to overthrow the Colombian government with violent means, seize large private lands and privately-owned natural resources, such as Drummond's vast coal mine, and redistribute this wealth to the Colombian peasants who lived in poverty.

3.      The AUC began establishing a presence in Cesar and Magdalena for the purpose of attacking and defeating the FARC in these areas where there were important and powerful business interests and where the FARC had established a significant foothold. By 1997, the areas of Cesar and Magdalena became embroiled in the civil conflict that had engulfed Colombia as the Colombian military and the AUC joined forces to battle the FARC.

4.      Drummond initially stated that it hoped to remain neutral in the civil conflict between the leftist guerillas, particularly the FARC, and the Colombian military and its AUC paramilitary proxies. In a September 13, 1995, memo from

James Adkins (former Director of Security for DCI) to Defendant Tracy, Adkins as head of security for Drummond indicated that he was perplexed as to why the guerillas had yet to make a significant attack on Drummond. He suggested that the short run goal for the company should be to keep its head down and mine coal. However, according to Drummond security reports, the company was formally declared a military target by the guerillas.

5.     After considering the various options, Drummond chose to enter the conflict. By no later than 1997, Drummond formally took a side in the civil conflict and joined with the AUC to defeat the FARC and drive its remnants out of Cesar and Magdalena Provinces. For its part, Drummond financed a significant expansion of the AUC's Northern Block, including the Juan Andres Alvarez Front, based in Cesar Province. Along with providing these front funds to arm and supply over 165 new soldiers, Drummond provided it with its day-to-day operating expenses. Defendant Garry Drummond expressly approved this plan, and gave the approval to Drummond's head of security, Adkins. Drummond also provided funds directly to Jorge 40, Commander of the Northern Block of the AUC, to assist other AUC units in the areas of Drummond's operations in Cesar and Magdalena Provinces. Drummond used various mechanisms across the years from 1997-2006 to funnel money to the AUC.

4

6.     Further, Drummond re-prioritized and directed the strategy of the AUC, conditioning ongoing support on requiring it to focus on defeating the FARC and eliminating its supporters and sympathizers from the area of Drummond's railroad line going through Cesar and Magdalena Provinces. Drummond also favored contractors that had direct ties to the AUC and/or were known supporters of the AUC. These include Jaime Blanco Maya, whose company ISA had the food service contract for the Drummond mine; two firms that provided security for Drummond's rail line, Secolda and Viginorte; and Sanchez Polo, a trucking company that hauled Drummond's coal and supplies.

7.     The military units supported by substantial resources from Drummond also provided substantial assistance to the AUC in the areas of Drummond's operations. Drummond's security department gathered intelligence about guerilla operations in Cesar and Magdalena Provinces and provided it to, among others, Colombian Military Intelligence Commander Lino Sanchez, who then shared the information with AUC commanders in the area. The Colombian military supported by Drummond also lent arms to the AUC and participated in joint operations with the AUC in their united fight against the FARC and ELN guerillas.

8.     As a result of Drummond's direct intervention in the civil conflict in these areas, hundreds of people living in and around Drummond's railroad corridor,

including places that had previously served as safe havens for FARC and ELN guerillas, were executed as the AUC utilized its well-known scorched earth methodology as a way to terrorize the local population and ensure they would no longer support or sympathize with the guerilla groups. Among those killed by the AUC in these operations were Plaintiffs' decedents described herein. These executions were war crimes, and extrajudicial killings in violation of the ATS, as well as extrajudicial killings under the TVPA.

9.     The Justice and Peace process, which started yielding new facts in 2007, changed the dynamic of the prior bond and shared mission between the AUC, the Government of Colombia and the business community operating in Colombia, including Drummond. Many of the AUC leaders are now speaking freely about their relationship with the elites of the Colombian business community, particularly the Drummond Defendants, and their direct collaboration with the Colombian military, because, among other things, the AUC leaders have expressed that they were betrayed by their former government and business partners. The AUC leaders are in prison for their role in a shared crime, while the businessmen and politicians who were their partners remain free and are enjoying the substantial fruits of their criminal enterprise.

10.    The key AUC leaders and members who worked directly with Drummond are now in custody or have already served their time as part of the Justice and Peace process in Colombia, and are giving testimony and speaking to government and human rights lawyers about their alliance with Drummond. These include Salvatore Mancuso, the former head of the AUC,   Rodrigo Tovar Pupo, alias "Jorge 40," the leader of the AUC's Northern Block, Jhon Jairo Esquivel Cuadrado, alias "El Tigre," a former commander of the Juan Andres Alvarez Front assigned to Drummond, Alcides Manuel Mattos Tabares, alias "Samario", a former subcommander of Juan Andres Alvarez Front,   Jairo Jesus Charris Castro, a former AUC member who was sentenced to 30 years in prison for his role in murdering the union leaders at Drummond, and Rafael Garcia, a high official of the Colombian Administrative Department of Security (Spanish acronym: DAS; similar to the FBI), who was also a political advisor to the top leaders of the AUC. While many of these and other witnesses have expressed concern that they or their family members will suffer violent retaliation for speaking out about Drummond's relationship with the AUC, they have provided new details about Drummond to allow justice to be served. The evidence continues to mount, but the facts alleged by Plaintiffs herein at this time are more than sufficient to state their claims against Drummond.

## II. JURISDICTION AND VENUE

11.     This Court has federal jurisdiction pursuant to 28 U.S.C. §1331, based on the

ATS and TVPA, 28 U.S.C. §1350, for the violations of international human rights

law.   Supplemental jurisdiction exists over the claim for wrongful death under

Colombian law pursuant to 28 U.S.C. §1367.   This Court also has diversity

jurisdiction over all claims, including the Colombian law wrongful death claim,

pursuant to 28 U.S.C. § 1332(a)(2).   The amount in dispute between each Plaintiff

and each Defendant exceeds $75,000.

12.     Venue properly lies in this Judicial District pursuant to 28 U.S.C.

§1391(b) and (c) as DCI, DLTD, and DUSA are Alabama corporations or

partnerships, with their principal places of business in Alabama.

## III.   EXHAUSTION OF REMEDIES FOR TVPA CLAIMS

13.     This Court has already confirmed that the law in the Eleventh Circuit

is that the ATS has no requirement to exhaust local, Colombian remedies. *See*

Memorandum Opinion, *Balcero v. Drummond Company, Inc.*, Case No.

2:09-cv-1041-RDP, Doc. No. 30 ("*Balcero* Order") at 33 n.23.   Conversely, the

TVPA has an express exhaustion requirement, and Defendants have the burden of

raising and establishing lack of exhaustion as an affirmative defense. In a related case, the Court found that Plaintiffs met their initial burden of articulating that they had no local remedies that were not futile. *See id.* at 33-34. The same is true here.

14. Plaintiffs do not have access to an independent or functioning legal system within Colombia to raise their TVPA complaints. Any efforts by Plaintiffs to seek redress would be futile because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk of retaliation. In particular, there is almost complete legal impunity for murders committed in Cesar Province by the AUC.

15. In fact, the collaboration between the AUC and the government of Colombia goes to the highest levels and ensures that no serious action will be taken to bring to justice in Colombia those involved in the murders alleged herein. Indeed, the administration of former Colombian President Alvaro Uribe was under pressure from outside Colombia, including from the U.S., due to the ongoing "para-political" scandal which has implicated numerous high-ranking government officials, including 60 congressional representatives aligned with Uribe, and high-ranking military officers in collaborating with paramilitaries and shielding paramilitaries from justice. However, within Colombia, it is business as usual.

According to a Human Rights Watch (HRW) report issued in November, 2008, entitled, *Breaking the Grip? Obstacles to Justice for Paramilitary Mafias in Colombia*, Human Rights Watch explains that

> In Colombia, more than in almost any country in the Western hemisphere, violence has corroded and subverted democracy. Too often, killings and threats - not free elections or democratic dialogue - are what has determined who holds power, wealth in the country. Nowhere is this more evident than in the relationship between paramilitary groups and important sectors of the political system, the military and the economic elite.
>
> Paramilitary groups have ravaged much of Colombia for two decades. Purporting to fight the equally brutal guerillas of the left, they have massacred, tortured, forcibly 'disappeared,' and sadistically killed countless men, women, and children. Wherever they have gone, they have eliminated anyone who opposed them, including thousands of trade unionists, human rights defenders, community leaders, judges and ordinary civilians.

16.     In this same report, HRW blames the "para-political" phenomenon for the extensive paramilitary violence throughout the country. As HRW explains, "[t]**he close military-paramilitary collaboration in several regions allowed the paramilitaries to commit massacre after massacre of civilians largely**

10

**unimpeded and with impunity**." HRW further relates that former President Uribe himself has been a major obstacle to the efforts of the Colombian Supreme Court to investigate and punish government officials for collaborating with the paramilitaries. As HRW states, "President Uribe has [r]epeatedly launched personal attacks on the Supreme Court and its members in what increasingly looks like a concerted campaign to smear and discredit the Court; [o]pposed and effectively blocked meaningful efforts to reform the Congress to eliminate paramilitary influence; [p]roposed constitutional reforms that would remove the 'parapolitics' investigations from the jurisdiction of the Supreme Court."

17.     Wholly apart from the danger of retaliation and the likelihood of undue influence in any civil action that might be brought by Plaintiffs in Colombia, all of the Drummond Defendants would need to be present in Colombia and the Colombian authorities would have to first bring a criminal case against the Defendants. Neither of these conditions are under the control of the Plaintiffs such that they could accomplish them as a prerequisite to filing a claim in Colombia. Further, it is extremely unlikely that all of the Defendants would consent to suit in Colombia, and the Colombian government is highly influenced by Drummond and is not likely to bring criminal charges against any of the Drummond Defendants or this would have already occurred. Thus, Plaintiffs had no local Colombian

remedies that could have been exhausted.

18.     Regarding the timing of Plaintiffs' claims, at the time the majority of Plaintiffs' decedents were killed, it was extremely dangerous in Colombia to try to hold anyone accountable for AUC violence.   All of Plaintiffs' pre-2007 claims were therefore tolled until at least early 2007, when the AUC paramilitaries who terrorized Plaintiffs and their decedents had to some extent demobilized and the raging civil war began to wind down.

## IV. PARTIES

### A. Plaintiffs

19.     All of the decedents described herein are among the hundreds, or even thousands, of persons murdered by the AUC's Northern Block in furtherance of its agreement with Drummond to confront the FARC, pacify the areas where the FARC had a foothold, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels. The following Plaintiffs in this action, as the legal representatives of the estates and/or as wrongful death beneficiaries, bring claims for damages on behalf of the decedents and for their own damages incurred as a result of the executions of the decedents based on war

crimes and extrajudicial killings under the ATS, for extrajudicial killing under the TVPA, and for wrongful death under Colombian law. All plaintiffs of the decedents have standing to bring these claims, including under the ATS and TVPA, 28 U.S.C. § 1350, and under Colombian law.   Some of the Plaintiffs listed below are minors.   All minor Plaintiffs are identified only by their initials, pursuant to Fed. R. Civ. P. 5.2.   All minor Plaintiffs are represented by parents and/or guardians, as indicated in the individual Plaintiff paragraphs below.   All of the minor Plaintiffs' representatives are suing on behalf of the minors and are also asserting claims on their own behalf.

20.   Marisol Melo Peñaloza is the domestic partner and legal representative of the Estate of Ever Enrique Charris Diaz under the laws of Colombia, and is also a legal heir to Ever Enrique Charris Diaz under the laws of Colombia. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she has suffered as a result of the execution of the decedent. On January 16, 1999, Ever Enrique Charris Diaz was killed by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Charris worked as a security guard for Drummond's railroad. He was at work when a few paramilitaries approached him and shot him, killing him on the spot. His body was found where the railroad crosses the road Troncal del

Caribe in Aracataca.

21.     Ana Gregoria Palomino Romero is the mother and legal representative of the Estate of Samuel Segundo Fontalvo Palomino under the laws of Colombia, and is also a legal heir of Samuel Segundo Fontalvo Palomino under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Samuel Segundo Fontalvo Palomino. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Samuel Segundo Fontalvo Palomino, who worked as a security guard on Drummond's railroad, was murdered on January 23, 2005, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the afternoon of January 23, 2005, Samuel Segundo Fontalvo Palomino was at his job guarding the rail line near Orihueca, Magdalena when he was approached by AUC paramilitaries aboard a motorcycle. The paramilitaries murdered Samuel Segundo Fontalvo Palomino with multiple gunshots. On July 29, 2008, paramilitary Nemias Moises Sandoval Becerra, alias Camilo, accepted responsibility for Samuel Segundo Fontalvo Palomino's murder.

22.     Luz Marina Castillo Manjarres is the domestic partner and legal representative of the Estate of Aroldo Jose Rodriguez Camacho under the laws of Colombia, and is also a legal heir to Aroldo Jose Rodriguez Camacho under the

laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Aroldo Jose Rodriguez Camacho. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On April 29, 2004, Aroldo Jose Rodriguez Camacho was murdered by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Rodriguez, a Drummond worker at Drummond's port and a union member of SINTRAMIENERGETICA, was at a cantina in Cienaga, Magdalena with some friends, when a group of AUC paramilitaries arrived and shot him. On August 24, 2008, the AUC paramilitary Jose Gregorio Mangones Lugo, alias Carlos Tijeras, confessed to the murder of Aroldo Jose Rodriguez Camacho.

23. Milagro Bolano Marquez is the domestic partner and legal representative of the Estate of Fernando Borja Hernandez, under the laws of Colombia, and is also a legal heir of Fernando Borja Hernandez under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Fernando Borja Hernandez. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Fernando Borja Hernandez was tortured, kidnapped, and disappeared on February 19, 1998, by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On February 19, 1998, as Fernando Borja

Hernandez was closing up his vendor kiosk in the market in Bosconia, Cesar, a pickup truck carrying several armed AUC paramilitaries arrived.   The paramilitaries ordered Fernando Borja Hernandez to board the vehicle, but when he refused to do so, the paramilitaries tortured Fernando Borja Hernandez and then kidnapped him.   Fernando Borja Hernandez was never seen again.

24.   Maria Otilia Aguirre Ballesteros is the mother and legal representative of the Estate of Carlos Alfredo Castro Aguirre under the laws of Colombia, and is also a legal heir of Carlos Alfredo Castro Aguirre under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Carlos Alfredo Castro Aguirre. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent.   Carlos Alfredo Castro Aguirre was murdered on or about June 29, 2004, with assistance by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On or about June 29, 2004, Carlos Alfredo Castro Aguirre and some friends left Fundacion, Magdalena to travel to Chimila, Cesar in search of work they had heard was available there. On or about July 1, 2004, Carlos Alfredo Castro Aguirre was found dead with gunshot wounds. Carlos Alfredo Castro Aguirre's body had been dressed in camouflage to make it appear that he had died in combat with the Colombian army.   This appears to have been an example of

16

the practice of "false positives" in which the AUC and the military dressed murdered civilians in uniform to claim a successful kill of a guerilla.

25.     Aminta Domitila Lazcano Junco is the mother and legal representative of the Estate of Luis Hidalgo Lazcano under the laws of Colombia, and is also a legal heir of Luis Hidalgo Lazcano under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Luis Hidalgo Lazcano. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Luis Hidalgo Lazcano was kidnapped and disappeared on June 7, 2002, by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On June 7, 2002, a group of AUC paramilitaries arrived at Luis Hidalgo Lazcano's home in Caracolicito, Copey, Cesar and asked for him by name.    When Luis Hidalgo Lazcano identified himself, the paramilitaries bound his hands and kidnapped him.    The Plaintiff and Luis Hidalgo Lazcano's brother followed the paramilitaries for a short distance, but turned back when the paramilitaries threatened them.   Luis Hidalgo Lazcano's brother Anselmo went to see the paramilitaries the following day and demanded that they return Luis Hidalgo Lazcano to him dead or alive, but the paramilitaries told him that they had killed Luis Hidalgo Lazcano and that Anselmo should not bother them again or they would kill him as well.

26.     Aminta Domitila Lazcano Junco is the sister and legal representative of the Estate of Buenaventura Lazcano Junco under the laws of Colombia and is also a legal heir of Buenaventura Lazcano Junco under the laws of Colombia. Isabel Maria Lazcano de Calderon is also the sister and is also a legal heir of Buenaventura Lazcano Junco under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Buenaventura Lazcano Junco. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages they suffered as a result of the execution of the decedent. Buenaventura Lazcano Junco was murdered on December 8, 2003, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On December 8, 2003, Buenaventura Lazcano Junco was getting ready to go home from the farm where he worked, located some two hours from his home in Caracolicito, Copey, Cesar when a group of AUC paramilitaries arrived at the farm.   The paramilitaries slit Buenaventura Lazcano Junco's throat, killing him.

27.     Hildemaro Melgarejo Molina is the father and legal representative of the Estate of Luis Eduardo Molina Guerra under the laws of Colombia and is also a legal heir of Luis Eduardo Molina Guerra under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Luis Eduardo Molina Guerra. Plaintiff

seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. Luis Eduardo Molina Guerra was murdered on April 10, 2005, by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On April 10, 2005, Luis Eduardo Molina Guerra was in Valledupar, Cesar when he was intercepted by AUC paramilitaries. The paramilitaries shot and killed Luis Eduardo Molina Guerra.

28.     Yolanda del Carmen Santiago Ossa is the sister and legal representative of the Estate of Luis Usley Santiago Castillo under the laws of Colombia and is also a legal heir of Luis Usley Santiago Castillo under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Luis Usley Santiago Castillo. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Luis Usley Santiago Castillo was kidnapped on May 18, 2000, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. His body was found on May 19, 2000.   On the morning of May 18, 2000, Luis Usley Santiago Castillo was with a cousin in Aguachica, Cesar when a group of AUC paramilitaries forced the two into a vehicle and kidnapped them. The bodies of Luis Usley Santiago Castillo and his cousin were found on May 19,

2000, on a road leading to Puerto Mosquito, Cesar. Paramilitaries Juan Francisco Prada Marquez, Alfredo Ballena, and Armando Madriaga Picon have since confessed to the murder of Luis Usley Santiago Castillo.

29.     Claudina Rosa Orozco is the sister and legal representative of the Estate of Jorge Luis Padilla Orozco under the laws of Colombia and is also a legal heir of Jorge Luis Padilla Orozco under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Jorge Luis Padilla Orozco. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Jorge Luis Padilla Orozco was murdered on July 8, 2004, by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On the evening of July 8, 2004, Jorge Luis Padilla Orozco was walking home from a relative's house in Barrio Parate Firme, La Paz, Cesar when he was intercepted by an AUC paramilitary. The paramilitary shot Jorge Luis Padilla Orozco multiple times killing him.

30.     Fatiniza Isabel Gutierrez Buelvas is the mother and legal representative of the Estate of Kewin de Jesus Querales Gutierrez under the laws of Colombia and is also a legal heir of Kewin de Jesus Querales Gutierrez under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Kewin de Jesus Querales Gutierrez. Plaintiff seeks all damages permitted under the law on

behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Kewin de Jesus Querales Gutierrez was murdered on February 18, 2004, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On February 18, 2004, Kewin de Jesus Querales Gutierrez's body was found with multiple gunshot wounds on the edge of the Guatapuri River in Valledupar, Cesar. Kewin de Jesus Querales Gutierrez was last seen alive that morning, when he was purchasing supplies at a market in Valledupar.

31.    Carlos Enrique Carbono Azuaga is the father and legal representative of the Estate of Iliana Esther Carbono Murgas under the laws of Colombia and is also a legal heir of Iliana Esther Carbono Murgas under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Iliana Esther Carbono Murgas. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. Iliana Esther Carbono Murgas was murdered on February 5, 2002, in the crossfire of a gun battle that involved the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the afternoon of February 5, 2002, Iliana Esther Carbono Murgas was at her job as a secretary at a health clinic in San Diego, Cesar when a group of AUC paramilitaries arrived and began shooting at

21

two men who were seated outside the clinic.   Iliana Esther Carbono Murgas was killed in the crossfire.

32.     Martha Josefa Hernandez Martinez is the domestic partner and legal representative of the Estate of Fredis Rafael Cantillo under the laws of Colombia and is also a legal heir of Fredis Rafael Cantillo under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Fredis Rafael Cantillo. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Fredis Rafael Cantillo was kidnapped and murdered on or around August 19, 1997, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Fredis Rafael Cantillo worked for a Drummond contractor. Around midnight on August 18, 1997, a group of AUC paramilitaries arrived at the home shared by Fredis Rafael Cantillo and the Plaintiff in Fundacion, Magdalena. The paramilitaries forced their way into the home, seized Fredis Rafael Cantillo, and pushed the Plaintiff and her son when they tried to protect Fredis Rafael Cantillo. The paramilitaries forced Fredis Rafael Cantillo into a vehicle, along with two other victims, and drove off with him. Fredis Rafael Cantillo was found dead from multiple gunshot wounds in the town of Santa Rosa de Lima, Fundacion on the morning of August 19, 1997, along with the bodies of the other two kidnap

victims.

33.     Luzlenid Silva Munoz is the domestic partner and legal representative of the Estate of Juan Jose Tovar Coll under the laws of Colombia and is also a legal heir of Juan Jose Tovar Coll under the laws of Colombia. Francia Coll de Tovar is the mother and is also a legal heir of Juan Jose Tovar Coll under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Juan Jose Tovar Coll. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages they suffered as a result of the execution of the decedent. Juan Jose Tovar Coll, who had worked as a security guard for Acolsure on Drummond's railroad, was murdered on January 9, 2001, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the evening of January 9, 2001, Juan Jose Tovar Coll left his home in Fundacion, Magdalena to run an errand. On the morning of January 10, 2001, Juan Jose Tovar Coll's body was found near a garbage dump on the outskirts of Fundacion, his hands and feet bound and with three gunshot wounds to his head.

34.     Dominga Gutierrez Caballero is the mother and legal representative of the Estate of Jose Armando Cantillo Gutierrez under the laws of Colombia and is also a legal heir of Jose Armando Cantillo Gutierrez under the laws of Colombia.

Plaintiff herein is a wrongful death beneficiary of Jose Armando Cantillo Gutierrez. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Jose Armando Cantillo Gutierrez was murdered on or about May 15, 2005, by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On or about May 15, 2005, Jose Armando Cantillo Gutierrez was descending on foot from the Sierra Nevada de Santa Marta, in Cesar near the border with Magdalena when he was intercepted by a group of AUC paramilitaries. The paramilitaries shot and killed Jose Armando Cantillo Gutierrez.   Jose Armando Cantillo Gutierrez's body was found in Chimila, Copey, Cesar.

35.     Juana Maria Contreras de Lopez is the mother and legal representative of the Estate of Jaider Jose Lopez Contreras under the laws of Colombia, and is also a legal heir to Jaider Jose Lopez Contreras under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Jaider Jose Lopez Contreras. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On February 10, 2001, Jaider Jose Lopez Contreras was killed by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Lopez worked for Acolsure, contracted by Drummond to provide security along the

railroad. On that day, he was working the night shift when a group of paramilitaries arrived and tied him to the railroad line so that the train would run him over. His remains were found tied to the railroad line near the municipality of Algarrobo. In November 2000, the paramilitaries had previously threatened the decedent, because they wanted to blow up the rail line and blame it on the guerrilla, but he refused to help them.

36.     Maria Felicia Meza Garcia is the mother and legal representative of the Estate of Carlos Arturo Madera Meza under the laws of Colombia, and is also a legal heir of Carlos Arturo Madera Meza under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Carlos Arturo Madera Meza. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Carlos Arturo Madera Meza was murdered on August 13, 2006, by remnants of  the AUC Northern Block, which received knowing and substantial assistance from Drummond.   Around midday on August 13, 2006, Carlos Arturo Madera Meza was on his way to his girlfriend's home in Caracolicito, Copey, Cesar when he was intercepted on the Caracolicito-Chimila road by paramilitaries on a motorcycle. The paramilitaries shot Carlos Arturo Madera Meza in the head, killing him.

37.     Everely Palomino Vanegas (also possibly Everelis, but hereinafter

"Everely") is the domestic partner and legal representative of the Estate of Gerardo Amaris Rocha under the laws of Colombia, and is also a legal heir of Gerardo Amaris Rocha under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Gerardo Amaris Rocha. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Gerardo Amaris Rocha was murdered on November 10, 2000, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the afternoon of November 10, 2000, Gerardo Amaris Rocha was at his home in Ojo de Agua, Chimichagua, Cesar with Everely Palomino Vanegas when AUC paramilitaries arrived. The paramilitaries shot Gerardo Amaris Rocha multiple times in the head and body, killing him.

38.     Gina Paola Santana Gutierrez is the domestic partner and legal representative of the Estate of Sergio Luis Mejia Bravo under the laws of Colombia, and is also a legal heir of Sergio Luis Mejia Bravo under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Sergio Luis Mejia Bravo. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Sergio Luis Mejia Bravo was murdered on February 20, 2007, by remnants of the AUC Northern Block, which received knowing and substantial assistance from

Drummond. On February 20, 2007, Sergio Luis Mejia Bravo was in the village of Candelaria, Chimichagua, Cesar when he was intercepted by paramilitaries.   The paramilitaries shot and killed Sergio Luis Mejia Bravo.

39.   Adelaida Isabel de la Rosa Rodriguez is the domestic partner and legal representative of the Estate of Carlos Alberto Gutierrez Mugno under the laws of Colombia, and is also a legal heir of Carlos Alberto Gutierrez Mugno under the laws of Colombia. C.N.G.R., born in 1996, is Carlos Alberto Gutierrez Mugno and Adelaida Isabel de la Rosa Rodriguez's son, and is also a legal heir of Carlos Alberto Gutierrez Mugno under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Carlos Alberto Gutierrez Mugno. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 13, 2002, Carlos Alberto Gutierrez Mugno, who worked as a security guard on Drummond's railroad, was murdered by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Mugno had the day off and was at a bar in the afternoon in Fundacion, Magdalena when a group of paramilitaries arrived. The paramilitaries roughed Carlos Alberto Gutierrez Mugno up, then shot him several times, killing him. In 2009, Jose Gregorio Mangonez Lugo, alias

Carlos Tijeras, confessed to the murder of Carlos Alberto Gutierrez Mugno.

40.    Hermelinda Sarmiento de la Cruz is the mother and legal representative of the Estate of Wilmer Rafael Sarmiento de la Cruz under the laws of Colombia, and is also a legal heir of Wilmer Rafael Sarmiento de la Cruz under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Wilmer Rafael Sarmiento de la Cruz.   Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Wilmer Rafael Sarmiento de la Cruz was murdered on December 6, 2005, by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On December 6, 2005, Wilmer Rafael Sarmiento de la Cruz was returning to his home in Barrio Maregua, Valledupar, Cesar when he was intercepted by a group of AUC paramilitaries. The paramilitaries forced Wilmer Rafael Sarmiento de la Cruz out his truck, and then shot him several times in the head, killing him.

41.    Ana Virginia Ochoa Navarro is the daughter and legal representative of the Estate of Gustavo Enrique Ochoa Perez under the laws of Colombia, and is also a legal heir of Gustavo Enrique Ochoa Perez under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Gustavo Enrique Ochoa Perez. Plaintiff seeks all damages permitted under the law on behalf of the decedent and

all damages she suffered as a result of the execution of the decedent. Gustavo Enrique Ochoa Perez was kidnapped and murdered on May 20, 1999, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the night of May 20, 1999, Gustavo Enrique Ochoa Perez was at home on the Hacienda Moravia in Maria Angola, Valledupar, Cesar with his family when a group of AUC paramilitaries arrived and banged on the door, identifying themselves as soldiers with the Colombian Army and demanding to be allowed in. When Gustavo Enrique Ochoa Perez opened the door, the paramilitaries seized him and kidnapped him. A short distance away from his home, the paramilitaries shot and killed Gustavo Enrique Ochoa Perez.

42.     Ana Cecilia Pastor Barrios is the daughter and legal representative of the Estate of Jose Alberto Pastor Juvinao under the laws of Colombia, and is also a legal heir of Jose Alberto Pastor Juvinao under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Jose Alberto Pastor Juvinao. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Jose Alberto Pastor Juvinao was kidnapped on September 23, 2001, by the AUC Northern Block, which received knowing and substantial assistance from Drummond; Jose Alberto Pastor Juvinao's body was found on September 26, 2001. Early on the

morning of September 23, 2001, Jose Alberto Pastor Juvinao left his home in Las Vegas, Caracolicito, Copey, Cesar to go to his farm. Along the way, Jose Alberto Pastor Juvinao was intercepted by a group of AUC paramilitaries. The paramilitaries kidnapped Jose Alberto Pastor Juvinao killed him. The paramilitaries then dismembered Jose Alberto Pastor Juvinao's body, which was found in Las Vegas on September 26, 2001.

43.     Edys Correa Cervantes is the sister and legal representative of the Estate of Victor de Jesus Correa Cervantes under the laws of Colombia, and is also a legal heir of Victor de Jesus Correa Cervantes under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Victor de Jesus Correa Cervantes. Victor de Jesus Correa Cervantes was murdered on May 23, 2002, by the AUC Northern Block, which received knowing and substantial assistance from Drummond.   On the night of May 23, 2002, Victor de Jesus Correa Cervantes was working on the rail line as a security guard in La Agustina, Guacamayal, Zona Bananera, Magdalena when he was intercepted by a group of AUC paramilitaries. The paramilitaries shot Victor de Jesus Correa Cervantes once in the head, killing him.

44.     Manuel Gregorio Tapia Vega (also "Tapias," but hereinafter "Tapia") is the father and legal representative of the Estate of Luis Segundo Tapia Padilla

(also "Tapias," but hereinafter "Tapia") under the laws of Colombia, and is also a legal heir of Luis Segundo Tapia Padilla under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Luis Segundo Tapia Padilla. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. Luis Segundo Tapia Padilla was murdered on or about September 4, 2002, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Shortly before his murder and as a result of threats from AUC paramilitaries, Luis Segundo Tapia Padilla and his domestic partner, who was pregnant, went to live at the La Esmeralda farm where he worked located on the Bosconia-Bucaramanga road. On or about September 4, 2002, AUC paramilitaries arrived at the La Esmeralda farm and shot Luis Segundo Tapia Padilla and his domestic partner, killing them both along with the unborn child she was carrying.

45.     Armando Rafael Candanoza Guzman is the brother and legal representative of the Estate of Alberto Luis Candanoza Guzman under the laws of Colombia, and is also a legal heir of Alberto Luis Candanoza Guzman under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Alberto Luis Candanoza Guzman. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the

decedent.  Alberto Luis Candanoza Guzman, who worked for FENOCO on the railroad line, was murdered on December 2, 2001, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the night of December 2, 2001, Alberto Luis Candanoza Guzman was sitting in front of his work station in Bosconia, Cesar when a pickup truck of armed AUC paramilitaries arrived. The paramilitaries shot Alberto Luis Candanoza Guzman twice in the head, killing him. On February 22, 2011, the AUC Northern Block paramilitaries Sixto Arturo Fuentes Hernandez, alias "El Negro Peter," and Oscar Ospino Pacheco, alias "Tolemaida," confessed to the murder of Alberto Luis Candanoza Guzman.

46.  Luz Marina Anaya Royero is the domestic partner and legal representative of the Estate of Victor Nicolas Mejia Palacio under the laws of Colombia, and is also a legal heir to Victor Nicolas Mejia Palacio under the laws of Colombia.  N.S.M.A., born in 2003, is the daughter of Victor Nicolas Mejia Palacio and Luz Marina Anaya Royero, and is also a legal heir under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Victor Nicolas Mejia Palacio. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the

decedent. On June 20, 2005, Victor Nicolas Mejia Palacio was murdered by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On June 18, 2005, Mr. Mejia left his home in Santa Marta, Magdalena to begin his workday in the department of Cesar. Two days later, on June 20, 2005, his body was found near Curumani, Cesar in an advanced state of decomposition. Victor Nicolas Mejia Palacio had been shot to death.

47.     Maria Sureya Suescun Botello is the wife and legal representative of the Estate of Gil Roberto Castaneda Murcia under the laws of Colombia, and is also a legal heir of Gil Roberto Castaneda Murcia under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Gil Roberto Castaneda Murcia. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Gil Roberto Castaneda Murcia was kidnapped and murdered on March 3, 2003, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the morning of March 3, 2003, a group of AUC paramilitaries arrived at Gil Roberto Castaneda Murcia's farm in Agustin, Codazzi, Cesar.   The paramilitaries loaded a large number of cattle into their vehicles and stole them. The paramilitaries forced Gil Roberto Castaneda Murcia into their vehicle and drove away, kidnapping him. Gil Roberto Castaneda Murcia's body was found a

short drive away from the farm. Gil Roberto Castaneda Murcia had been shot twice in the head and once in the back. Following the murder, Maria Sureya Suescun Botello received death threats from the AUC paramilitaries, forcing her to abandon her claim to Gil Roberto Castaneda Murcia's farm in Agustin, Codazzi, Cesar.

48.     Edilma Isabel Torres Ozuna is the mother and legal representative of the Estate of Pedro Miguel Rodriguez Torres under the laws of Colombia, and is also a legal heir of Pedro Miguel Rodriguez Torres under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Pedro Miguel Rodriguez Torres. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages they suffered as a result of the execution of the decedent. Pedro Miguel Rodriguez Torres was murdered on or about May 6, 2003, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Pedro Miguel Rodriguez Torres on May 3, 2003, left his home in Valledupar, Cesar to do some errands with his uncle. The bodies of Pedro Miguel Rodriguez Torres and his uncle were found on May 6, 2003, in Loma Linda on the highway to Buenaventura. Pedro Miguel Rodriguez Torres had been shot twice in the neck and head. Pedro Miguel Rodriguez Torres' uncle had also been shot to death.

49.     Alba Luz Caballero Gomez is the domestic partner and legal

34

representative of the Estate of Jairo de Jesus Ponzon Rua under the laws of Colombia, and is also a legal heir to Jairo de Jesus Ponzon Rua under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Jairo de Jesus Ponzon Rua. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On January 26, 1997, Jairo de Jesus Ponzon Rua was killed by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Ponzon worked as a security supervisor for the company Odebrecht, a Drummond contractor hired to do maintenance on the railroad. On the day Mr. Ponzon was killed, he was patrolling his usual route from Aracataca to La Loma de Potrerillo. He never came back and his body was found in la Loma del Balsamo, Fundacion. Soon before his death, a group of paramilitaries had threatened him, indicating that he should quit his job, but he refused.

50.     Amparo De Jesus Florez Torres is the domestic partner and legal representative of the Estate of Engelver Garcia Pallares under the laws of Colombia, and is also a legal heir to Engelver Garcia Pallares under the laws of Colombia.   J.A.G.F., born in 1996, is Engelver Garcia Pallares and Amparo De Jesus Florez Torres's son, and is also a legal heir under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein

are all wrongful death beneficiaries of Engelver Garcia Pallares. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Engelver Garcia Pallares was killed on September 3, 1999, on the highway going from Codazzi to the township of Cuatro Vientos, Cesar, Colombia by the AUC Northern Block, which received knowing and substantial assistance from Drummond.

51.    Luz Marina Pacheco Cantillo is the wife and legal representative of the Estate of Armando Mejia Daza under the laws of Colombia, and is also a legal heir of Armando Mejia Daza under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Armando Mejia Daza. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Armando Mejia Daza was murdered on April 19, 1999, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. On the morning of April 19, 1999, Armando Mejia Daza was in the store he ran out of his home in Caracolicito, Copey, Cesar when a pickup truck with AUC paramilitaries aboard arrived. The paramilitaries entered the store and shot Armando Mejia Daza several times, killing him. The paramilitaries then stole a number of Armando Mejia Daza's commercial goods and fled.

52.    Merilsa Francisca Daza Amaya is the domestic partner and legal representative of the Estate of Marcos Jose Padilla Rodriguez under the laws of Colombia, and is also a legal heir to Marcos Jose Padilla Rodriguez under the laws of Colombia. Jhon Alfer Padilla Daza, Marcos Jose Padilla Daza, Gicela Margarita Padilla Daza, Adriana Cristina Padilla Daza and Yarlenys Rosmira Padilla Daza are Marcos Jose Padilla Rodriguez' children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Marcos Jose Padilla Rodriguez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Marcos Jose Padilla Rodriguez was killed on November 23, 2003, by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Padilla was working at his bar in Valledupar, when two paramilitaries arrived. They ordered a drink and then shot Mr. Padilla, killing him instantly. On January 21, 2004, the municipal deputy of Valledupar issued a statement certifying that Marcos Jose Padilla Rodriguez was killed for ideological and political reasons in the context of the internal armed conflict.

53.    Carmen Inelma is the mother and legal representative of the Estate of Aroldo Enrique Campo Medina under the laws of Colombia, and is also a legal

heir to Aroldo Enrique Campo Medina under the laws of Colombia. Alfredo Campo Medina and Ana Cristina Campo Medina are Aroldo Enrique Campo Medina's siblings, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Aroldo Enrique Campo Medina. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Aroldo Enrique Campos Medina was killed on January 29, 2007, in Chiriguana, Cesar by remnants of the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Campo left a friend's house and was heading home, when he was intercepted by a paramilitary who shot and killed him on the spot.

## B. Defendants

54.    Defendant DCI is a for-profit corporation incorporated in Alabama that is engaged primarily in the mining and shipment of coal. It is a closely-held corporation owned by the Drummond family, and is controlled in its day-to-day operations by Defendant Garry N. Drummond. Its principal place of business is located at 1000 Urban Center Dr., Birmingham, Alabama 35242-2532. Among other places, DCI owns and operates a large coal mine, rail line and port in Colombia, South America. The operations in Colombia are financed and managed

from the Alabama headquarters of DCI, and the profits from the Colombia operations revert to DCI.

55.    Defendant DLTD is an Alabama company, and has its principal place of business at 530 Beacon Parkway, Birmingham, Alabama 35209. It is wholly-owned by DCI. DLTD manages the day-to-day operations of the Drummond coal operations in Colombia, but is at all times operating under the complete ownership, direction and control of Defendant DCI. Fully aware of the violence in Colombia, particularly anti-union violence, and the absolute impunity afforded to the perpetrators of such violence in Colombia, DCI created DLTD for the sole purpose of operating the Colombian mines for the sole benefit of DCI while also attempting to shield DCI from liability for any and all tortious conduct committed by the management of these mines. The creation of DLTD was a sham done for the aforesaid unlawful purpose.

56.    Defendant DUSA is a for-profit corporation incorporated in Alabama. Its principal place of business and/or registered address is 1000 Urban Center Dr., Birmingham, Alabama 35242. DUSA is the general partner of DLTD. DUSA is an indirect wholly-owned subsidiary of DCI, and DCI created and used its wholly owned subsidiary, Drummond Coal Sales, to create DUSA. DUSA and its officers and directors, jointly with DCI, operate, direct and control the day-to-day

operations of Defendant DLTD in Colombia. Fully aware of the violence in Colombia, particularly anti-union violence, and the absolute impunity afforded to the perpetrators of such violence in Colombia, DCI created DUSA for the sole purpose of serving as the general partner of DLTD, which operated the Colombian mines for the sole benefit of DCI, while also attempting to shield DCI from liability for any and all tortious conduct committed by the management of these mines. The creation of DUSA was a sham done for the aforesaid unlawful purpose.

57. Defendant Garry Drummond is the Chairman and Chief Executive Officer of DCI. He is a resident of the State of Alabama. He personally approved the plan proposed by Adkins and others to have Drummond provide material support to the AUC so that the AUC would drive the FARC and other guerrilla groups out of the areas of Drummond's operation in Colombia. Defendant Drummond received regular visits from Adkins, often on a monthly basis, in which Adkins briefed him on all security issues, including the progress of the AUC's efforts on behalf of Drummond to drive the guerrilla groups out of the areas of Drummond's operations. Defendant Drummond also made frequent trips to Colombia and was able to observe first-hand the presence of the AUC around the Drummond facilities, and he was briefed by Adkins and others as to all aspects of security in the areas around Drummond's Colombian operations.

58.     James Adkins (who is not named as a defendant in this Complaint) was the Director of Security for Drummond's operations in Colombia. Hired by Drummond from the CIA, Adkins had full knowledge of the terrorist activities of Colombian paramilitary groups at the time he was hired. Adkins reported to both Defendant Garry Drummond and Defendant Mike Tracy, as well as other Alabama-based Drummond officers, including Augusto Jimenez, President of Defendant DLTD. On behalf of the Drummond Defendants, Adkins approved the payments to the AUC and its predecessor paramilitary groups as described herein. During his years of service for Drummond, between 1995-2002, Adkins traveled to Alabama every 4-6 weeks to brief Defendant Garry Drummond, Defendant Mike Tracy, and other Drummond officials on security issues, including Drummond's support for the AUC. Adkins regularly told the AUC leaders and their intermediaries that he went to Alabama regularly to brief Defendant Garry Drummond and obtain his consent to key strategic issues, including providing support to the AUC. Adkins obtained consent in Alabama from Defendant Garry Drummond to provide substantial support to the AUC.

59. At all times relevant to the allegations herein, Defendant Mike Tracy was an executive at DCI or DLTD. Defendant Tracy oversaw the start-up of operations for Drummond's mine in Colombia. Defendant Tracy was in charge of all aspects

of the Drummond mining operation in Colombia and reported directly to Defendant Garry Drummond. Defendant Tracy was fully briefed by Adkins of the agreements made with the AUC, and he approved of Drummond's direct collaboration with the AUC terrorists. On numerous occasions, Defendant Tracy himself met with AUC commanders to discuss the status of the AUC's work on Drummond's behalf. He also socialized with known paramilitaries when he was in Colombia.

60.    At all times relevant to the allegations herein, Augusto Jimenez (who is not named as a defendant in this Complaint) was President of DLTD.   Jimenez was a direct participant in Drummond's plan to make significant payments to the AUC, and he personally participated in arranging payments from security contractor Secolda to the AUC.   Jimenez was directly involved in security issues, including obtaining assistance from the Colombian military for the Drummond operations and bringing in private security firms that had direct links to the AUC. Jimenez reported directly to Defendant Garry Drummond.   Jimenez was fully briefed by Adkins of the agreements made with the AUC, and he approved of Drummond's direct collaboration with the AUC terrorists. On numerous occasions, Jimenez met with representatives of the AUC, including Jaime Blanco Maya, who acted as a liaison between the AUC and Drummond.

42

61.     Defendant DCI is jointly and severally liable for all of the tortious actions committed when its alter ego and/or agent, DLTD, acts in concert with any other person or entity in furtherance of DCI's business interests and activities.

62.     Defendant DUSA is directly liable for its own tortious conduct, and is jointly and severally liable for all of the tortious actions committed when its limited partner, alter ego and/or agent, DLTD, acts in concert with any other person or entity in furtherance of its business interests and activities.

63.     The AUC paramilitary forces that murdered all of the decedents referenced herein were acting within the course and scope of a business relationship with Defendants with the advance knowledge, acquiescence or subsequent ratification of Defendants.

64.     Individual Defendants Tracy and Drummond are liable under a superior responsibility theory. Although Plaintiffs' current allegations adequately allege such a theory, Defendants previously ignored similar allegations and improperly characterized superior responsibility as a "new theory of liability" during summary judgment briefing. *See* Case 2:09-cv-01041-RDP, Doc. No. 425 at 2. To remove any doubt, Plaintiffs expressly state that they seek to hold the following Defendants liable in relation to wrongdoing committed by the following persons under their effective control:  Defendant Tracy for Adkins and Defendant

Garry Drummond for Jimenez, Adkins, and Blanco.

## V.   FACTS CONCERNING THE CIVIL CONFLICT IN COLOMBIA AND THE GOVERNMENT OF COLOMBIA'S DIRECT RELATIONSHIP WITH THE AUC

65.     Colombia is widely-known as a country that is torn by a long-standing civil war involving armed leftist groups, primarily the FARC on the one side, and the Colombian military and the AUC on the other. Other leftist guerilla groups active in 1995-96 when the paramilitary groups began consolidating include the National Liberation Army ("ELN").

66.     The AUC, officially formed in late 1996 by Carlos Castaño as an umbrella group to consolidate the various paramilitary groups into one major force to defeat the FARC, was created by Colombian landowners, military officers and politicians for the purpose of serving as a brutal military unit to engage and defeat the leftist guerilla groups that had formed to overthrow the Government of Colombia. The main such group, the FARC, had been successful in its military campaigns of the early to mid-1990s and controlled large areas of Uraba, Magdalena and Cesar Provinces. These areas under FARC control were among the most valuable in Colombia, as Uraba and Magdalena were the primary banana-growing regions of Colombia, and Cesar had significant natural resources,

particularly coal.

67.    There never has been a question that the regular military in Colombia, and the civil government authorities, tolerated the paramilitaries, allowed them to operate, and often cooperated with them. Recent testimony of AUC leaders in custody under the Justice and Peace process makes this connection even more explicit – the government of Colombia worked with the leaders of the AUC to create the AUC as an informal special unit of the military for the purpose of using brutal tactics that the regular military was not permitted to use under the Geneva Conventions and other laws governing the conduct of war.

68.    Many current and former political leaders in Colombia were directly involved in establishing the right-wing paramilitary groups in Colombia which later joined under the one umbrella of the AUC. Indeed, in 1996, former Colombian President Alvaro Uribe was the governor of Antioquia and was instrumental in the creation of one of the first paramilitary groups in Colombia.

69.    The sole purpose of creating the AUC was to have a military organization that was capable and willing to use extreme violence and brutal means to defeat the FARC and drive it out of the areas where it was interfering with important business interests in Colombia. The regular Colombian military was ineffective in dealing with the FARC. There are a number of documented reasons

for this. Most military observers agree that the leadership of the Colombian military, drawn from the elites of Colombia, were simply unwilling to risk life and limb to engage a ferocious guerilla group like the FARC. The AUC's mission was to "out guerilla the guerillas" as one former U.S. military advisor to the Colombian army put it. The AUC was expected to use terror and violence to defeat the FARC.

70.     The initial supporters of the AUC in the private sector were wealthy Colombian landowners who had been victims of the FARC's violence. For example, former Colombian President Uribe's family owned a large farm. Uribe's father was executed by the FARC, and the family plantation was crippled by the FARC's violent attacks in the area. Likewise, Raul Hasbun's family owned and operated a banana plantation in Uraba. When Hasbun's father was killed by the FARC, he not only organized his community to support the AUC, he himself became a commander in the AUC, using the *nom de guerre* Pedro Bonito.

71.     The AUC, including the Northern Block units directly involved in the wrongful acts alleged herein, was created based on official sanction of the Government of Colombia. In 1994, as a way for the Colombian government to create a legal mechanism to fund the AUC, it passed Decree 356, which established the "Special Vigilance and Private Security Services." This decree laid the foundation for the creation of the Convivir groups, officially launched in

1995 through Resolution 368. The Convivir groups were comprised of civilians who petitioned the government for a license to "provide their own security. . . in areas of high risk or in the public interest, which requires a high level of security." Defense Ministry, Decree 356, República de Colombia, February 11, 1994, pp. 19-20; and Resolution 368, April 27, 1995.

72.     When former Colombian President Uribe was still the Governor of Antioquia he implemented the plan to establish the government-registered front groups called "Convivirs" to allow the AUC to collect government and private funds to support the military activities of the AUC. Further, the Convivirs provided legal status to the AUC and allowed the Colombian government to coordinate activities with it.

73.     The AUC's predecessor paramilitary groups established at least 14 Convivirs in 1995-96 that were "legal" entities under Colombian law that served as fronts for the paramilitaries. Landowners and private companies made payments to these Convivirs based on geographic region. 100% of the funds collected were used by the paramilitaries for arms, supplies and other necessities in the paramilitaries' military campaign against the FARC. The Colombian military also helped raise funds for the AUC, approaching private companies, including Drummond, to make contributions to the Convivirs that were fronts for the AUC

and/or its predecessor organizations. Further, Colombian military officers met regularly with the leaders of the Convivirs to coordinate military operations and share intelligence. The Convivir leaders were in all cases paramilitary commanders. All of these arrangements are documented by the Human Rights Watch Report, *War Without Quarter: Colombia and International Humanitarian Law* (1998).

74.    As a result of the Convivir structure, as well as the fact that most of the AUC members had been in the Colombian military, the AUC had a close, mutually-beneficial, symbiotic relationship with the Colombian military.   As reported by Human Rights Watch, 78% of the murders in Colombia from October 1999 to March 2000 were attributable to the paramilitaries.   The Human Rights Watch investigators found "detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations."

75.    The facts supporting the ongoing symbiotic relationship between the military and paramilitaries in Colombia include active and retired military who actually set up paramilitary units, the military who provide the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries who conduct missions at the request of the military.

76.     The   close,   symbiotic   relationship   between   the   military   and paramilitaries   in   Colombia   is   so   widely   acknowledged   that   the   U.S.   State Department confirms this fact without reservation:

> Credible   allegations   of   cooperation   with   paramilitary   groups, including instances of both silent support and direct collaboration by members   of   the   public   security   forces,   in   particular   the   army, continued.   Evidence   suggests   that   there   were   tacit   arrangements between local military commanders and paramilitary groups in some regions, and paramilitary forces operated freely in some areas that were under military control or despite a significant military presence. Individual members of the security forces actively collaborated with members of paramilitary groups – passing them through roadblocks, sharing intelligence, providing them with ammunition, and allegedly even joining their ranks while off-duty.

77.     In the February 28, 2002, Report of the UN High Commissioner for Human Rights on the human rights situation in Colombia ("UNHCR Report"), the UN High Commission explains that the links between the paramilitaries and the State continue and indeed are intensifying.   As the UNHCR Report explains:

> During   2001,   the   Office   continued   to   observe   that   paramilitary
>
> activity   was   strengthening   and   spreading   throughout   much   of   the
>
> country's territory. ... Toleration, support and complicity on the part of
>
> public servants, as well as non-fulfillment of their duty to safeguard
>
> rights, with respect to several acts by these groups, means that the
>
> State continues to bear responsibility.

78.    The UNHCR Report further relates that "the growth in paramilitary activity has been aided by the State's inaction or slow reaction in preventing the formation of illegal armed groups, and in keeping new territories from falling into the de facto control of these organizations."   Finally, the UNHCR explains that the growth in paramilitary control and violence has been assisted by the impunity which human rights violators receive in the Colombian judicial system. Thus, the UNHCR states that, throughout 2001, it "continued to receive troubling reports of ties between members of the security forces and elements of the paramilitary groups. The existence of pending criminal and disciplinary investigations of members of the security forces shows how widespread these relationships are. However, the investigations have not led to any determination of responsibility or the application of relevant sentences and punishments to ensure that these acts do not benefit from impunity."

79.    The UNHCR reached the very same conclusions in its March 18, 2003, report, stating that there remains "open collusion" on the part of Colombian security forces with paramilitaries and that there is continued "expansion and consolidation of paramilitaries in several areas."

80.    Further, in *Country Reports on Human Rights Practices – Colombia* (March, 2002), the U. S. State Department, which had in September 2001

designated the AUC, the chief and largest paramilitary group as a "terrorist" group, continued to conclude that "in some locations elements of the state security forces tolerated or even collaborated with paramilitary forces." The State Department reached this same conclusion in its Report of March 31, 2003, stating that "[s]ome members of the security forces collaborated with paramilitary groups that committed serious abuses."

81.   For a number of years, the location in which Defendants operate in Colombia, the Cesar Province, has been one of these locations where the collaboration between the state security forces and the paramilitary forces is especially keen. Thus, Amnesty International has reported that it "has been increasingly concerned by the escalation in human rights violations carried out in the Department of Cesar by members of the security forces and paramilitary allied to them.   'Disappearances,' extrajudicial executions and other human rights violations continue to be reported as the security forces have increased their presence and paramilitary organizations have been set up and consolidated in the region, sometimes with the support of powerful economic interests." Indeed, Drummond allowed its vast property around its coal mine to serve as a joint base for the military and AUC in that area, and there was frequent collaboration between the military and the AUC due to Drummond's provision of a safe haven

for the AUC.

82.     Amnesty International, in specifically describing the human rights situation in the Cesar Province – the area in which the acts described herein took place – explains that "[t]he systematic violation of human rights against members of popular organizations. . .in the department of Cesar corresponds to a national strategy of undermining organizations which the [state] security forces deem to be subversive." Amnesty International further finds that "[m]any violations of human rights in the [Cesar] region are committed in order to advance and protect the interests of economically powerful sectors. Labeling anyone who dares to challenge the interests of powerful economic sectors as subversive. . .and then targeting them for human rights violations provides a means for those sectors to protect their interests." Recently, the UNHCR has confirmed this assessment of Amnesty International, noting in the same breath that "members of paramilitary groups have been blamed for most of the [ ] violent deaths" suffered by trade unionists and that Cesar is one of "[t]he departments most affected by anti-union violence. . ."

83.     As a consequence of the official vilification of "leftists" and "guerilla sympathizers" by the Colombian government, this served as an open invitation to paramilitaries to target innocent civilians living in areas where there was a FARC

presence with violence. Indeed, Rafael Garcia, a former DAS official, has stated under oath that the DAS worked closely with the AUC, that as a DAS official he witnessed Drummond making payments to the AUC to murder the union leaders at Drummond, and that he personally, while a DAS official also served as the political adviser for the AUC paramilitaries and also acted as liaison between DAS Director Jorge Noguera and AUC Northern Block leader, Jorge 40. He specifically stated under oath that "the AUC and the DAS worked closely together to further their joint mission of ridding Colombia of leftist guerillas."

84.     From late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC, using tactics of terror on civilians living in and around areas that had been under FARC control, assumed that these innocents were sympathetic to the FARC and systematically murdered thousands of them. The AUC became known for using chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerillas in their villages.

85.     On September 5, 2001, the U.S. Department of State designated the

AUC a terrorist organization. *See* 66 Fed. Reg. 47,054. This designation was based on the acts of the AUC from 1996-2001 in which it used extreme violence to terrorize innocent civilians and ensure that they did not sympathize with the FARC.

86.     The fact that the Colombian military and government had a major role in the formation and financing of the AUC's predecessor paramilitary groups is conclusively established by the September 13, 1995, memo of Adkins to Defendant Tracy. Adkins reported to Tracy that the Cordoba Battalion Commander of the Colombian military visited him to request funds from Drummond to support the formation of a paramilitary group under the Colombian government's Convivir program to combat the guerillas. At that time, Adkins concluded, correctly, that it would be illegal for Drummond to make such a contribution.

## VI.     DRUMMOND'S ROLE IN CREATING AND SUPPORTING THE AUC AND ITS WAR ON THE FARC

87.     The Drummond Defendants have a personal and direct connection to the origin of the AUC. Alfredo Araujo, Drummond's Director of Community Relations, was a close friend since childhood of Rodrigo Tovar Pupo, alias Jorge 40, who was one of the original founders of the AUC along with Carlos Castaño and Salvatore Mancuso. Several of Araujo's close relatives joined Jorge 40 as

active members of the AUC. Three close family members of Araujo, his cousin, Hernando Molina Araujo, a former governor of Cesar Province, another cousin, Alvaro Araujo Castor, a former Senator, and his uncle, Alvaro Araujo Noguera, a former Minister of Agriculture, are in jail for their participation in and support for the AUC. Araujo used his family relationship and connection to Jorge 40 to make arrangements for Drummond to make substantial payments to the AUC. Araujo made the plan with Jorge 40. He then used his position in the company to get Jimenez and others to agree to the plan to make substantial payments to the AUC. Araujo, on behalf of Drummond, shared with AUC the goal of eradicating the FARC and other leftist guerillas and prevailing in the ongoing civil conflict.

88.     Araujo was also a friend of Jaime Blanco Maya, who had close ties to both the AUC and to the government. Araujo helped to bring Blanco into the Drummond fold by awarding his company, ISA, the food concession for the workers at the Drummond mine. Blanco was close friends with Oscar Jose Ospino Pacheco, alias "Tolemaida", one of the AUC Northern Block's top commanders under Jorge 40. At the same time, Blanco's half-brother, Edgardo Maya, was until recently the Government of Colombia's Inspector General. He is now in prison for his ties to the AUC.

89.     While Carlos Castaño is either dead or disappeared, the other two

AUC founders, Salvatore Mancuso and Jorge 40, both now in prison in the United States and awaiting trial on drug trafficking charges, have stated that Drummond was one of the U.S. multinationals that provided substantial support to the AUC that allowed it to buy arms and equipment and join the war effort to defeat the FARC. The other major companies that Mancuso and Jorge 40 have mentioned as major initial supporters of the AUC are Chiquita Brands International and Dole Foods, Inc.

90.   In 2007, after years of denials and coverups, Chiquita pled guilty to a federal felony of providing material support to a terrorist organization. In its factual proffer to the Justice Department, attached hereto as Exhibit A, Chiquita admitted that it was a financial founder of the AUC and made regular payments to the AUC from 1996-2004, when a self-reporting member of the board of directors informed the Justice Department of Chiquita's payments to the AUC, a designated terrorist organization. This is a rare glimpse into the world of the relationship between the AUC and U.S. multinationals. Chiquita confirmed that it made its payments to a Convivir set up as a front for the AUC.

91.   The Drummond Defendants provided support to the AUC well beyond what Chiquita provided, and are equally guilty of providing knowing and substantial support to a terrorist organization. As is described in ¶¶ 133-136, *infra*,

Drummond provided millions of dollars to the AUC to support its war with the FARC, and Drummond established, equipped, supported, and directed the AUC's Northern Block in its actions in engaging the FARC in the towns along Drummond's 120-mile railroad line from its mine in La Loma to "Puerto Drummond" in Santa Marta. Drummond became a major supporter of the AUC war effort to defeat the FARC and provided the support from approximately 1997 to 2006, when the AUC formally began a demobilization following its efforts to destroy and contain the FARC were largely successful.   Specifically, Drummond began paying the AUC through Jaime Blanco no later than early 1997.   When Adkins brought Garry Drummond the idea, Garry Drummond agreed to make payments to the AUC.   The payments were first made by Adkins bringing cash payments of $10,000 from Alabama.   Blanco would deliver the cash payments from Adkins to the AUC.   After some time, Adkins and Blanco developed another scheme to funnel money to the AUC through Blanco.   Blanco would use inflated invoices for services provided to Drummond, and he would provide the overage to the AUC.   The evidence of the Drummond Defendants' support dating back to approximately 1997 was not available at the time prior related actions were filed.   While the Drummond Defendants used other methods to provide support to the AUC during the relevant time period, they relied on Blanco as described above.

# VII.   CAUSES OF ACTION

### First Cause of Action

**The Alien Tort Claims Act, 28 U.S.C. § 1350 – War Crimes**
**The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were War Crimes, and Defendants Aided and Abetted or Conspired With the AUC, or the AUC Was Defendants' Agent**

### All Plaintiffs Against All Defendants

92.    Plaintiffs incorporate by reference paragraphs 1 through 91 of this Complaint as is set forth herein.

### The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were War Crimes

93.    The Colombian military was not able to effectively address the uprising of the FARC, so as previously alleged, the Colombian government facilitated the creation and funding of the AUC for the sole purpose of using this unofficial force to defeat the FARC. As one high commander of the AUC told Plaintiffs' representatives, "the Colombian military felt itself bound to the Geneva Conventions. The AUC was not."

94.    The extreme brutality practiced by the AUC that earned it the terrorist moniker by the U.S. Department of State was from the outset a planned strategy to effectively confront and defeat the FARC.

95.     Article 3 of the Geneva Convention, which applies to "an armed conflict not of an international character," applies to the civil conflict in Colombia. Thus, noncombatants to the Colombian civil war, including the Plaintiffs' decedents, are covered, and the war crimes committed by any parties to the conflict, including the AUC, are actionable under the ATS.

96.     The three elements of "war crimes" are well-established and not in dispute. The elements are:

(1) that there was an armed conflict;

(2) that the AUC and the FARC were parties to the conflict; and

(3) that Plaintiffs were killed in the "course of hostilities."

97.     *As to the first element*, there is no dispute that Colombia has been devastated by a raging civil conflict since the early 1990's. This has been widely documented and has never been disputed in this or any other case. For example, the 1997 State Department Human Rights Report notes that the Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *Id.* at 1.   As AUC Commander Carlos Tijeras described the nature of the conflict in a sworn statement, "at the time I was acting as Commander of the William Rivas Front I was a major participant in a civil war that was being fought over the future

direction of my country. I was on the side of democracy and capitalism and we were fighting communists and guerillas."

98.     *As to the second element*, once the AUC consolidated the various paramilitary groups in late 1996 under the leadership of Carlos Castaño, the AUC became the most visible armed opposition to the FARC, which, by late 1996, had become the prominent leftist rebel group. As previously alleged, *see* ¶¶ 65-86 *supra*, acting in the place of the Colombian military, the AUC directly engaged the FARC in an extremely brutal and violent struggle that left thousands of innocent civilians dead, displaced and terrorized. *See generally* R. Kirk, *More Terrible Than Death: Massacres, Drugs, and America's War in Colombia* (2003); S. Dudley, *Walking Ghosts: Murder and Guerilla Politics in Colombia* (2006).

99.     *As to the third and final element*, all of the violent acts against civilians alleged herein occurred in the "course of hostilities." All of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold. These areas included Cesar [where Drummond's mine is located] and Magdalena [where Drummond's port is located] Provinces. In these areas, the AUC pursued a scorched earth policy of first driving the FARC out and then brutally murdering and torturing people who lived in these areas and were assumed by the AUC to be sympathetic to the

FARC. As Jose Gregorio Mangones Lugo, alias "Carlos Tijeras," who was an AUC commander in Magdalena where Drummond's port is located, stated,   "we not only drove the guerilla groups out of the area, but our tactics made sure the local people would never entertain the idea of supporting or joining the guerillas. We made clear with our actions that anyone who supported the FARC was our enemy and would be dealt with accordingly."

100.   The AUC used extremely violent means to take back areas held by the FARC and used tactics of violence and terror to depopulate areas of innocent civilians merely because the AUC presumed that civilians in areas previously held by the FARC were sympathetic to the leftist guerillas. This military tactic is documented by the U.S. Department of State. For example, the 1997 State Department Report noted that "[t]he many paramilitary groups took the offensive against the guerillas, often perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base . . . ***An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerilla support***, was the primary cause of the growing internal displacement problem." *Id.* at 2 (emphasis added).

101.   As the U.S. Department of State reported in 1999:

Paramilitary groups and guerillas were responsible for the vast majority of political and extrajudicial killings during the year. **Throughout the country,**

**paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerillas in an <u>orchestrated campaign</u> to terrorize them into fleeing their homes, thereby depriving guerillas of civilian support. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerilla control**.

1999 State Department Report at 2 (emphasis added).

102.   These consistent and reliable reports by the State Department of the AUC's tactics in terrorizing villagers are exactly what happened in this case when the AUC attacked the villages where Plaintiffs reside and Plaintiffs' decedents were executed.

103.   According to Jhon Jairo Esquivel Cuadrado, alias "El Tigre," the commander of the Juan Andres Alvarez Front from 1996-2000, prior to November 1999, the Juan Andres Alvarez Front was operating in the municipalities of Bosconia, El Paso, La Jagua de Ibirico, Becerril, Agustín Codazzi, San Diego, La Paz, and Chiriguaná, which are the major towns in Cesar along the route of Drummond's rail line. As El Tigre stated, "the AUC was there because these were known FARC strongholds, and the AUC's mission was to eradicate the FARC wherever we found it."

104.   El Tigre has further stated that as the commander of the Juan Andres Alvarez Front of the AUC, he viewed the towns along the Drummond rail line as important strategic areas for the FARC as the populations in those areas had been

providing housing, supplies and recruits to the FARC. In his words, "the AUC had every intention of attacking these areas and using our methods to make sure that the people in these areas would never again support the FARC. Drummond's ultimate decision in November, 1999 to provide the AUC's Juan Andres Alvarez Front substantial payments allowed us to have more arms and men when we attacked these areas."

105.   El Tigre further stated that "I have reviewed the facts of what happened to those who were killed as described in Plaintiffs' Complaint that was filed on May 19, 2009. While many of those events occurred after I was captured by police on July 19, 2000 and taken out of service with the AUC, the places that are described are areas that were FARC strongholds and that we had targeted for attack. The violent acts that are described are typical of what we in the AUC did to ensure that villagers would not provide any form of support to the FARC. While I was commander of the Juan Andres Alvarez Front we infiltrated the communities where the FARC had a presence, identified persons we suspected of being guerillas and then hunted them down and killed them. We used brutal methods to ensure that the survivors would be clear that if they assisted the FARC in any way, a brutal death would be their fate. Drummond's support for our Front and the Northern Block did not change our military targets or methods, but did prioritize the order

and timing of the areas we targeted, and of course, allowed us to be more effective because Drummond's funds provided us with more men, arms and supplies. Based on Drummond's direction to us, mainly provided through Alfredo Araujo, we prioritized our operations to have a major focus on the towns along Drummond's rail line where we had information that the FARC was operating or had supporters."

106.    Alcides Manuel Mattos Tabares, alias "Samario", was from mid 2000 until May 2002 the chief of security for Oscar Jose Ospino Pacheco, alias "Tolemaida," who in July, 2000, replaced El Tigre as the Commander of the Juan Andres Alvarez Front. Samario was jailed from May-December, 2002, and when released, was made the third Commander of the Front and was in charge of "urban people," the AUC's term for hit men. As the person directly responsible for processing orders to execute people from December 2002 until April 9, 2005, when he again went to prison, Samario had full knowledge of the targets and the reasons for executions carried out by the AUC's Juan Andres Alvarez Front. Samario, consistent with the assertions of El Tigre, has stated that the Front focused a lot of its operations against the FARC in the areas around Drummond's rail line in Cesar, particularly in the municipalities of Bosconia, El Paso, La Jagua de Ibirico, Becerril, Agustín Codazzi, San Diego, La Paz, and Chiriguaná. This

was, according to Samario, "because the FARC was very successful in these areas and this is where we had to fight them and root out their supporters." Further, Samario stated that, "every execution order that passed through my hands was to kill someone we thought was a member or supporter of the FARC, or we thought was a leftist guerilla who was on the same side of the war as the FARC. Sometimes others were killed in villages when we went after our targets because they were in the way, or we needed to make a strong example to the people. Even the unionists we killed for Drummond [discussed in ¶¶ 140-141, 155-161, *infra*] we killed because Alfredo Araujo Castro, who had an important position with Drummond, told Tolemaida and me they were leftist guerillas who were helping the FARC."

107.   Samario also is on record stating that "any executions that occurred after December 2002 most certainly would have been ordered by my superiors and then implemented by me and my men. We worked in all of the towns that were along the Drummond rail corridor because they were FARC areas. We killed people in these areas because they were with the FARC or we believed they supported the FARC, our enemy. Our methods of killing were intended by us to ensure that everyone was clear that we would be back and do the same to them if they assisted the FARC. Drummond's major support for the Juan Andres Alvarez Front did not alter in any way our mission or the areas we needed to operate,

because that was determined by where FARC had established a foothold. Drummond's direction and support to us did require that we prioritize our resources and focus our efforts on the towns along the Drummond rail line in Cesar, but for us this was consistent with our mission because we were pursuing the FARC and its supporters in these areas. When I've said we provided 'security' for Drummond, this means that we were fighting our military enemy, the FARC, that viewed Drummond and other wealthy companies as legitimate military targets. In my view, the FARC came to these areas because Drummond was there, and we then came to fight the FARC where it was based. Drummond's support was essential to our military success because we added at least 165 fully-equipped men to the Front and supported them with food and supplies with the funds Drummond provided us."

108.   Based on the statements of El Tigre and Samario, as well as other AUC leaders who have testified in the Justice and Peace process in Colombia or have otherwise given statements, all of the people killed by the AUC in the area of Drummond's rail line in Cesar were executed as suspected FARC members or supporters and thus were killed in the "course of hostilities."

109.   While none of Plaintiffs' decedents were with the FARC or provided it with support, merely being suspected of either by the AUC was enough to get

them killed. All of the Plaintiffs' decedents were merely innocent civilians executed in the course of the conflict between the AUC and the FARC. There has never been any evidence or credible assertion after any of their deaths that any of Plaintiffs' decedents were members or supporters of the FARC.

110.   Both El Tigre and Samario have stated that they are confessing the murders they had a role in as part of the Justice and Peace process, and that every person killed by them and their associates in the AUC was a military target when the AUC attacked FARC strongholds. This includes the Plaintiffs' decedents, all of whom were killed in villages in the areas where the leaders of the Northern Block of the AUC have stated they conducted operations to defeat the FARC and its supporters.

111.   All of the Plaintiffs' decedents herein were killed by the AUC's Northern Block while it was receiving knowing and substantial support from Drummond. The Justice and Peace process is ongoing, but all of the Plaintiffs' decedents have either been officially declared to be a civilian victim of the civil conflict, or they were in fact killed during the course of the civil conflict. By definition, war crimes include the executions of innocent civilians who are in the area of a civil conflict, regardless of whether the perpetrators intended to target the specific individuals who were killed.

## Drummond Aided and Abetted the AUC's War Crimes

112.    Citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp. 2d 633, 668 (S.D. N.Y. 2006), the Court in *Balcero* held that the standard for aiding and abetting is "(1) the principal violated international law; (2) the defendant knew of the specific violation; (3) the defendant acted with the intent to assist that violation – that is, the defendant specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal venture; and (5) the defendant was aware that his acts assisted the specific violation."[1]  *Balcero* Order at 17.

113.    ***As to the first element***, Plaintiffs have established in ¶¶ 93-111, *supra*, that the AUC, the principal, violated international law by engaging in war crimes.

---

[1]    Although Plaintiffs address herein the higher standard adopted by *Balcero*, their position is that the binding standard for aiding and abetting was stated by the Eleventh Circuit in *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005) as: (1) "one or more of the wrongful acts that comprise the claim were committed," (2) the Defendants "substantially assisted some person or persons who personally committed or caused one or more of the wrongful acts that comprise the claim," and (3) Defendants "knew that [their] actions would assist in the illegal or wrongful activity at the time [they] provided the assistance." This test is virtually identical to that adopted by the RESTATEMENT (SECOND) OF TORTS, § 876(b). Further, under international law, a similar aiding and abetting standard of knowing, substantial assistance has been applied since at least the Nuremberg cases. *See, e.g., U. S. v.  Friedrich Flick*, 6 *Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10* (1952).

114. ***As to the second element***, Plaintiffs allege that the Drummond Defendants had actual knowledge of the AUC's specific war crimes violations. The AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent civilians living in areas under FARC control was well known in Colombia and was widely reported in the press in Colombia and the United States. In 1997, for example, the State Department Report noted that "[t]he many paramilitary groups took the offensive against the guerillas, often perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base . . . ***An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerilla support***, was the primary cause of the growing internal displacement problem." *Id.* at 2 (emphasis added).

115. In 1999, the State Department Report stated:

> Paramilitary groups and guerillas were responsible for the vast majority of political and extrajudicial killings during the year. **Throughout the country, paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerilas in an <u>orchestrated campaign</u> to terrorize them into fleeing their homes, thereby depriving guerilas of civilian support. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerilla control**.

1999 State Department Report at 2.

116. Early on, Araujo, acting as Drummond's primary contact with the AUC, had specific and detailed knowledge of the AUC's record of terror due to his

discussions with Jorge 40, Tolemaida, and Jaime Blanco, and other AUC leaders with whom he had a personal relationship.

117.   Early on, Adkins, in his capacity as director of security for Drummond and as a former CIA agent with extensive experience in Latin America including Colombia, had specific and detailed knowledge of the AUC's record of terror due to his review of all major reports of AUC atrocities, including U.S. State Department Human Rights Reports on Colombia, and his discussions with Jorge 40, Tolemaida, and Jaime Blanco, and other AUC leaders with whom he met. Further, he was briefed in regular meetings by Araujo, as well as the Colombian security officials employed by Drummond, including those described in ¶¶ 179-187, *infra*. Adkins regularly briefed Defendants Garry Drummond and Mike Tracy on the status and activities of the AUC in and around the Drummond facilities.

118.   Further, from 1995 on, Adkins, using personnel of his extensive and experienced security department, as well as his regular briefings with the military personnel based on the Drummond property, and through meetings with Alfredo Araujo, Jaime Blanco and others with direct links to the AUC's predecessor paramilitary groups, had detailed and extensive knowledge of the operations of the AUC, the FARC, other leftist guerilla groups, and the military. From 1995 on,

Adkins prepared detailed intelligence reports for Drummond, and he reported his findings to Drummond officers, including Augusto Jimenez, Defendant Mike Tracy and Defendant Garry Drummond. Thus, by 1997, around the time when Drummond made a formal arrangement with the AUC to provide substantial financial support to the Northern Block and the Juan Andres Alvarez Front, Drummond had specific and detailed knowledge of the AUC's brutal methods and tactics.

119.   As an example of Adkins' detailed knowledge that he communicated to other Drummond officials, in an August 10, 1995, report for Drummond, Adkins lists the towns along the Drummond rail route and provides details of guerilla attacks, identifies the 19th Front of the FARC as "a particular threat to Drummond," and lists the real names and the aliases of the leaders of the19th Front of the FARC. He also lists the names and some aliases for "ordinary combatants" of the 19th Front of the FARC. He lists also the weapons the 19th Front has as its disposal, communication equipment, and that the 19th Front is both a military unit and a political unit, "charged with recruiting and gaining sympathizers." This detailed knowledge only improved each year until Drummond made the formal decision to join the AUC to defeat the FARC, which had been succeeding in its mission of gaining sympathizers in the towns along Drummond's rail line.

120.   In his September 13, 1995, memo to Defendant Mike Tracy, Adkins expressly stated his knowledge of the tactics of the paramilitary group at the time it was forming. In declining at that time to provide support to the nascent paramilitary group, Adkins stated, "*such a program will bring with it egregious human rights violations that preclude Drummond from ever participating*." (emphasis added). When, by 1996 or early 1997, Drummond made the formal decision to join with the AUC in its war with the FARC, its leaders had specific knowledge of the tactics that would be employed by the AUC as it pursued the FARC in the towns along Drummond's rail lines. Defendant Mike Tracy approved the decision to formally engage the AUC.

121.   Early on, General (ret.) Rafael Peña Ríos, the head of local security for Drummond in Colombia, based on his past military experience and his own direct interactions with the AUC and its predecessor paramilitary organizations, had specific knowledge of the AUC's record of terror and its tactic of executing innocent civilians in areas of FARC influence as a way to discourage others from supporting the FARC. On at least one occasion, he told *El Tiempo* newspaper in Colombia that he, like the paramilitary groups, viewed trade unions and the leftist guerillas as one and the same thing, and he excused the violence of the right-wing paramilitaries as necessary to confront the guerillas.

122.   According to a June 28, 1995, Drummond report, "[t]here is no lack of resources for intelligence collection. Drummond has access to military and police reporting thanks mainly to General Peña."

123.   In November, 1999, the head of security at the Drummond mine was Colonel (ret.) Ricardo Lineros.   Based on his past military experience and his own direct interactions with the AUC and its predecessor paramilitary organizations, he had specific knowledge of the AUC's record of terror and its tactic of executing innocent civilians in areas of FARC influence as a way to discourage others from supporting the FARC. Colonel Lineros regularly met with and briefed Adkins and General Peña.

124.   According to Jairo Jesus Charris Castro, who was until March 1999, the Security Coordinator for Viginorte, the private security company used by Drummond in Colombia that also was a front group for the AUC, he regularly observed security meetings involving not only Adkins and Alfredo Araujo with General Peña and Colonel Lineros in 1998-99, but that Defendant Garry Drummond, the chief executive officer of Drummond, Defendant Mike Tracy, and Augusto Jimenez, among others, participated in security briefings that included discussions of the activities of the AUC and the FARC as they related to Drummond's areas of operation in Colombia.

125.   Even if Drummond was somehow ignorant of the AUC's record of extreme violence when it began funding the AUC on a large scale, after funding began, Adkins and Alfredo Araujo, on behalf of Drummond, closely monitored the AUC's actions and were fully aware of the violence that was done by the units directly supported by Drummond. They reported their observations in regular briefings to Jimenez, Defendant Tracy and Defendant Garry Drummond. Further, in September 2001, the AUC was formally and publicly designated a terrorist organization by the U.S. State Department. Drummond was aware of this designation and continued to fund the AUC until 2006, when the AUC formally demobilized. The violent events from 1996-2001 that led to the AUC's designation as a terrorist organization were widely reported and were certainly known to Drummond through Araujo and Adkins.

126.   Defendant Mike Tracy had his own contacts with AUC members. Between 1998-2000, he met with AUC representatives on several occasions at an apartment in Santa Marta that was in front of the Ecopetrol building. The apartment was on the 5th floor and it was rented from a Colombian named Mauricio Avellaneda. He also met with AUC commanders at the Drummond port area. AUC members were given free access to the Drummond port and were waived through the security gates by Drummond Security forces. Defendant Tracy was often there

74

and met with the AUC forces. Defendant Tracy also on numerous occasions had drinks with AUC members at a bar in Santa Marta called the Golden Mendihuaca Caribbean Resort. Tracy was known to enjoy a local drink made from Zapote juice, with no seeds, and very cold milk. During these informal meetings, Defendant Tracy would receive briefings from the AUC on the status of their security operations for Drummond.

127.   After the AUC was designated a terrorist organization, at least some of Drummond's payments were made to ISA, the food service company that served as a conduit for AUC funding with the assistance of Alfredo Araujo's close friend, Jaime Blanco. These funds were channeled to the AUC by Blanco. Drummond's payments to the AUC in cash and through front companies are direct evidence of Drummond's knowledge that it was paying for illegal activity. Drummond also, according to the Popa Battalion's commander Colonel Mejia, began channeling money to Colonel Mejia to distribute to the AUC as a way of hiding and legitimizing the payments.

128.   ***As to the third element***, when the Drummond Defendants entered into an arrangement to support the AUC, they acted with the intent to assist the AUC's war crimes. Drummond intended that, with its funds, the AUC would expand its war effort against the FARC and focus the AUC's military campaign in Cesar on

specific areas along the Drummond rail line where the FARC had a foothold. In doing so, as previously alleged, Drummond had specific knowledge that the AUC would commit war crimes, including extrajudicial killings, of innocent civilians, like Plaintiffs' decedents, who lived in and around the towns Drummond required the AUC to attack and pacify.

129.   The area of Drummond's coal mine was protected by a detachment of Colombian military that established a base on Drummond's property. Approximately 300 troops from La Popa Battalion, a military unit based in Valledupar in the province of Cesar, were permanently assigned to Drummond to guard its facilities from any attacks by the FARC. In addition, Drummond used a private security firm, Viginorte, which was a front group for the AUC but did provide security staff for Drummond's management personnel and to control access to its facilities. Further, Drummond had an extensive in-house security staff, including Adkins and General Peña. Drummond's main facilities and staff were thus protected by tight security. When Drummond made the decision to join with the AUC, it was for the same reason that the Colombian government allowed for and facilitated the formation of the AUC in the first instance – to pursue the FARC in the areas where it had support and destroy it using the same violent tactics that the FARC itself employed.

130.   In November, 1999, Alfredo Araujo, on behalf of Drummond, met with Jorge 40 and other AUC members, including El Tigre, "Guerrero," "Kevin," "Cortico," "Pelo de Puya," "El Enano," "Pirulo," and "Cachaco," to discuss a plan to get major Drummond funding for the AUC's Northern Block. Araujo explained to Jorge 40 that there had been a recent FARC attack on the Drummond rail line, but that for the Drummond executives in the U.S. to approve significant funding for the AUC, there had to be another attack, and the AUC had to demonstrate that it could respond effectively with a swift and violent counterattack on the FARC. Araujo directed that the AUC should stage a new attack on the rail line, and make it look like the FARC's 41st Front had attacked the rail line again. This, Araujo assured Jorge 40, would cause the Drummond executives in Alabama to agree to make payments to enhance the AUC's presence in the areas along the Drummond rail line.

131.   According to El Tigre, Araujo said to Jorge 40, "Drummond is willing to provide a sum of money so that your group can strengthen itself with men and arms, as long as you commit to providing security to the railroad line and the coal operations in the mine." Further, according to El Tigre, who was at the meeting, "we were told by Araujo that the areas along the Drummond rail line that had a FARC presence had to be attacked and pacified. We all understood this. We were not

talking about physical protection of property. We were talking about doing what the AUC was created to do and that is destroy the FARC and its supporters. Sometimes people from Drummond used words like "security" and we did too – it was a euphemism for going after the FARC and its supporters. We also used "operation" as a way to say we were going to attack a FARC area. The Colombian army provided the stationary guards for Drummond's property. The AUC's role was to hunt and destroy the FARC and its sympathizers."

132. Jorge 40 assigned El Tigre and "Pirulo" to conduct the staged attack on the Drummond rail line, which they successfully did in April, 2000. Following the attack, as per the agreement with Araujo, the AUC distributed pamphlets in the town of Loma de Potrerillo attributing the attack to the FARC's 41st Front. The AUC then, in May 2000, in furtherance of the plan agreed to with Araujo, assassinated five people near Casacara, Becerril, in Cesar, and claimed that these five were FARC collaborators who were responsible for blowing up the rail line. These five men had nothing to do with the attack, but were killed to show that the AUC could respond effectively to a FARC attack on the rail line and find and execute FARC members on their own territory. Their names were William Enrique Rios Villazon, Angel Maria Ospina, Ciro Alfonso Guerrero Rueda, Oscar Enrique Yance Atencio, and Edilson Julio Glavis.

133.   After the successful staging of a rail attack, Drummond made a large payment to the AUC's Northern Block. Jorge 40 sent El Tigre and "Amin" to the town of Las Palmitas, near the back entrance to the Drummond mine. Drummond employees whose names are not known delivered three boxes filled with US dollars. Amin opened the boxes to verify the contents. The funds were then delivered to Jorge 40 by his men.

134.   When Drummond supplied that payment and thereafter made regular monthly payments to the AUC, it was explicitly agreed, initially between Araujo and his friend Jorge 40, and thereafter between Adkins and Jorge 40 and his representatives, that the funds were to be used to recruit at least 165 new soldiers so that the AUC's Northern Block would be able to successfully attack and destroy the FARC and its supporters in the areas along Drummond's rail line. In fact, the funds provided by Drummond were the sole source of funds for these new troops and arms, and these new troops and arms allowed the Northern Block in Cesar and Magdalena to expand to a major force that was able to successfully defeat the FARC in the areas along Drummond's rail line.

135.   According to El Tigre, Drummond, through Araujo and Adkins, did not make a general contribution to the AUC's overall treasury. Rather, the funds were specifically dedicated by Drummond's direction to buy arms and supplies to

79

equip more than 165 additional men to add to the AUC's Northern Block so that it could effectively attack and defeat the FARC.

136.   Once the funds were paid by Drummond, the Juan Andres Alvarez Front of the AUC's Northern Block was able to recruit new men and went from a force of about 20 to 200. According to El Tigre, Jorge 40 used Drummond's funds, and only Drummond's funds, to purchase arms and equipment for the new AUC men directly from Carlos Castaño. From then on, under the command of El Tigre, the Juan Andres Alvarez Front became a major fighting force in the war against the FARC. The forces created a permanent base from which they patrolled the towns in and around the Drummond facilities and the rail corridor and pursued their mission of destroying the FARC and its sympathizers. In fulfilling this mission, the Juan Andres Alvarez Front murdered hundreds of innocent civilians and displaced thousands more because, according to El Tigre, the best way to prevent civilians from assisting the FARC in an area is to get rid of the people living there. This was the AUC's well-known and established method of operation.

137.   In 2000, while under the command of El Tigre, the Juan Andres Alvarez Front executed seven investigators from the CTI of the Public Prosecutor's Office:   Israel Alberto Roca Martinez, Hugo Alberto Quintero Solano, Jaime Elias Barros Ovalle, Edilberto Linares Correa, Mario Abel Anillo Trocha, Danilo Javier

Carrera Aguancha, and Carlos Arturo Ibarra Bernal. As part of the Justice and Peace process, El Tigre has specifically confessed that he and his men executed the seven CTI investigators during the course of the civil conflict because they threatened to disrupt the AUC's war effort against the FARC.

138.   The Juan Andres Alvarez Front, under El Tigre's command, also murdered a man named "Daniel," who Araujo specifically directed them to execute based on Araujo's assertion that Daniel was a guerilla. They killed him in La Loma near the Platanal bridge.

139.   El Tigre was captured by the Colombian authorities on July 19, 2000. Jorge 40 then assigned the command of the Juan Andres Alvarez Front to Tolemaida, who continued the AUC's war against the FARC. After the change in power, Adkins participated in a November, 2000, meeting between Drummond officials and top AUC leaders. The meeting occurred at the entrance to Drummond's mine in La Loma at approximately 2 p.m. Adkins was accompanied by Araujo and Jaime Blanco, the previously described friend of Araujo's who ran the cafeteria concession at the Drummond mine, and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Tolemaida, and several other armed AUC members. At this meeting, Adkins and Araujo approved a payment to the AUC on behalf of Drummond for the assassination of the top leaders of the

Drummond union, including Locarno and Orcasita. Locarno and Orcasita were murdered by the AUC on March 12, 2001. The union leaders were pulled off a company bus on their home from their shift in the Drummond mine and executed by the AUC. Tolemaida was in charge of the operation, following the orders of Jorge 40, and one of Tolemaida's key commanders, Samario, participated as well.

140.    Rafael Garcia, the former DAS official, stated under oath that in early 2001, when he was working as political adviser to the AUC, he traveled to Valledupar along with Jorge Castro Pacheco of Ariguani, a municipality in Magdalena, Colombia.   Jorge Castro Pacheco served as the representative for Jorge 40.   Garcia attended a meeting at the Hotel Sicarare in Valledupar with Jorge Castro Pacheco, who, at the time of the meeting was 3rd succentor to Roberto Perez, a Senator from Sucre, Colombia. Also in attendance was Guillermo Sanchez Quintero, who at the time was Mayor of Ariguani and Alfredo Araujo, who was Drummond's Director of Community Relations. At this meeting, Garcia witnessed Araujo give Jorge Castro Pacheco a suitcase filled with money. Araujo and Jorge Castro Pacheco talked openly about the purpose of this money - to take violent measures against union workers at Drummond. Garcia heard Araujo say to Jorge Castro Pacheco that the money was to be given to Jorge 40 to carry out the killings of certain union leaders at Drummond. It was clear from things said in this

conversation that the plan to violently attack the union leaders had been made some time before and had been a matter of discussion between Araujo and Jorge 40. Araujo specifically said that he wanted the AUC's "help with these guys that were causing problems." Garcia specifically recalls the names Orcasita and Locarno mentioned as targets by Araujo.

141.   At a subsequent meeting in early May, 2001, Adkins and Araujo met again with the top leaders of the AUC, including Jorge 40, Tolemaida, Don Luis, and several AUC operatives who worked closely with Jorge 40, including Kener, El Chino, El Toro, Samario, Machoman, and 05. The meeting was held at a farm on the road between Bosconia and Plato. In front of the entire group, including Adkins and Araujo, Jorge 40 congratulated Tolemaida for the successful operation of executing the two Drummond union leaders Locarno and Orcasita.

142.   At this meeting Drummond, through Adkins and Araujo, made an agreement with Jorge 40 to make an additional large cash payment to the AUC of approximately $1.5 million (U.S.) and regular monthly payments of approximately $100,000 (U.S.) to continue to support the AUC's Northern Block so that it could continue to attack and destroy the FARC. This additional funding was to allow the Northern Block to maintain a permanent base and to continue its ongoing and successful war against the FARC. Once again, the Drummond representatives,

including Adkins and Araujo, directed that the AUC focus on the towns along Drummond's rail line where the FARC had a presence.

143.   On or about the time of this meeting, at the instigation of Araujo, Drummond escalated its own role in the development and support of the AUC and began raising funds from other businesses and individuals to make payments to the AUC. A portion of these funds were provided to the Popa Battalion commander, Colonel Mejia, who made payments to the AUC based on executions of suspected guerillas. With the ongoing support from Drummond, the AUC's Northern Block continued to confront the FARC in the areas around the Drummond rail line, and in the process, continued to terrorize, displace and murder innocent civilians who lived along Drummond's rail corridor or near the mining facilities and other Drummond facilities.

144.   All of the decedents described herein were among those murdered by the AUC's Northern Block during the course of its war with the FARC in the areas in and around Drummond's facilities. Drummond is responsible for establishing a major force of the AUC, the Northern Block, in Cesar and Magdalena, and providing the funds to arm and mobilize these AUC troops that ultimately terrorized the innocent civilians in the area of Drummond's facilities and murdered the relatives of the Plaintiffs herein.

145.   *As to the fourth element*, Drummond's acts had a substantial effect upon the success of the criminal venture, the AUC's war crimes, including extrajudicial killings of the Plaintiffs' decedents. Both El Tigre and Samario have provided statements that, but for Drummond's infusion of support, the AUC's Juan Andres Alvarez Front would have remained a small band of 20 poorly-armed men without the means to accomplish their mission. Drummond's funds, and only Drummond's funds, allowed the Front to expand to nearly 200 men and to purchase arms, equipment and supplies to attack the FARC in the towns along the Drummond rail corridor. The expanded and well-armed and supplied Front then was responsible for the executions of Plaintiffs' decedents.

146.   According to Samario, "[w]ith these new men and arms [acquired with Drummond's funds], we were able to have real success in defeating the FARC in the towns along the Drummond rail route. By the time I was captured on April 9, 2005, we had largely been successful in destroying the FARC in these areas and driving many of the FARC's supporters out of the region."

147.   *As to the fifth and final element*, the Drummond Defendants were aware that their acts assisted the specific war crimes violations alleged herein. As alleged in ¶¶ 98-127, *supra*, Drummond had specific knowledge that the AUC would, when directed by Drummond to attack specific villages, destroy the FARC

and its supporters, and pacify the villages, the AUC would execute innocent civilians, like Plaintiffs' decedents, because that is how the AUC operated. This method of operation was precisely what Drummond expected to receive for its support that was directly earmarked for men, arms and supplies to allow the AUC to have the capacity to attack the FARC in the villages where Plaintiffs' decedents were executed.

148.   Drummond, through Alfredo Araujo, provided the specific targets for the AUC's attacks on towns along the Drummond rail corridor. Plaintiffs' decedents were executed because Drummond specifically directed the AUC to these areas.

149.   When Drummond met again with the AUC leaders in May 2000, the AUC demonstrated with a specific report to Drummond what its funds were accomplishing. At subsequent meetings between Adkins, Araujo, and other Drummond managers, the AUC leaders reported on their progress against the FARC. On at least three occasions, in May and November 2000 and May 2001, Drummond re-confirmed its payment arrangements with the AUC following discussions of progress made in the AUC's effort to destroy the FARC.

150.   In September 2001, the AUC was designated a terrorist organization by the U.S. State Department. This was widely publicized in both the U.S. and Colombia. Drummond officials, particularly Adkins, whose key function was to

provide Drummond with intelligence on the AUC and its conflict with FARC, must have known of this designation. Knowing of the AUC's status as a terrorist organization, Drummond continued to provide it with substantial support for an five additional years, until April 2006.

151. According to both Samario and El Tigre, on several occasions, during the course of the meetings between Drummond and the AUC on the progress of the war against FARC, Araujo provided specific names of suspected FARC guerillas to be executed. On each of these occasions, the AUC executed the individuals named by Araujo. According to Samario, "even the unionists we killed for Drummond we killed because Alfredo Araujo Castro, who had an important position with Drummond, told me that they were leftist guerillas who were helping the FARC. We were not common murders. We were the vanguard of the nation's fight with the FARC and its supporters."

152. According to Samario, many of the executions in the area of Drummond's operations were carried out based on orders from Araujo: "I estimate that there were 40 or more people that Tolemaida directed me to execute based on information from Drummond that they were FARC members or supporters. That information always came to us through Araujo or his friend Jaime Blanco to Tolemaida. Further, there were hundreds more we executed as part of our own

information and operations, and consistent with our direction from Drummond to wipe out the FARC in these areas [along the rail corridor]."

153. A former solider in the Popa Battalion stationed on the Drummond property, Edwin Guzman, stated under oath that the chief of security for Drummond at the mine property, retired Colonel Rodriguez, met regularly with Samario and with Cebolla, two paramilitary commanders. Rodriguez gave information to these commanders and encouraged them to do more to pursue the guerillas that were attacking the rail lines. Further, as previously alleged, Drummond made its own agreement to provide funds to Popa Battalion commander Colonel Mejia, so that he could pay the AUC funds based exclusively on how many suspected guerillas were executed. This is conclusive on the issue of whether Drummond knew that its funds were being used to kill civilians.

154. Drummond's role in the expansion and support of the AUC's Northern Block was a major factor in the AUC's success in its war with the FARC in Cesar. Drummond had a shared purpose with the AUC in destroying the FARC, and but for Drummond's major support for that shared purpose, the AUC's forces along the Drummond rail line would have remained a small band of 20 poorly-armed men without the means to accomplish their mission. Drummond's intent is a question of fact, but Plaintiffs' allegations herein demonstrate Drummond had no reason to

provide millions of dollars to the AUC other than accomplishing their shared purpose of defeating and destroying the FARC.

155. As a further example that Drummond and the AUC had a specific shared purpose of using violent means to exterminate leftist guerillas suspected of being associated with the FARC, both Adkins and Alfredo Araujo met with the top leaders of the AUC and directed that the AUC assassinate the two top union leaders at Drummond, Valmore Locarno Rodriguez (hereinafter Locarno) and Victor Hugo Orcasita Amaya (hereinafter Orcasita). Locarno and Orcasita were murdered by the AUC on March 12, 2001, after being pulled off a company bus.

156. The meeting between Adkins, Araujo and another Drummond executive and the AUC leaders was in November, 2000. The meeting occurred at the entrance to Drummond's mine in La Loma at approximately 2 p.m. Adkins and Araujo were also accompanied by Jaime Blanco, and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Tolemaida, and several other armed AUC members. At this meeting, Adkins, on behalf of Drummond, approved a payment to the AUC for the assassination of Locarno and Orcasita. Also present was Jaime Blanco's head of security, Jairo Jesus Charris Castro.

157. In early 2001, another meeting was held to make the payment from Drummond to the AUC for the execution of the union leaders. Rafael Garcia, a high

official of the Colombian government, was present at this meeting. He was Director of the computer system office of the Colombian Administrative Department of Security (Spanish Acronym: DAS). DAS is, among other things, responsible for providing security to Colombian state institutions and individuals.   As is common with many government officials, Garcia also worked with and supported the AUC. He served as the AUC's political adviser. While serving at the DAS, he also acted as liaison between DAS Director Jorge Noguera and the AUC Northern Block leader, Jorge 40.   The AUC and the DAS worked closely together, in Garcia's words, " to further their joint mission of ridding Colombia of leftist guerillas."

158.   The early 2001 Drummond meeting occurred when Garcia was working as political adviser to the AUC. Garcia traveled to Valledupar in Cesar Province, along with Jorge Castro Pacheco, who was a government official in Ariguani, a municipality in Magdalena, Colombia.   He served as 3rd succentor to Roberto Perez, a Senator from Sucre, Colombia.   While holding this position, he also served as an official representative of Jorge 40.   The meeting was held at the Hotel Sicarare in Valledupar. Along with Garcia and Jorge Castro Pacheco, also in attendance were Guillermo Sanchez Quintero, who at the time was Mayor of Ariguani and Araujo. Garcia witnessed Araujo give Jorge Castro Pacheco a suitcase filled with money. Araujo and Jorge Castro Pacheco talked openly about the

90

purpose of this money - to execute the union leaders at Drummond.   Garcia heard Araujo say to Jorge Castro Pacheco that the money was to be given to Jorge 40 to carry out the killings of certain union leaders at Drummond.   It was clear from things said in this conversation that the plan to violently attack the union leaders had been made some time before and had been a matter of discussion between Araujo and Jorge 40. Araujo specifically said that he wanted the AUC's "help with these guys that were causing problems." Garcia specifically recalls the names Orcasita and Locarno mentioned as targets by Araujo.

159.   In furtherance of this agreement, on March 12, 2001, Locarno and Orcasita were pulled off a company bus on their way home from their shift in the Drummond mine and executed by the AUC. Tolemaida was in charge of the operation, following the orders of Jorge 40, and one of Tolemaida's key commanders, Samario, participated as well.   At a subsequent meeting in early May, 2001, Adkins and Araujo met again with the top leaders of the AUC, including Jorge 40, Tolemaida, "Don Luis," who was Jorge 40's chief financial officer, and several AUC operatives who worked closely with Jorge 40, including "Kener, ""El Chino," "El Toro," "Samario," "Machoman", and "05." The meeting was held at a farm on the road between Bosconia and Plato. In front of the entire group, including Adkins and Araujo, Jorge 40 congratulated Tolemaida for the

successful operation of executing the two Drummond union leaders Locarno and Orcasita.

160.   Although there are now numerous witnesses who have testified in Colombia about the role of Drummond and Adkins and Araujo, as well as Jaime Blanco, in the murders of the union leaders, no serious action has been taken against Drummond or any of the individuals. Blanco's body guard, Charris, was recently sentenced to 30 years in prison for his very minor role in the executions in a classic example of using a less powerful fall guy. Likewise, Blanco was recently sentenced for his role in the union murders based in part on the Charris testimony, but none of the Drummond officials also implicated by Charris, including Defendant Garry Drummond, Augusto Jimenez, Araujo and Adkins, have been charged. The Court that sentenced Blanco did order that these Drummond officials be investigated for their roles in the murder of the union leaders.

161.   Tolemaida, who all concerned agree was the head of the AUC operation to execute the union leaders at Drummond's request, was a fugitive in hiding in Venezuela once the AUC demobilization began. According to reports from Charris and others, Drummond provided Tolemaida with approximately one million U.S. dollars that he was to use to support himself in Venezuela and to keep him and his execution team quiet about Drummond's role in the murders, as well as

Drummond's role in the other violence that the AUC visited upon the towns along the Drummond rail corridor. Tolemaida kept most of the money for himself when he fled to Venezuela. In December 2009, Tolemaida was captured in Venezeula and was extradited to Colombia, where he is now in custody at the Picota prison outside Bogota. He has through intermediaries attempted to bribe or threaten those who have given evidence of Drummond's collaboration with the AUC. In exchange for Drummond's support, he provided an August 11, 2011, declaration claiming that Drummond had no role in the AUC's financing.

162.   Drummond's shared mission with the AUC also extended to providing direct and substantial assistance to the AUC's drug trafficking operations. Drummond allowed its coal barges to transport cocaine from Colombia to the U.S. These funds also allowed the AUC to support its troops, buy equipment, and generally maintain the AUC's Northern Block. Further, Drummond's coal barges served to transport cocaine to the U.S. and Europe.

163.   All the forms of direct and indirect support Drummond provided to the AUC were specifically intended to further the joint purpose of eliminating the FARC and its supporters from the areas in and around the towns that lined the Drummond rail line.

**Drummond Conspired With the AUC to Commit War Crimes**

164.   Plaintiffs incorporate by reference paragraphs 1 through 163 of this Complaint as is set forth herein.

165.   In *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005)*, the Eleventh Circuit held that the three elements for conspiracy are: (1) "two or more persons agreed to commit a wrongful act," (2) Defendants "joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it," and (3) "one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." *See Balcero* Order at 22.

166.   ***As to the first element***, based on ¶¶ 65-86, 98-127, *supra*, which are incorporated herein by reference, the AUC was formed based on agreement between its leaders, government backers, and private supporters, to attack areas where the FARC had strongholds. The express purpose of the AUC's mission was to use violent means, including war crimes and extrajudicial killings, to accomplish its mission.

167.   ***As to the second element***, based on ¶¶ 98-127, *supra*, which are incorporated herein by reference, the Drummond Defendants at first declined to join the AUC and support its mission, but no later than 1997, formally agreed to join the

AUC's mission of eradicating the FARC using violence that amounted to war crimes, including extrajudicial killings.

168. **As to the third element**, based on ¶¶ 113-163, *supra*, which are incorporated herein by reference, both the AUC and Drummond Defendants committed acts in furtherance of the conspiracy. The agreement was that Drummond would fund and direct the AUC's war efforts in the areas in and around the Drummond rail line. Both parties fulfilled their obligations under the agreement.

169. The coordination and funding meetings between the AUC and Drummond served to monitor, renew, refine and otherwise ensure that the parties continued to meet their obligations under the agreement. These meetings and the ongoing monthly funding provided by Drummond demonstrates that Drummond was satisfied that the AUC was meeting its specific obligations under the agreement made between the parties. This arrangement continued, according to Samario, until approximately April 2006, when the leaders of the AUC's Northern Block formally demobilized.

170. In addition to the meetings between Drummond and the AUC that allowed Drummond to receive updates on the progress of the AUC's war against the FARC, Drummond's own security staff, including Adkins and his employees and agents, gathered detailed intelligence on executions and other acts of violence

carried out by the AUC in furtherance of Drummond's agreement with the AUC. Adkins made regular reports to the officers of Drummond based in Alabama, including Defendant Mike Tracy and Defendant Garry Drummond.

171.   Alfredo Araujo met with the AUC leaders frequently due to his personal friendships with Jorge 40, Tolemaida and Jaime Blanco. On several occasions, Araujo provided names of persons to be executed in furtherance of the agreement between Drummond and AUC to eliminate persons suspected of being members or supporters of FARC. As previously alleged, Arajuo provided at least 40 names to the AUC of persons to be executed as suspected guerillas in furtherance of the agreement between Drummond and the AUC. Further, according to Samario, hundreds of other civilians were murdered as the AUC implemented its agreement with Drummond to destroy the FARC and pacify the towns along the rail corridor. Further, as previously alleged, Drummond also made a specific agreement in early 2000 to assume a larger role in assisting the AUC and its mission by raising funds from other businesses and individuals and channeling some of these funds to the Popa Battalion so that Colonel Mejia had funds to pay the AUC based on the number of executions it tallied. Plaintiffs' decedents were among those killed as part of the AUC's operations funded by Drummond.

**The AUC Acted as Drummond's Agent When it Committed War Crimes**

172.    Plaintiffs incorporate by reference paragraphs 1 through 171 of this Complaint as is set forth herein.

173.    The elements of agency are that (1) Drummond had a relationship with the AUC; (2) in committing the acts alleged, the AUC was acting on Drummond's behalf and under its control; and (3) the executions of the Plaintiffs' decedents were within the scope of the relationship.    *See Balcero* Order at 26 n. 19.

174.    *As to the first element*, based on ¶¶ 113-163, *supra*, which are incorporated herein by reference, Drummond entered into a specific agreement with the AUC that Drummond would provide substantial support to the AUC to purchase weapons and supplies to equip at least 165 new men for the Northern Block. In exchange, the AUC would pursue the FARC and destroy its strongholds in the towns along the Drummond rail line.

175.    *As to the second element*, based on ¶¶ 104-106, 119, 149-152, *supra*, which are incorporated herein by reference, Drummond provided specific direction to the AUC on the towns to be attacked, and in some cases, the people to be executed. With respect to the hundreds of innocent civilians who were executed in the towns along the Drummond rail corridor, including Plaintiffs' decedents, all of them were killed in the course of the AUC's attacks on the towns that Drummond

identified as places to be attacked and pacified.

176. ***As to the third element***, based on ¶¶ 109, 151-154, *supra*, which are incorporated herein by reference, all of the Plaintiffs' decedents were killed by the AUC's Northern Block in furtherance of its operations on behalf of Drummond in the towns along the railroad corridor. All of the Plaintiffs' decedents herein were killed by the AUC's Northern Block. The Justice and Peace process is ongoing, but all of the Plaintiffs' decedents have either been officially declared to be a civilian victim of the civil conflict, or they were in fact killed during the course of the civil conflict. All of the executions of the Plaintiffs' decedents occurred after Drummond made its first agreement with the AUC as described herein.

177. Drummond's ongoing regular payments to the AUC from approximately 1997-April 2006, with full knowledge by Drummond of the specific acts of violence and terror committed each month by the AUC in the areas in and around the Drummond rail line, constitutes ratification of these acts.

## Second Cause of Action

**The Alien Tort Claims Act, 28 U.S.C. § 1350 – Extrajudicial Killings
The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed
Under Color of the Authority of the Colombian Government, and Defendants
Aided and Abetted or Conspired With the AUC, or the AUC Was
Defendants' Agent**

### All Plaintiffs Against All Defendants

178.   Plaintiffs incorporate by reference paragraphs 1 through 177 of this Complaint as is set forth herein.

### The AUC Was Acting Under Color of the Authority
### of the Colombian Government

179.   Drummond ensured close cooperation from the Colombian military by hiring influential military officers for its security operations. In all cases, these military officers also had a relationship with or were supporters of the AUC. As previously alleged in ¶¶ 116-129, which are incorporated by reference herein, in 1999, General (ret.) Rafael Peña Ríos was the head of security for Drummond in Colombia, and was openly supportive of the AUC's mission of eliminating leftist guerillas.

180.   During most or all of the time period in which Plaintiffs' decedents were executed, the head of security at the Drummond mine was Colonel (ret.) Luis Carlos Rodriguez, who had good relations with both the military from the Popa

Battalion stationed on the Drummond property, but also with the leaders of the AUC in that area, particularly Samario and Cebolla. According to one soldier in the Popa Battalian, Colonel Rodriguez coordinated the activities of the regular military and the AUC. Further, Drummond, through Araujo and members of the security staff, made a direct arrangement to raise funds and provide them to Colonel Mejia of the Popa Battalion so that he could pay the AUC based on the number of people killed that were suspected of being guerillas.

181.   One major way that the Popa Battalian assisted the AUC was to take civilians who had been executed by the AUC and dress them in guerilla uniforms to legitimize or "legalize" the murders.   There were 300 soliders from the Popa Battalian stationed at a base on the Drummond property near the mine and were there to protect both Drummond's property as well as its personnel, in particular, its U.S. personnel who live on their own compound with 24-hour military protection. Drummond provided supplies, food and funds for the troops to be stationed there.

182.   As previously alleged in ¶¶ 74-95, *supra*, which are incorporated herein by reference, the Colombian government had a direct role in setting up the AUC to serve as a special branch of the Colombian military that was unconstrained by the Geneva Convention and other rules of war.

183.   Further, as previously alleged in ¶¶ 120, *supra*, which are

incorporated herein by reference, in a September 13, 1995, memo, Adkins reported to Defendant Mike Tracy that he had been approached by a military commander from the Cordoba Battalion to have Drummond join other companies in supporting the formation of a paramilitary unit to pursue guerilla units in the area of Drummond's operations.

184.   The specific AUC units that ultimately formed within the Northern Block and the Juan Andres Alvarez Front were thus initially formed, according to Adkins, through the direct participation of a Colombian military officer, who openly sought the assistance of Drummond to support this special force of the Colombian military. According to several AUC commanders, including El Tigre and Samario, the Colombia military had a direct role in providing funds to the AUC to support AUC operations around the Drummond facility.

185.   Once the AUC's Northern Block became functional in the areas in and around the Drummond rail line, the Colombian military operated in a cooperative fashion. According to AUC Commander El Tigre, the understanding was that "the Colombian army provided the stationary guards for Drummond's property. The AUC's role was to hunt and destroy the FARC and its sympathizers." El Tigre and Samario both served as AUC coordinators with the Colombian military stationed on Drummond's property.

186.   With respect to the La Popa Battalion's practice of assisting the AUC by creating "false positives," as alleged in ¶¶ 181-182, *supra*, the specific troops assigned to the Drummond facilities, and paid by Drummond to be there, utilized this practice from their base on the Drummond property. One member of that battalion, Edwin Guzman, has testified under oath that he was ordered by his superiors while serving in the Drummond security units to put guerilla uniforms on civilians executed in and around the Drummond facilities by the AUC.

187.   Because the Colombian military helped to create the AUC, including the Northern Block, and then the specific military units of the La Popa Battalion based on Drummond's property cooperated and coordinated with the AUC, and provided direct funding to the AUC, the AUC units of the Northern Block were acting under color of law, either because they were engaged in joint action with the Colombian military or were in a symbiotic relationship with the Colombian military.

## The Executions of Plaintiffs' Decedents Were Extrajudicial Killings

188.   All of Plaintiffs' decedents were executed by the AUC, which was acting under color of authority of the Colombian government. None of those executed had committed a crime, had been charged with a crime, or had been

provided with any form of judicial process prior to their executions. Each of these executions was thus extrajudicial killings under the law of nations.

## **Drummond Aided and Abetted the AUC's Extrajudicial Killings**

189.    As previously alleged in ¶¶113-163, *supra*, which are incorporated herein by reference, the Drummond Defendants met the five elements of aiding and abetting the AUC's war crimes as identified by this Court.

190.    The primary war crime that Drummond aided and abetted was the killings of innocent civilians, including Plaintiffs' decedents. In aiding and abetting these war crimes, Drummond also aided and abetted the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

## **Drummond Conspired With the AUC to Commit Extrajudicial Killings**

191.    As previously alleged in ¶¶ 165-171, *supra*, which are incorporated herein by reference, the Drummond Defendants met the three elements of conspiracy with the AUC to commit war crimes.

192.    The primary war crime that Drummond conspired with the AUC to commit was the killings of innocent civilians, including Plaintiffs' decedents. In

conspiring to commit these war crimes, Drummond also conspired to commit the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

## The AUC Was Acting as Drummond's Agent in Committing Extrajudicial Killings

193.   As previously alleged in ¶¶ 173-177, *supra*, which are incorporated herein by reference, the AUC acted as Drummond's agent in committing war crimes.

194.   The primary war crime that the AUC committed while acting as Drummond's agent was the killings of innocent civilians, including Plaintiffs' decedents. In committing these war crimes acting as Drummond's agent, the AUC also committed the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

195.   Drummond's ongoing regular payments to the AUC from approximately 1997-April 2006, with full knowledge by Drummond of the specific acts of violence and terror committed each month by the AUC in the areas in and around the Drummond rail line, constitutes ratification of these acts.

## Third Cause of Action

## The Torture Victims Protection Act, 28 U.S.C. § 1350 – Extrajudicial Killings The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed Under Color of the Authority of the Colombian Government, and Defendants Aided and Abetted or Conspired With the AUC, or the AUC Was Defendants' Agent

## All Plaintiffs Against Individual Defendants Drummond and Tracy

196.    Plaintiffs incorporate by reference paragraphs 1 through 195 of this Complaint as is set forth herein.

## The AUC Was Acting Under Color of the Authority of the Colombian Government

197.    As previously alleged in ¶¶ 179-187, *supra*, which are incorporated herein by reference, as with Plaintiffs' Second Cause of Action for Extrajudicial Killings under the Alien Tort Statute, the AUC, in committing the extrajudicial killings of Plaintiffs' decedents, was acting under color of authority of the Government of Colombia.

**The Executions of Plaintiffs' Decedents Were Extrajudicial Killings**

198.    All of Plaintiffs' decedents were executed by the AUC, which was acting under color of authority of the Colombian government. None of those executed had committed a crime, had been charged with a crime, or had been provided with any form of judicial process prior to their executions. Each of these executions were thus extrajudicial killings under the Torture Victims Protection Act.

**Defendants Aided and Abetted the AUC's Extrajudicial Killings**

199.    As previously alleged in ¶¶113-163, *supra*, which are incorporated herein by reference, Defendants met the five elements of aiding and abetting the AUC's war crimes as identified by this Court.

200.    The primary war crime that Defendants aided and abetted was the killings of innocent civilians, including Plaintiffs' decedents. In aiding and abetting these war crimes, Defendants also aided and abetted the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

## Defendants Conspired With the AUC to Commit Extrajudicial Killings

201.    As previously alleged in ¶¶165-171, *supra*, which are incorporated herein by reference, Defendants met the three elements of conspiracy with the AUC to commit war crimes.

202.    The primary war crime that Defendants conspired with the AUC to commit was the killings of innocent civilians, including Plaintiffs' decedents. In conspiring to commit these war crimes, Defendants also conspired to commit the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

## The AUC Was Acting as Defendants' Agent in Committing Extrajudicial Killings

203.    As previously alleged in ¶¶173-177, *supra*, which are incorporated herein by reference, the AUC acted as Defendants' agent in committing war crimes.

204.    The primary war crime that the AUC committed while acting as Defendants' agent was the killings of innocent civilians, including Plaintiffs' decedents. In committing these war crimes acting as Defendants' agent, the AUC also committed the killings themselves, which as alleged above, were extrajudicial

killings because they were committed by the AUC under color of the authority of the Government of Colombia.

205.    Drummond's ongoing regular payments to the AUC from approximately 1997-April 2006, with full knowledge by Defendants of the specific acts of violence and terror committed each month by the AUC in the areas in and around the Drummond rail line, constitutes ratification of these acts.

**Fourth Cause of Action**

**Wrongful Death on Behalf of All Plaintiffs Against All Defendants**

206.    Plaintiffs incorporate by reference paragraphs 1 through 205 of this Complaint as is set forth herein.

207.    Defendants committed, or acted in concert to commit, or Defendants' employees or agents, committed acts that constitute wrongful death under the laws of Colombia, and that caused the deaths of the decedents herein.

208.    Defendants' actions and omissions were a direct and substantial cause of the deaths of the decedents herein.   Defendants failed to use due care to protect them from injury and harm, thereby proximately causing their wrongful deaths.

209.    Plaintiffs have suffered damages, including emotional harm, loss of companionship, and loss of financial support, as a result of the murders of their

relatives.   Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial for the harm they have suffered individually as a result of the murders of their relatives.

## VIII.   DEMAND FOR JURY TRIAL

210.   Plaintiffs demand a trial by jury on all issues so triable.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)   enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)   declare that Defendants have violated Plaintiffs' human rights and the laws of the United States and Colombia, as set forth herein;

(c)   award Plaintiffs compensatory and punitive damages;

(d)   grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and other members of their communities in and around the Drummond facilities in Colombia;

(e)   award Plaintiffs the costs of suit including reasonable attorneys' fees; and

(f)   award Plaintiffs such other and further relief as the Court deems just

under the circumstances.


Respectfully submitted,


  *//s// Thomas L. Carmichael*
**THOMAS L. CARMICHAEL (CAR133)**
**ASB-1587-A34T**
**CARMICHAEL LAW FIRM, LLC**
**301 N. Walston Bridge Rd., Suite 100**
**Jasper, Alabama 35504**
**(205) 302-0099**
**tlc4injury@yahoo.com**


**<u>OF COUNSEL:</u>**
**CARMICHAEL LAW FIRM, LLC**
**301 N. Walston Bridge Rd., Suite 100**
**Jasper, Alabama 35504**
**(205) 302-0099**
**tlc4injury@yahoo.com**


**PLAINTIFFS DEMAND TRIAL BY JURY.**


  *//s// Thomas L. Carmichael*

## PLEASE SERVE THE DEFENDANTS AT:

Drummond Company, Inc.
C/O Bruce C. Webster, Registered Agent
1000 Urban Center Dr. Ste 300
Birmingham, Alabama 35242

Drummond LTD.
C/O William B. Long, Registered Agent
530 Beacon Pky West
Birmingham, Alabama 35242

Drummond USA, Inc.
C/O Bruce C. Webster, Registered Agent
1000 Urban Center Dr. Ste 300
Birmingham, Alabama 35242

Garry Drummond
5374 Overton Rd
Birmingham, Alabama 35210-4009

James Michael Tracy
4418 Boulder Lake Cir C
Vestavia, Alabama 35242 (Shelby County)