

FILED

2013 Jun-20  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARISOL MELO PENALOZA, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 2:13-cv-00393-RDP** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DRUMMOND COMPANY, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS DRUMMOND COMPANY, INC., DRUMMOND LTD., AND DRUMMOND USA'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## TABLES OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT…………..…………….1

STANDARD OF REVIEW………………………………...…………………………3

ARGUMENT……………………………………………………………….4

I.  Plaintiffs' Claims Remain Viable After *Kiobel v. Royal Dutch Petroleum*………………………………………………………..……..4

II.  Plaintiffs Sufficiently Pled Defendants' Liability for Extrajudicial Killings Under *Mamani*…………………………….…………5

   A.  *Mamani* did not create a more burdensome pleading standard than that established by the Supreme Court in *Twombly* and *Iqbal* and applied by this Court in *Balcero*. …………………...……..6

   B.  Plaintiffs sufficiently pled the AUC committed extrajudicial killings after *Mamani*……………………………………….…10

   C.  Plaintiffs sufficiently pled that defendants are liable after *Mamani* under secondary liability theories…………………………14

III.  Plaintiffs' Sufficiently Pled Aiding and Abetting, Conspiracy, Agency, and Ratification Liability……………………………………18

   A.  Plaintiffs sufficiently pled aiding and abetting liability under both the "knowledge" and, alternatively, the "purpose" standard……………………………………………18

   B.  Plaintiffs sufficiently pled a conspiracy theory of liability…………25

   C.  Plaintiffs sufficiently pled an agency theory of liability……………28

   D.  Plaintiffs sufficiently pled a ratification theory of liability………… 30

IV.  Plaintiffs' Claims are Not Barred by the Statute of Limitations…………...31

A.      Equitable tolling applies to plaintiffs' claims until at least
        2007, when the Colombian Justice and Peace Process began...........32

B.      The statute of limitations was also equitably tolled by
        Defendants' fraudulent concealment of payments to the AUC
        and responsibility for the murders of Plaintiffs' decedents............ 38

C.      The fact-intensive inquiry underlying application of the
        statute of limitations is more appropriately addressed
        by a jury…………………………………………………………….. 39

V.    Colombia's Statute of Limitations Applies to Plaintiffs' Wrongful
      Death Claims Under Colombian Law…………………………………... 41

VI.   The Three Additional Plaintiffs' Claims Should Not Be Dismissed……… 47

CONCLUSION…………………………………………………………………... 50

# TABLE OF AUTHORITIES

## CASES

*Ahmed-Al-Khalifa v. Queen Elizabeth II,*
  2013 WL 2242459 (N.D. Fla. May 21, 2013)…………………………………4

*Aldana v. Del Monte Fresh Produce, N.A.,*
  416 F.3d 1242 (11th Cir. 2005)……………………………………14, 18, 25

*Ashcrof v. Iqbal,*
  556 U.S. 662 (2009)………………………………….………………..*in passim*

*Arce v. Garcia,*
  400 F.3d 1340 (11th Cir. 2005)……………………………….……*in passim*

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)……………………………………………………… 3, 5

*Bodnar v. Piper Aircraft Corp.,*
  392 So.2d 1161 (Ala. 1980)………………………………….…….....42, 46

*Bowoto v. Chevron Texaco Corp.,*
  312 F. Supp. 2d 1229 (N.D. Cal. 2004)………………………………… 28

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.,*
  116 F.3d 1364 (11th Cir. 1997)……………………………………….. 3

*Cabello v. Fernandez-Larios,*
  402 F.3d 1148 (11th Cir. 2005)…………………………………… *in passim*

*Carmichael v. United Techs Corp.,*
  835 F.2d 109 (5th Cir. 1988)…………………………………………….25

*Chavez v. Carranza,*
  559 F.3d 486 (6th Cir. 2009)…………………………………………….33

*Colo. River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976)……………………………………………………... 49

*Curtis v. Citibank, N.A.*,
  226 F.3d 133 (2d Cir. 2000)……………………………………………...48

*Doe v. Drummond Co., Inc.*,
  2010 WL 9450019 (N.D. Ala. Apr. 30, 2010)……………………...*in passim*

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011)……………………………………… 18, 19, 28

*Doe v. Saravia*,
  348 F. Supp. 2d 1112 (E.D. Cal. 2004)……………………………………34

*Doe v. Unocal Corp.*,
  963 F. Supp. 880 (C.D. Cal. 1997)……………………………………………41

*Forti v. Suarez-Mason*,
  672 F. Supp. 1531 (N.D. Cal. 1987)…………………………….…………41

*Eastman Kodak v. Kavlin*,
  978 F. Supp. 1078 (S.D. Fla. 1997)……………………………………….. 25

*Ellis v. Gen. Motors Acceptance Corp.*,
  160 F.3d 703 (11th Cir. 1998)…………………………………………...38

*Estate of Doe v. Islamic Republic of Iran*,
  808 F. Supp. 2d 1 (D.D.C. 2011)………………………………………… 9

*Greene v. H&R Block E. Enterprises, Inc.*,
  727 F. Supp. 2d 1363 (S.D. Fla. 2010)……………………………………..49

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006)………………………………………………… 25, 26

*Hilao v. Estate of Marcos*,
  103 F.3d 767 (9th Cir. 1996)……………………………………………34

*In re Bruno Tesch (Zyklon B Case)*,
  13 Int'l L. Rep. 250 (Br. Mil. Ct. Mar. 1-8, 1946)…………………….. 20, 23

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder*
*Derivative Litig.*,
    792 F. Supp. 2d 1301 (S.D. Fla. 2011)………………………… …9, 10, 15, 28

*In re South African Apartheid Litig.*,
    617 F. Supp. 2d 228 (S.D.N.Y. 2009)……………………………...18, 26, 28

*Jean v. Dorelien*,
    431 F.3d 776 (11th Cir. 2005)………………………………….…32, 33

*Khulumani v. Barclay Nat'l. Bank,*
    504 F.3d 254 (2d. Cir.2007)………………………. …………………………19

*Kiobel v. Royal Dutch Petroleum,*
    133 S. Ct. 1659 (2013)………………………………………………… 1, 4, 5

*La Grasta v. First Union Sec.*,
    358 F.3d 840 (11th Cir. 2004)………………………………………...40

*Lizarbe v. Rondon*,
    642 F. Supp. 2d 473 (D. Md. 2009)…………………………………….…..34

*Long v. Slaton*,
    508 F.3d 576 (11th Cir. 2007)…………………………………………….3

*Mamani v. Berzain*,
    654 F.3d 1148 (11th Cir. 2011)……………………………………..*in passim*

*Murphy v. McGriff Transp.*, *Inc.*,
    2012 WL 3542296 (N.D. Ala. Aug. 15, 2012)…………...……....42, 44, 46

*Mwani v. Bin Laden*,
    2013 WL 2325166 (D.D.C. May 29, 2013)……………………….….. 4

*Omar ex rel. Cannon v. Lindsey*,
    334 F.3d 1246 (11th Cir. 2003)…………………………………………41

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633 (S.D.N.Y. 2006)…………………………………19, 26
    582 F.3d 244 (2d Cir. 2009)……………………………………………… 26

*Prosecutor v. Dordevi,c*
    Case No. IT-05-87/1-T (Feb. 23, 2011) ……………………………………20

*Prosecutor v. Furundzija,*
    Case No. IT–95–17/1 (Dec. 10, 1998) …………………………………..20

*Prosecutor v. Krstic,*
    Case No. IT –98–33–A (Apr. 19, 2004) …………………………….……20

*Prosecutor v. Strugar*,
    Case No. IT-01-42-A (July 17, 2008)……………………………………23

*Prosecutor v. Tadic,*
    Case No. IT–94–1–T (May 7, 1997) …………………………………..…..20

*Prosecutor v. Taylor,*
    Case No. SCSL-03-01-T (May 18, 2012) ………………..……………20, 23

*Rodriguez v. Mahony*,
    2012 WL 1057428 (C.D. Cal. Mar. 26, 2012)…………………………….. 32

*Rimkus v. Islamic Republic of Iran*,
    750 F. Supp. 2d 163 (D.D.C. 2010)………………………… ………………9

*Romero v. Drummond Co. Inc.,*
    552 F.3d 1303 (11th Cir. 2008)……………………………………………...5

*Sarei v. Rio Tinto, PLC*,
    487 F.3d 1193 (9th Cir. 2007)……………………………………………...18

*SEC v. First Jersey Secs., Inc.,*
    101 F.3d 1450 (2d Cir. 1996)…………………………………………… 49

*Sinaltrainal v. Coca-Cola,*
    578 F.3d 1252 (11th Cir. 2009)……………………………………………25

*Speaker v. U.S. Dep't of Health Human Servs. Ctrs for Disease Control and Prevention,*
    623 F.3d 1371 (11th Cir. 2010)……………………………………………...6

*Tello v. Dean Witter Reynolds, Inc.*,
  410 F.3d 1275 (11th Cir. 2005)…………………………………4, 35, 40, 41

*U. S. v. Friedrich Flick*,
  6 Trials of War Criminals Before the Nuremberg Military
  Tribunals Under Control Council Law No. 10 (1952) ……………………20

*U.S. v. Myers*,
  972 F.2d 1566 (11th Cir. 1992)………………………………………….24

*Wagner v. Islamic Republic of Iran*,
  172 F. Supp. 2d 128 (D.D.C. 2001)………………………………………… 9

## STATUTES

Alien Tort Statute
  28 USC §1350…………………………………………………………31

Torture Victims Protection Act
  28 USC §1350, note…………………………………………...10, 23, 31

## RULES

Fed. R. Civ. P. 41(a)(1)…………………………………………………47

## OTHER AUTHORITIES

Restatement (Second) of Torts
  § 876(b) (1979)………………………………………………………..20

S. Rep. No. 101–249 (1991)………………………………………………… 32

## INTRODUCTION AND SUMMARY OF ARGUMENT

In an attempt to overcome this Court's previous refusal to dismiss similar claims in *Doe v. Drummond Co., Inc.*, 2:09-CV-01041-RDP, 2010 WL 9450019, at *3 (N.D. Ala. Apr. 30, 2010) (hereinafter "*Balcero*"), Defendants Drummond Company, Inc., Drummond Ltd., and Drummond U.S.A., Inc. (collectively "Defendants" or "Drummond") try to convince this Court the law has changed, such that Plaintiffs' claims should now be dismissed.[1]  First, Defendants contend the Supreme Court's recent decision, *Kiobel v. Royal Dutch Petroleum,* 133 S. Ct. 1659 (2013), mandates dismissal.  Plaintiffs' claims, however, "touch and concern" the U.S. with "sufficient force" to displace the presumption against extraterritoriality.  *Id.* at 1669.

Second, Defendants rely heavily on a recent Eleventh Circuit decision, *Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011), to argue there is a new pleading standard for extrajudicial killings.  As Plaintiffs address below, *Mamani* merely applied established Supreme Court pleading standards to allegations it ultimately deemed conclusory.  Moreover, *Mamani* did not address aiding and abetting, conspiracy, or any other theory of secondary liability; nor did it address war crimes.  At any rate, Plaintiffs' allegations concerning Drummond's material

---

[1] Defendants' Motion to Dismiss was approximately 51 pages.  Plaintiffs presume Defendants assumed each Defendant is entitled to file a separate motion of 25 pages, but filed a collective motion for the corporate defendants.  Plaintiffs have responded with a similar length brief.

support to the AUC, a terrorist organization that uses brutal violence against civilian populations in pursuit of victory in the civil conflict with leftist guerillas, far surpass the allegations in *Mamani*.  Not only do Plaintiffs demonstrate they have alleged the AUC committed extrajudicial killings and war crimes, they also allege detailed facts to support aiding and abetting, conspiracy, agency, and ratification theories of liability.

Third, Drummond asserts Plaintiffs' claims under the Alien Tort Statute (ATS) and Torture Victim Protection Act (TVPA) are barred by the statute of limitations.  Plaintiffs, however, have alleged their claims are equitably tolled until at least 2007 when they could finally come forward to press their claims. Alternatively, Defendants' fraudulent concealment likewise tolls their claims.  This Court already ruled in *Balcero* that the Plaintiffs there had made a sufficient showing concerning equitable tolling at the dismissal stage on identical facts.

As to Plaintiffs' wrongful death claims under Colombian law, Defendants argue Alabama's two-year statute of limitations applies because it is procedural, but they concede there are two exceptions to the rule requiring the forum state's statute of limitations to be applied.  In this case, Plaintiffs have demonstrated both that the statute of limitations is "bound-up" in the Colombian law and is a matter of public policy.  As a result, this Court should apply Colombia's statute of limitations.

Finally, Defendants assert three Plaintiffs should be dismissed because they have duplicative claims in *Balcero*. These plaintiffs' claims are in a unique procedural posture, and this Court should consider all the equities in utilizing its discretion to manage its docket. It would be fundamentally unjust to leave these plaintiffs without any forum in which to litigate all their claims against all defendants.

For all these reasons, and those addressed more fully herein, Defendants' Motion to Dismiss should be denied.

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the court must "accept the allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the Plaintiffs." *Long v. Slaton*, 508 F.3d 576, 579 (11th Cir. 2007). Dismissal is appropriate only where Plaintiffs fail to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A complaint "does not need detailed factual allegations," but must merely "be enough to raise a right to relief above the speculative level." *Id.* at 555. Further, a "complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* [plausible]

theory." *Balcero*, 2010 WL 9450019, at *3 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997)) (alteration in original).

"Dismissal under Federal Rule of Civil Procedure 12(b)(6) on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Balcero* Order, Doc. 275, at 2 (citing *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005)). Accordingly, "a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Id.* at 3. "The doctrine of equitable tolling allows a court to toll the statute of limitations until such a time as the court determines would have been fair . . . to begin running on the plaintiff's claims." *Id.* at 4.

## ARGUMENT

### I. Plaintiffs' Claims Remain Viable After *Kiobel v. Royal Dutch Petroleum.*

As Defendants have raised no new arguments, Plaintiffs incorporate by reference the entirety of their post-*Kiobel* briefing submitted for consideration in *Balcero.  See* Docs. 449, 552. As the Plaintiffs argued in that case, *Kiobel v. Royal Dutch Petroleum Co.* has no impact on Plaintiffs' case because their ATS claims "touch and concern" the U.S. with "sufficient force to displace the presumption

against extraterritoriality." 133 S. Ct. at 1669.[2]  Additionally, in this case,

Plaintiffs' TVPA claims against individual defendants and wrongful death claims

under Colombian law are not impacted by the *Kiobel* decision.[3]

## II.   Plaintiffs Sufficiently Pled Defendants' Liability for Extrajudicial Killings under *Mamani*.

This Court previously found that under the pleading standard announced in

*Twombly,* 550 U.S. at 570, and confirmed in *Ashcroft v. Iqbal*, 556 U.S. 662,  684

(2009), the *Balcero* plaintiffs sufficiently pled secondary liability for war crimes

and extrajudicial killings under the ATS.  *See Balcero*, 2010 WL 9450019, at *12-

14.  As Defendants admit, those allegations "are essentially the same" as those

here.  MTD at 24.  Defendants argue unpersuasively, however, that under the

Eleventh Circuit's subsequent *Mamani* decision, these same allegations now fail to

state a claim for extrajudicial killing.  *Id.*

---

[2] Defendants cite one recent case applying *Kiobel*, which dismissed ATS claims for aiding and abetting the South African Apartheid government.  *See* MTD at 22 (citing *Ahmed-Al-Khalifa v. Queen Elizabeth II*, 5:13-CV-103-RS-CJK, 2013 WL 2242459 (N.D. Fla. May 21, 2013)).  This decision is distinguishable because, like *Kiobel*, it involved foreign parties and exclusively foreign conduct.  *Id. Cf. Mwani v. Bin Laden*, CIV.A. 99-125 JMF, 2013 WL 2325166, at *4 (D.D.C. May 29, 2013) (denying dismissal of ATS claims after *Kiobel* because the attacks against a U.S. embassy "touched and concerned" the U.S. and noting also that "overt acts in furtherance of that conspiracy took place within the [U.S.]").

[3] Defendants concede that after *Kiobel* there is no doubt in the Eleventh Circuit that corporations may be sued under the ATS.  MTD at 54-55 (citing *Romero v. Drummond Co., Inc.,* 552 F.3d 1303 (11th Cir. 2008)).  Moreover, although the Supreme Court did not directly rule on the issue of corporate liability, the Court presumed corporations can be held liable under the ATS when it stated that "mere corporate presence" will not suffice for such claims.  *See Kiobel*, 133 S.Ct. at 1669.  This reference would be rendered superfluous if the Supreme Court did not understand corporations can be held liable under the ATS when the claims "touch and concern the territory of the United States . . . with sufficient force." *Id.*

*Mamani* was not a watershed case, nor did it alter the elements of an extrajudicial killing.  Moreover, there is no dispute *Mamani* only addressed claims for extrajudicial killings under the ATS and not war crimes, which are distinct violations of the law of nations.  In fact, the *Mamani* decision did little more than reiterate the Supreme Court's most recent pronouncement on the pleading standard, which this Court already applied in *Balcero*.  2010 WL 9450019, at *2 (citing, e.g., *Iqbal*, 556 U.S. at 684).  Thus, just as the *Balcero* plaintiffs' allegations that their decedents' deaths constitute extrajudicial killings under the ATS and TVPA were sufficient before *Mamani*, Plaintiffs' allegations here are sufficient after *Mamani*.  This Court's reasoning in *Balcero* thus applies with equal force to this case.

> **A.**    ***Mamani* Did Not Create a More Burdensome Pleading Standard Than That Established by the Supreme Court in *Twombly* and *Iqbal* and Applied by This Court in *Balcero*.**

Drummond attempts to create the illusion that *Mamani* dictates an insurmountable pleading standard for plaintiffs, when in fact the Eleventh Circuit was merely "[f]ollowing the Supreme Court's approach in *Iqbal*."  654 F.3d at 1153.  Plaintiffs' complaint must only "contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S. at 570); *see also Speaker v. U.S. Dep't of Health Human Servs. Ctrs. for Disease Control and Prevention*, 623 F.3d 1371, 1386 (11th Cir. 2010)

(Plaintiffs "need not prove [their] claims on the pleadings," but rather "must merely provide enough factual material to raise a reasonable inference, and thus a plausible claim.").

Applying *Twombly* and *Iqbal*, the Eleventh Circuit in *Mamani* determined that based on the plaintiffs' conclusory allegations there, they had not sufficiently alleged the particular defendants' conduct plausibly violated international law. 654 F.3d at 1153-55. The *Mamani* Court's reasoning focused on the fact that the allegations never provided "more than a sheer possibility" of misconduct, *id.* at 1153, and were actually more consistent with *lawful* behavior and thus failed to state "plausible claims," *id.* at 1155; *see also Iqbal*, 556 U.S. at 679 (stating that determining whether an allegation is "plausible" is necessarily context driven, and facts are not well pled when the allegations do not allow the court to "infer more than the mere possibility of misconduct"). For example, the Eleventh Circuit emphasized that the allegations were against *government officials* who were:

> facing a situation where many of their opponents in Bolivia were acting boldly and disruptively (for example blocking major highways to the nation's capital and forcing the Defense Minister out of at least one town) . . . Plaintiffs pleaded facts sufficient to show that the President, in the face of significant conflict and thousands of protesters, ordered the mobilization of a joint police and military operation to rescue trapped travelers; authorized the use of "necessary force" to reestablish public order; and authorized an executive decree declaring the transport of gas to the capital city to be a national priority.

*Mamani*, 654 F.3d at 1154.  All of these allegations, the Court noted, gave no hint

at illegal conduct, and instead plausibly stated a claim only for *lawful* conduct (a

lawful military objective).  *Id.* at 1153-54.

Defendants argue after *Mamani*, Plaintiffs' allegations of extrajudicial

killings must "exclude plausible 'alternative explanations.'"  MTD at 29.[4]

Defendants' newly minted requirement constitutes a sweeping expansion of *Iqbal*,

which focused exclusively on alternative lawful explanations.[5]  As this Court noted

in *Balcero*, the Court only "must determine if the allegations provide for relief on

*any* [plausible] theory."   2010 WL 9450019, at *3.  Indeed, Plaintiffs have alleged

a plausible theory because, unlike in *Mamani*, the AUC's basic strategy, as a

terrorist organization,[6] was to use brutal violence against civilian populations in

pursuit of victory in the civil conflict with leftist guerrillas.  The most plausible

explanation for any killing carried out by a member of such an organization is that

it was "deliberate," pursuant to the organization's overall strategy.  *See infra*,

Section II.B.  Acts of indiscriminate violence by terrorist organizations have

---

[4] Defendants repeatedly refer to a so-called "heightened pleading standard" applied to ATS cases.  *See* MTD at 10-11, 37.  As this Court previously explained, the so-called "heightened pleading standard" does not impose a greater burden than the *Iqbal* standard, but merely requires that "the complaint identify facts showing that defendants violated a specific international law." *Balcero*, 2010 WL 9450019, at *4 n.10.

[5] In *Iqbal*, plaintiff's claims were dismissed because the alleged arrests "were likely lawful and justified by . . . nondiscriminatory intent," not simply because of the existence of *any* alternative explanation.  556 U.S. at 682.

[6] The United States government officially declared the AUC to be a terrorist organization in 2001 and deemed it illegal for any U.S. corporation to fund or otherwise support it.  *See* FAC ¶¶ 85, 125, 150.

generally been found to constitute extrajudicial killings under the ATS.  *See, e.g.,*
*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*,
792 F. Supp. 2d 1301, 1351 (S.D. Fla. 2011) (denying defendants' motion to
dismiss where plaintiffs' allegations did not include any specific intent to kill
particular individuals); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d
1, 14 (D.D.C. 2011) (finding that two bombings of U.S. embassies in Lebanon
constituted extrajudicial killings, though the bombers did not know the specific
identities of those killed and did not individually target each decedent); *Rimkus v.*
*Islamic Republic of Iran*, 750 F. Supp. 2d 163, 182 (D.D.C. 2010) (bombing of
Khobar Towers in Saudi Arabia held to constitute extrajudicial killings); *Wagner v.*
*Islamic Republic of Iran*, 172 F. Supp. 2d 128, 133-34 (D.D.C. 2001) (finding the
September 1984 bombing was a "deliberate and premeditated act" that killed 14
people and "[t]here is no evidence that it was judicially sanctioned by any lawfully
constituted tribunal").[7]

---

[7] Defendants' argument that Plaintiffs failed to provide sufficient detailed allegations related to
each decedent, connecting these defendants to these decedents, MTD at 35-36, is unavailing.
Like the terrorist bombings at issue in these cases, the AUC's violence targeted broad categories
of the civilian population (people living in areas thought to be supportive of the FARC,
particularly along the Drummond rail line), and its goals were achieved through spreading terror
generally in those communities. This does not require specific intent as to particular victims, and
thus is quite unlike the actions of the sharpshooters in *Mamani*.  Accordingly, Plaintiffs'
allegations that each was killed by a paramilitary, in the relevant region, during the relevant time
period, are sufficient to state a claim for extrajudicial killing under these facts, without more
detailed allegations regarding the AUC's intent to kill each decedent individually. *See, e.g.,*
*Chiquita*, 792 F. Supp. 2d at 1351.

As discussed below, Plaintiffs have alleged non-conclusory allegations creating a more-than-plausible showing of the AUC's responsibility for Plaintiffs' decedents' deaths and Defendants' liability, which satisfies the pleading requirements of *Iqbal*. *See infra*, Sections II.B. & II.C.

**B.**   **Plaintiffs Sufficiently Pled the AUC Committed Extrajudicial Killings after *Mamani*.**

Courts generally use the TVPA's definition of extrajudicial killings for claims under the ATS, *see, e.g., Chiquita,* 792 F. Supp. 2d at 1324, which defines them as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  28 USC §1350, note § 3(a). The *Mamani* Court noted the allegations must show "decedents' deaths were 'deliberate' in the sense of being undertaken with studied consideration and purpose."  654 F.3d at 1155.

Indeed, very unlike *Mamani* in which the Court held "[p]laintiffs [had] not pleaded facts sufficient to show that anyone – especially *these defendants*, in their capacity as high-level officials – committed extrajudicial killings within the meaning of established international law," 654 F.3d at 1155 (emphasis in original), here, Plaintiffs allege the AUC employed a deliberate and carefully-designed strategy to defeat the FARC, and used the killing of civilians as a necessary (and desired) tactic to achieve their ultimate goal.  *See* Doc. 20, FAC ¶ 136 ("according

to El Tigre, the best way to prevent civilians from assisting the FARC in an area is to get rid of the people living there.  This was the AUC's well-known and established method of operation"); *id.* ¶ 99 ("Carlos Tijeras" stated that "we not only drove the guerrilla groups out of the area, but our tactics made sure the local people would never entertain the idea of supporting or joining the guerrillas.  We made clear with our actions that anyone who supported the FARC was our enemy and would be dealt with accordingly."); *id.* ¶ 107 (Alcides Manuel Mattos Tabares, alias "Samario," stated that "[o]ur methods of killing were intended by us to ensure that everyone was clear that we would be back and do the same to them if they assisted the FARC.").  Plaintiffs also allege that all of their decedents "were killed in villages in the areas where the leaders of the Northern Block of the AUC have stated they conducted operations to defeat the FARC and its supporters."  *Id.* ¶ 110.

Thus, Plaintiffs allege Drummond made an agreement with the AUC, an illegal terrorist organization, to support and fund its activities with the designed purpose[8] of advancing the AUC's interests to eradicate the FARC in Colombia. *See, e.g., id.* ¶¶ 5, 119-120, 167.  These allegations plausibly demonstrate illegal conduct and are actually *inconsistent* with lawful activity because Plaintiffs have detailed the specifics of the AUC's brutal tactics of attacking civilians, which

---

[8] Although Plaintiffs satisfy this "shared purpose" standard for aiding and abetting, articulated by this Court in *Balcero*, Plaintiffs argue herein that a shared intent is sufficient to establish ATS liability through aiding and abetting.  *See infra*, Sections II.C. & III.

earned it the moniker of "terrorist" by the U.S. Government.  Furthermore, as the AUC was a terrorist organization, all violent acts committed by the organization were unlawful.

For all of these reasons, Plaintiffs' allegations are clearly distinguishable from *Mamani* where there were no allegations that the killing of plaintiffs' decedents was part of an overall, deliberate strategy of the Bolivian military to use civilian casualties to stop a popular uprising.  654 F.3d at 1150.  Rather, the allegations in *Mamani* demonstrated the tactics used were most plausibly lawful military objectives.  *Id.* at 1154 n.6 (noting "the defense minister may have been directing military personnel *not* to fire at uninvolved civilians . . . *See Iqbal*, 556 U.S. at 680-87 (discussing pleadings that are compatible with lawful inferences)").

To further argue Plaintiffs' allegations are insufficient, Defendants assert instances in which the AUC "mistakenly identif[ied] a target" to be a FARC supporter negates the AUC's commission of extrajudicial killings.  *See* MTD at 30 (citing, *e.g.,* FAC ¶ 106 (Samario stated that "every execution order that passed through my hands was to kill someone we thought was a member or supporter of the FARC . . . Sometimes others were killed in villages when we went after our targets because they were in the way or we needed to make a strong example to the people.")).  Defendants, however, are inventing an additional element for extrajudicial killings that is not supported by any authority.  Despite any mistaken

identities, Plaintiffs allege the AUC committed extrajudicial killings of Plaintiffs'
decedents because they were deliberate killings not previously authorized
following proper judicial proceedings.[9]   Moreover, Plaintiffs are not required to
allege the Defendants knew the specific identities of those killed.  *See supra,*
*Islamic Republic of Iran* bombing cases (holding terrorist bombings constitute
extrajudicial killing, despite lack of targeting of specific decedents).  This is
merely an attempt by Defendants to revive an argument previously rejected by this
Court.[10]

    As the murders of Plaintiffs' decedents occurred pursuant to the AUC's
established strategy of targeting civilians in violation of international law, the
killings were deliberate and distinguishable from those in *Mamani,* and thus meet
the extrajudicial killing standard.

---

[9]  This Court previously held that even where certain individuals were suspected of being FARC
supporters, this does not negate a claim for war crimes because civilian status is not an element
of a war crime.  *See Balcero*, 2010 WL 9450019, at *7 n.16.

[10] In *Balcero*, this Court noted that it "can find no authority for Defendants' contention that
Drummond must have known of specific *identities* of those murdered, and have ordered the
deaths of those specific individuals, in order to potentially be held liable for aiding and abetting
extrajudicial killings. Nor have Defendants cited to the court to any basis for that contention.
Without such authority, this court must conclude that, at this time, Plaintiffs have done enough to
sufficiently allege aiding and abetting based upon their factual contention that Drummond
purposefully participated in murders along its rail lines."  2010 WL 9450019, at *11 n.24
(internal citations omitted).

**C.     Plaintiffs Sufficiently Pled that Defendants Are Liable after**
*Mamani* **under Secondary Liability Theories.**

Drummond argues that to survive a motion to dismiss after *Mamani*,

Plaintiffs must allege "deliberate targeting of the victim by the named defendant,"

MTD at 27, and "facts connecting what these defendants personally did to the

particular alleged wrongs," *id.* at 31.  Defendants misread *Mamani*, and

incorrectly blend theories of primary and secondary liability.

First, Defendants falsely claim that "[i]n its analysis of secondary liability,

the [*Mamani*] Court found that deliberate targeting of the victim by the named

defendant is required." *Id.* at 27.  *Mamani*, however, found plaintiffs had not

sufficiently alleged an ATS tort at all, and so never applied any theory of

secondary liability.  654 F.3d at 1155; *see also id.* at 1154 ("Before we decide who

can be held responsible for a tort, we must look to see if an ATS tort has been

pleaded at all.").

Second, Drummond misinterprets *Mamani*'s conclusion that "[p]laintiffs do

not allege a connection exists between the Defense Minister's directing of where to

fire weapons and the death of plaintiffs' decedents," *id.* at 1154, to mean that

"*these* Defendants" must directly be "held liable for extrajudicial killing."  MTD at

28.[11]  Plaintiffs need only show the *principal*'s actions satisfy the extrajudicial

---

[11] Defendants cite *Manami*'s reference to *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), to argue that the facts in *Cabello* present the only circumstances in which secondary

killing standard and that the *defendant*s' actions satisfy the standard for aiding and abetting an extrajudicial killing.  *See Chiquita*, 792 F. Supp. 2d at 1338 (distinguishing standards for secondary liability from those for underlying violations); *see also generally Balcero*, 2010 WL 9450019 (implicitly making this distinction because plaintiffs do not allege the AUC killed the victims and defendants are secondarily liable for the killings).  In fact, even the *principal* is not required to have specifically targeted the particular victim.  *See Chiquita*, 792 F. Supp. 2d at 1351 (denying defendants' motion to dismiss where plaintiffs' allegations did not include any specific intent to kill particular individuals).[12]

Moreover, it is clear from the context in which the *Mamani* court references a "connection" between "the Defense Minister's directing of where to fire weapons and the death of plaintiffs' decedents," the Court was not contending the Defense Minister must have targeted specific civilians in order to establish a claim for

---

liability may attach.  *See* MTD at 27.  Regarding *Cabello*, the *Mamani* Court merely noted the ways in which the allegations, and ultimately the evidence, were far different than in *Mamani*. 654 F.3d at 1155 n.9.  Moreover, courts in this circuit have held secondary liability is sufficiently pled with far less "direct" facts than in *Cabello*.  As one district court stated: "*Cabello* and *Aldana [v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242 (11th Cir. 2005)] thus establish that aiding and abetting, or accomplice liability, is a recognized theory of indirect liability under the ATS.  While these cases involve assistance by the defendants that is arguably more direct than that alleged here—for instance, the defendant in *Cabello* was personally present during the alleged unlawful acts—the Eleventh Circuit's holding in each case was not based on this direct assistance.  Rather, *Aldana* and *Cabello* broadly held that conspiracy and accomplice liability are recognized theories for secondary liability under the ATS.  Neither the specific holdings nor the underlying reasoning of these decisions discussed . . . [a] specific-versus-general assistance distinction."  *Chiquita.*, 792 F. Supp. 2d at 1339.

[12] *See also supra, Islamic Republic of Iran* bombing cases (holding terrorist bombings constitute extrajudicial killing, despite lack of targeting of specific decedents).

extrajudicial killing.  654 F.3d at 1154.  Rather, the "connection" the Court referenced was only not sufficiently pled because directing where to shoot more plausibly constituted a lawful military action and did not – without further allegations – show a "connection" to unlawful conduct in violation of the law of nations.  *See id.* at 1154 n.6 (stating "the Defense Minister may have been directing military personnel *not* to fire at uninvolved civilians is consistent with the pleadings about his helicopter directives.  *Iqbal*, 556 U.S. at 680 (discussing pleadings that are compatible with lawful inferences).").

Even if this Court were persuaded by Drummond's misreading of *Mamani*, however, Plaintiffs' allege non-conclusory allegations beyond those even present in the *Balcero* complaint, showing "Drummond's purposeful intent to assist in particular acts of murder along the rail lines."  *See Balcero,* 2010 WL 9450019, at *11 (finding the same allegations as in this case were sufficiently pled).  In addition to El Tigre's testimony, noted by this Court in *Balcero*, *id.* at *12-13 (describing Drummond's purposeful direction of AUC activities), Plaintiffs now allege specific details of how payments were made, who directed those payments to be made, and the purposes for which the payments were made.  For example, the FAC includes specific details describing how Jaime Blanco, former operator of Drummond's food concession, funneled payments to the AUC: "The payments were first made by Adkins bringing cash payments of $10,000 from Alabama.

16

Blanco would deliver the cash payments from Adkins to the AUC."  FAC ¶ 91.

Blanco later used "inflated invoices for services provided to Drummond, and he

would provide the overage to the AUC."  *Id.*; *see also id.* ¶¶ 6, 88 (Garry

Drummond approved the scheme to pay the AUC).

Plaintiffs also allege in greater detail Drummond's use of the Colombian

military to channel funds to the AUC.  *Id.* ¶¶ 7, 73, 127.  Further, there are more

specific allegations regarding high level Drummond officials' participation in the

scheme.  *See, e.g., id.* ¶ 59 ("Defendant Tracy was briefed by Adkins about

Drummond contractors who were paying the AUC"); *id.* ¶ 60 (DLTD President

Augusto Jimenez "was a direct participant in Drummond's plan to make significant

payments to the AUC, and he personally participated in arranging payments from

security contractor Secolda to the AUC"); *id.* ("On numerous occasions, Jimenez

met with representatives of the AUC, including Jaime Blanco Maya, who acted as

a liason between the AUC and Drummond"); *id.* ("Araujo was a direct participant

in Drummond's plan to make significant payments to the AUC, and he personally

participated in arranging payments from Drummond to various AUC commanders,

including his friend Rodrigo Tovar Pupo, alias 'Jorge 40,' head of the Northern

Block of the AUC.").

In light of this Court's previous ruling in *Balcero* and these new, non-

conclusory allegations, Drummond's position that Plaintiffs failed to adequately

allege it aided and abetted the AUC's extrajudicial killing is unsupportable regardless of this Court's interpretation of *Mamani*.

## III. Plaintiffs' Sufficiently Pled Aiding and Abetting, Conspiracy, Agency, and Ratification Liability.

In the Eleventh Circuit, federal common law governs accessorial liability in ATS and TVPA cases.  *See, e.g., Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247-48 (11th Cir. 2005) (looking "to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983"); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158-59 (11th Cir. 2005) (applying federal common law to aiding and abetting and conspiracy claims); *Balcero*, 2010 WL 9450019, at *15-16 (applying Restatement (Second) of Agency).[13]  As this Court previously found in *Balcero* with similar pleadings, under federal common law Plaintiffs adequately pled liability for war crimes and extrajudicial killings based on aiding and abetting, conspiracy, agency, and ratification theories.  Indeed, in this case the pleadings are more detailed than *Balcero* because Plaintiffs here have access to additional facts based on discovery in *Balcero*.

---

[13] Other federal courts also apply federal common law to agency theories under the ATS.  *See, e.g., Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 51 (D.C. Cir. 2011) (in ATS cases, "agency law . . . [is to] be drawn from federal common law"); *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1202 (9th Cir. 2007) ("Courts applying the ATCA draw on federal common law, and there are well-settled theories of vicarious liability under federal common law."); *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 271 (S.D.N.Y. 2009) (applying "federal common law principles concerning agency").

A.     **Plaintiffs Sufficiently Pled Aiding and Abetting Liability under Both the "Knowledge" and, Alternatively, the "Purpose" Standard.**

Drummond reiterates the five-factor standard for aiding and abetting this Court applied in *Balcero*.  *See* MTD at 34 (citing *Balcero*, 2010 WL 9450019, at *11).  In *Balcero*, this Court relied on Second Circuit case law, which imposed an intent/purpose *mens rea* requirement to aiding and abetting liability under the ATS. 2010 WL 450019, at *11 (citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 668 (S.D.N.Y. 2006)); *Khulumani v. Barclay Nat'l. Bank*, 504 F.3d 254, 276 (2d. Cir.2007)).  Since this Court ruled on this issue, however, another circuit court has determined a knowledge standard should be applied to aiding and abetting liability under the ATS.  *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 33-39 (D.C. Cir. 2011).  Regardless of the test applied, however, Plaintiffs have alleged sufficient facts to support their claims for aiding and abetting.

In *Exxon Mobil*, the D.C. Circuit rejected the purpose standard and found under federal common law that knowledge was the appropriate standard.  *Id.* The *Exxon* court specifically cited *Cabello*, 402 F.3d at 1157-60, as support for establishing a knowledge standard in the Eleventh Circuit.  *Exxon Mobil,* 654 F.3d at 33.  The Eleventh Circuit previously approved a three-part test for aiding and abetting liability, which only requires knowing, substantial assistance.  *Cabello,*

402 F.3d at 1158. [14]  In *Cabello*, the Eleventh Circuit found the defendant could be

held indirectly liable for aiding and abetting if Plaintiffs proved: (1) "one or more

of the wrongful acts that comprise the claim were committed," (2) the Defendants

"substantially assisted some person or persons who personally committed or

caused one or more of the wrongful acts that comprise the claim," and (3)

Defendants "knew that [their] actions would assist in the illegal or wrongful

activity at the time [they] provided the assistance." *Id*.[15]

Drummond does not dispute, nor could it, that Plaintiffs easily satisfy this

standard because they allege in detail how the war crimes and extrajudicial killings

described in the FAC were committed "by the AUC Northern Block, which

received knowing and substantial assistance from Drummond." FAC ¶¶ 20-53.

---

[14] *Cabello* applied federal common law to plaintiffs' aiding and abetting claims, 402 F.3d at 1158-59, while the Second Circuit standard applied in *Balcero* purportedly drew upon international law. *Balcero*, 2010 WL 9450019, at *11. After this Court issued its decision in *Balcero*, the D.C. Circuit found the Second Circuit's analysis of customary international law (CIL) concerning aiding and abetting was flawed. *See Exxon Mobil*, 654 F.3d at 35-38 (demonstrating the Rome Statute for the International Criminal Court (ICC) as well as the one Nuremburg cased relied upon actually support a knowledge standard, not purpose). Additionally, a long and continuous line of cases from the Nuremburg Tribunals, the International Criminal Tribunal for Rwanda (ICTR), and the International Criminal Tribunal for the former Yugoslavia (ICTY) embrace a knowledge standard for aiding and abetting. *See, e.g., In re Bruno Tesch (Zyklon B Case)*, 13 Int'l L. Rep. 250 (Br. Mil. Ct. Mar. 1-8, 1946); *U. S. v. Friedrich Flick*, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1187, 1192 (1952); *Prosecutor v. Tadic,* Case No. IT–94–1–T, Trial Chamber Opinion and Judgement, ¶¶ 674, 692 (May 7, 1997); *Prosecutor v. Furundzija,* Case No. IT–95–17/1 Trial Chamber Judgement, ¶¶ 236, 245, 249, 275 (Dec. 10, 1998); *Prosecutor v. Krstic,* Case No. IT –98–33–A, Appeals Judgement, ¶¶ 139–41 (Apr. 19, 2004); *Prosecutor v. Dordevic*, Case No. IT-05-87/1-T, ¶ 1876 (Feb. 23, 2011); *Prosecutor v. Taylor*, Case No. SCSL-03-01-T, Judgement, ¶ 6904 (May 18, 2012).
[15] This test is virtually identical to that adopted by the Restatement (Second) of Torts § 876(b) (1979).

Plaintiffs allege "Drummond had specific and detailed knowledge of the AUC's brutal methods and tactics," because they were "widely reported in the press in Colombia and the United States." *Id.* ¶ 114.  Moreover, in a September 1995 memo, Drummond's Security Advisor, James Adkins, "expressly stated his knowledge of the tactics"  and advised Drummond that providing support to the AUC would "bring with it egregious human rights violations . . . ."  *Id.* ¶ 120. Plaintiffs also allege that Drummond, nonetheless, made the decision to fund the AUC to combat the FARC's presence along Drummond's rail line and this monetary support assisted the AUC in its commission of war crimes and extrajudicial killings.  Specifically, El Tigre stated Drummond's decision "to provide the AUC's Juan Andres Alvarez Front substantial payments allowed us to have more arms and men when we attacked these areas," *id.* ¶ 104, and Samario stated that "Drummond's support was essential to our military success because we added at least 165 fully-equipped men to the Front and supported them with food and supplies with the funds Drummond provided us."  *Id.* ¶ 107.

Instead, although Drummond acknowledges that similar allegations satisfied the heightened intent/purpose standard in *Balcero*,  Drummond argues *Mamani* changed the aiding and abetting standard and now calls into question this Court's ruling in *Balcero*.  MTD at 35-37.  *Mamani*, however, did not even reach the standard for aiding and abetting liability and it only addressed extrajudicial

21

killings, not war crimes.  *See* 654 F.3d at 1155 n.8 (while plaintiffs pled aiding and

abetting liability, the court's only mention of it was in a footnote in which it made

clear that it was not ruling out aiding and abetting liability).  Rather, as discussed

above, *Mamani* merely applied *Iqbal* to determine the plaintiffs' pleadings were

too conclusory to find the underlying extrajudicial killings had occurred.  *See*

*supra*, Section II.A.  Moreover, this Court was aware of *Iqbal* and applied its

holding in *Balcero*.  2010 WL 9450019, at *2.  Because *Mamani* did not address

the necessary intent for aiding and abetting liability (under either the intent or

purpose standard) and Drummond has presented no other reason to disregard

*Balcero*'s holding, Plaintiffs' allegations of aiding and abetting liability should

likewise satisfy *Iqbal*'s  pleading standard in this case.

  This Court in *Balcero* found Drummond purposefully intended to assist the

AUC in its commission of war crimes and extrajudicial killings, 2010 WL

9450019, at *11-12, because Drummond directed the AUC to prioritize its

operations in the towns along Drummond's rail line where the FARC was

operating or had supporters, *see* FAC ¶¶ 105, 142, and provided money to the

AUC on the condition that "the areas along the Drummond rail line that had a

FARC presence had to be attacked and pacified."  *Id.* ¶ 131.  Drummond did this

with the understanding and intent that they "were not talking about physical

protection of property," but rather "talking about doing what the AUC was created

to do and that is destroy the FARC and its supporters."  *Id.*  In addition, beyond the

testimony of El Tigre, which was found sufficient in *Balcero*, Plaintiffs now allege

"Defendant Garry Drummond discussed with Adkins and others that the guerrillas

threatened his ability to make timely deliveries of coal to his international

customers and he expected the AUC to solve this problem."  *Id.* ¶ 128.

   Finally, Drummond also would have this Court impose an additional

requirement to demonstrate aiding and abetting liability:  that Drummond intended

"to kill innocent civilians."  MTD at 36.  Drummond does not cite a single legal

authority in support of this position, however, and this Court previously rejected it

in *Balcero* for this very reason.  2010 WL 9450019, at *7 n.16 ("this court can find

no authority for the contention . . . that civilian status is an element of a war crimes

claim.").[16]  Indeed, every single legal authority to consider the issue agrees that

war crimes do not require specific intent to kill innocent civilians.[17]  Similarly,

there is no requirement for extrajudicial killings that Drummond intended to kill

---

[16] Nor is it an element of extrajudicial killings as defined by the TVPA.  *See* 28 USC §1350, note § 3(a).

[17] There is a consistent line of cases from Nuremberg to the 2012 conviction of former Liberian President Charles Taylor holding that specific intent to kill is not required for war crimes.  In the Zyklon B case, defendant businessmen were convicted for selling insecticide to the Nazis, which was used for mass executions, because they knew of the Nazis' intended use for the product but lacked specific intent to kill (they argued they were merely trying to make a profit).  *See In re Tesch*, p. 93, 100-01,103.  Charles Taylor was convicted of, *inter alia*, aiding and abetting war crimes based on indiscriminate, random violence involved in attacking villages, *Taylor* ¶ 6994, and a "general policy of using terror against civilians."  *Id.* ¶ 872.  The ICTY has held unequivocally that for war crimes "[t]here is no requirement of the intent to attack particular civilians, rather it is prohibited to make the civilian populations as such, as well as individual civilians, the object of an attack."  *Prosecutor v. Strugar*, Case No. IT-01-42-A, ¶ 271 (July 17, 2008).

"innocent civilians," as an extrajudicial killing merely requires allegations that the decedents' executions were not pursuant to proper judicial proceedings.  28 U.S.C. §1350, note § 3(a).

However, although *not* required, Plaintiffs' allegations also satisfy Drummonds' unsupported and extreme position that it must have intended innocent civilians to be killed by the AUC.  First, Drummond cannot claim it lacked intent for the AUC to use its well-known tactic of terrorizing local populations to ensure they did not sympathize with the FARC when it unleashed the AUC on the towns along its rail line.  *See, e.g.*, *U.S. v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992) (approving instruction that jury "may infer that a person ordinarily intends all the natural and probable consequences of an act knowingly done.").  Second, the FAC supports Plaintiffs' allegation that Drummond knew exactly what effect its support of the AUC would have on innocent civilians.  *See, e.g.,* FAC ¶ 99 (Carlos Tijeras stated the AUC "not only drove the guerrilla groups out of the area, but [their] tactics made sure the local people would never entertain the idea of supporting or joining the guerrillas.");  *id.* ¶ 106 (Samario stated "[s]ometimes others were killed in villages when we went after our targets because they were in the way or we needed to make a strong example to the people.");  *id.* ¶136 ("according to El Tigre, the best way to prevent civilians from assisting the FARC in an area is to get rid of the people living there. This was the AUC's well-

known and established method of operation.").  In addition, Drummond knew the AUC had been designated a terrorist organization by the U.S. State Department precisely because it had committed massacres against innocent civilians.  *Id.* ¶¶ 85, 125, 150.

For all these reasons, Plaintiffs have adequately pled liability under an aiding and abetting theory.

### B.     Plaintiffs Sufficiently Pled a Conspiracy Theory of Liability.

Conspiracy liability is cognizable under the ATS and TVPA.  *See, e.g.*, *Aldana*, 416 F.3d at 1248 (confirming the ATS "reaches conspiracies and accomplice liability") (quoting *Cabello*, 402 F.3d at 1157, which held defendant could be held liable for ATS and TVPA violations under a conspiracy theory); *Balcero,* 2010 WL 9450019, at *10 ("Secondary liability may attach on any one of the following three theories: aiding and abetting, conspiracy, or agency."); *see also Carmichael v. United Techs Corp.*, 835 F.2d 109, 113-14 (5th Cir. 1988) (assuming, without deciding, that the ATS confers jurisdiction over private parties who conspire in state acts of torture); *Eastman Kodak v. Kavlin*, 978 F. Supp. 1078, 1091 (S.D. Fla. 1997) (concluding as "a matter of initial impression" that

"the ATCA makes a private actor liable in tort for conspiring with state actors to violate the law of nations.").[18]

In the Eleventh Circuit *Cabello* decision, which remains the binding case in this Circuit, the standard for conspiracy liability under the ATS is: (1) "two or more persons agreed to commit a wrongful act," (2) Defendants "joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to

---

[18] Defendants contend conspiracy claims are limited to conspiratorial agreements to commit genocide and wage aggressive war. *See* MTD at 37 n.13 (citing *Hamdan v. Rumsfeld*, 548 U.S. 557, 610 (2006)). The Supreme Court decision on which Defendants rely is not applicable. First, both before and after *Hamdan* was decided, the Eleventh Circuit has approved of conspiracy as a theory of accessorial liability under the ATS for claims beyond genocide and a common plan to wage aggressive war. *See e.g., Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1258 & n.5 (11th Cir. 2009) (holding that a conspiracy theory of indirect liability is applicable to torture claims); *Aldana*, 416 F.3d at 1247–48 (same); *Cabello*, 402 F.3d at 1151, 1157 (holding that a conspiracy theory of indirect liability is applicable to claims for extrajudicial killing, torture, and crimes against humanity). Second, *Hamdan* analyzed whether the inchoate crime of conspiracy (which requires an agreement and overt acts, but no completed deed) was recognized by international law and concluded the only "conspiracy crimes" so recognized are "conspiracy to commit genocide and common plan to wage aggressive war." 548 U.S. 557, 610 (2006). *Hamdan's* limitation of conspiracy, however, was based on the "law of war," not the law of nations, which is broader. *Id.* at 566-67. Third, *Hamdan* explicitly limited its scope of review to conspiracy as a standalone offense and distinguished conspiracy as a theory of accessorial liability for completed offenses. *See id.* at 611 n.40 (finding international law does not "recognize as a separate offense conspiracy to commit war crimes or crimes against humanity," but does recognize the joint criminal enterprise theory of liability, that is a species of liability for the substantive offense (akin to conspiracy), not a crime on its own). Drummond attempts to piggyback off two Southern District of New York decisions, both of which erroneously relied on *Hamdan's* discussion of conspiracy as an inchoate offense to determine the international legal character of conspiratorial liability under the ATS. *See* MTD at 37 n.13 (citing *Talisman*, 453 F. Supp. 2d at 663-65; *S. African Apartheid Litig.*, 617 F. Supp. 2d at 262). This conflation is a striking misreading of *Hamdan*, which finds no support in the Supreme Court's narrow finding. Moreover, on appeal, the Second Circuit correctly identified the *Hamdan* finding as being limited to inchoate offenses and left open the possibility that ATS claims alleging conspiratorial liability for war crimes and crimes against humanity could be cognizable "under a theory of relief based on a joint criminal enterprise." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009).

help accomplish it," and (3) "one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy."  402 F.3d at 1159.  Drummond again incorrectly asserts that a conspiracy claim requires intent to kill innocent civilians, and *Mamani* changes the conspiracy standard.  MTD at 38-39.  *See infra* Section III.A. (addressing these same arguments in the context of aiding and abetting).  For the same reasons this Court rejected Drummond's argument that Defendants did not possess the requisite intent in *Balcero*, it should likewise do so now.  2010 WL 9450019, at *15.

As discussed above, Plaintiffs' allegations satisfy the purpose standard this Court applied to aiding and abetting liability in *Balcero*.  *See supra* Section III.A. Since Drummond's position is the same standard applies to conspiracy liability, MTD at 38, it naturally follows that Plaintiffs' allegations demonstrating Drummond purposefully intended to aid and abet the AUC in its commission of war crimes and extrajudicial killings also demonstrate Drummond's intent to participate in a conspiracy with the AUC to commit war crimes and extrajudicial killings.  Specifically, Drummond entered into a conspiracy with the AUC to defeat the FARC, whereby "the areas along the Drummond rail line that had a FARC presence had to be attacked and pacified."  FAC ¶ 131; *see also id.* ¶¶ 105, 142.  To help accomplish this goal, Drummond provided the AUC with "substantial payments" which were "essential to [the AUC's] military success"

because they allowed the AUC to "add at least 165 fully-equipped men to the Front and supported them with food and supplies . . . ." *Id.* ¶¶ 104, 107.

For all these reasons, Plaintiffs have adequately pled liability under a conspiracy theory.

### C. Plaintiffs Sufficiently Pled an Agency Theory of Liability.

Drummond urges this Court to reconsider its previous holding that agency is a cognizable theory of secondary liability under the ATS and TVPA.  MTD at 40. *See also Balcero,* 2010 WL 9450019, at *10 ("Secondary liability may attach on any one of the following three theories: aiding and abetting, conspiracy, or agency.").  The only case Drummond cites in support of its argument that agency liability is not supported in international law is another district court case from this Circuit.  MTD at 40 (citing *Chiquita,* 792 F. Supp. 2d at 1352-53).  Drummond does not explain why this Court should abandon its previous holding to adopt that of a fellow district court, indicating only that *Chiquita* was decided after *Balcero*. *Id.*  Moreover, *Chiquita*'s rejection of agency liability under the ATS is not accepted by other courts.  *See, e.g., Exxon Mobil*, 654 F.3d at 56 (holding "that under established principles of agency law, corporations can be held liable in ATS lawsuits for torts committed by their agents."); *S. African Apartheid Litig.*, 617 F. Supp. at 274 (allegations of complaint "support liability against a number of defendants under an agency theory"); *Bowoto v. Chevron Texaco Corp.*, 312 F.

Supp. 2d 1229, 1247 (N.D. Cal. 2004) ("plaintiffs may proceed against defendants

on the theory that CNL was acting as defendants' agent.").

In *Balcero*, this Court applied the federal common law standard of agency

and held that Plaintiffs must allege the AUC "acted on Defendants' behalf and

under Defendants' control" and that "the murders alleged in the [FAC] were within

the scope of that relationship."  *See Balcero*, 2010 WL 9450019, at *15.

Additionally, this Court found there were "sufficient allegations in the [FAC] that

Drummond directed the AUC to redirect its focus on the towns around

Drummond's rail lines and that certain murders along the rail lines were within the

scope of the relationship between the AUC and Drummond . . . ."  *Id.* at *16

(internal citations omitted).  Drummond does not dispute these findings and they

apply equally in this case.

What this Court found missing in *Balcero*, and Drummond repeats here, are

sufficient "allegations that the AUC acted 'under the control of' Drummond."  *Id.*

In the present FAC, however, Plaintiffs include numerous allegations that the AUC

acted on behalf of Drummond.  *See, e.g.,* FAC ¶ 106 (Samario stated the AUC

killed unionists "for Drummond"); *id.* ¶ 128 (Drummond "expected" the AUC to

solve its problem with the FARC guerrillas); *id.* ¶ 149 (the AUC "reported" to

Drummond  on "what its funds were accomplishing" and "on their progress against

the FARC"); *id.* ¶ 151 (Drummond provided specific names of suspected FARC

guerrillas to the AUC to be executed and on each occasion the AUC carried out the

executions); *id.* ¶ 152 ("many of the executions in the area of Drummond's

operations were carried out based on *orders*" Drummond gave the AUC)

(emphasis added).

For all these reasons, Plaintiffs have adequately pled liability under an

agency theory.

**D.      Plaintiffs Sufficiently Pled a Ratification Theory of Liability.**

Although Plaintiffs do not dispute the standard applicable to Plaintiffs'

ratification theory of liability, *see* MTD at 43 (citing the three-part test this Court

applied in *Balcero*), Drummond once again attempts to impose an additional

innocent civilian requirement, which simply does not exist in the law and for

which Drummond never once cites a single legal authority.  *Id.*; *see also infra*

Section III.A. (detailing the lack of such requirement in the aiding and abetting

context).  Rather, Plaintiffs must only allege Drummond had actual knowledge of

conduct constituting a tort and failed to take adequate steps to remedy the situation.

*Balcero,* 2010 WL 9450019, at *16.  Plaintiffs demonstrated Drummond's

knowledge of the AUC's tortuous activities in the context of aiding and abetting

liability.  *See infra* Section III.A.  First, Drummond possessed "actual knowledge"

of the AUC's tortuous methods and tactics because they were (1) "widely reported

in the press in Colombia and the United States," FAC ¶ 114; (2) reported to

30

Drummond by it Security Advisor, James Adkins, who warned that providing support to the AUC would "bring with it egregious human rights violations . . . ." *id.* ¶ 120; and (3) Drummond knew the AUC was designated a terrorist organization by the U.S. State Department precisely because it used these tactics against innocent civilians.  *Id.* ¶¶ 85, 125, 150.  Second, not only did Drummond fail to take adequate steps to remedy the situation, it made a deliberate choice to fund the AUC to combat the FARC's presence along Drummond's rail line.  FAC ¶¶ 119-120.  This monetary support assisted the AUC in its commission of war crimes and extrajudicial killings.  *See, e.g., id.* ¶ 104 (Drummond's decision "to provide the AUC's Juan Andres Alvarez Front substantial payments allowed [the AUC] to have more arms and men when [it] attacked these areas"); *id.* ¶ 107 ("Drummond's support was essential to [the AUC's] military success, responsible for adding "at least 165 fully-equipped men to the Front and support[ing] them with food and supplies").

For all these reasons, Plaintiffs have adequately pled liability under a ratification theory.

## IV.   Plaintiffs' Claims are Not Barred by the Statute of Limitations.

Defendants argue the claims of 20 out of 45 Plaintiffs are barred by the ten-year statute of limitations, which undisputedly is applicable to ATS and TVPA claims.  *See* MTD at 44 (citing 28 U.S.C. § 1350; *Arce v. Garcia*, 400 F.3d 1340,

1346 (11th Cir. 2005)).  Defendants raise the same argument, which this Court previously rejected in *Balcero*.  *Balcero* Order, Doc. 275, at 6 (endorsing the equitable tolling doctrine and holding dismissal on statute of limitations grounds was premature).  There has been no material change in the law since the 2012 order in *Balcero*, and so Defendants' motion here should likewise be denied.

A.   **Equitable Tolling Applies to Plaintiffs' Claims Until at Least 2007, When the Colombian Justice and Peace Process Began.**

As the Eleventh Circuit has noted, "every court that has considered the question of whether a civil war and a repressive authoritarian regime constitute 'extraordinary circumstances' which toll the statutes of limitations of the [ATS] and TVPA has answered in the affirmative." *Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005).[19]  In the leading case on equitable tolling under the ATS and TVPA, the Eleventh Circuit in *Arce*, 434 F.3d at 1258-65, applied equitable tolling to plaintiffs' actions arising out of the civil conflict in El Salvador between 1983 and 1992.  The Court confirmed that the applicable ten-year statute of limitations would not begin for such claims until the El Salvador Peace Agreement was

---

[19] Additionally, minors' claims are tolled under the ATS and TVPA.  *See, e.g., Cabello*, 402 F.3d at 1156 ("When a statute is equitably tolled, the statutory period does not begin to run until the impediment to filing a cause of action is removed."); *Rodriguez v. Mahony*, No. CV 10-02902-JST JEMX, 2012 WL 1057428, at *5 (C.D. Cal. Mar. 26, 2012) (holding that plaintiff's ATS claims were tolled until plaintiff's eighteenth birthday and noting "[t]he Senate Report on the TVPA states that the ten-year statute of limitations is subject to equitable tolling, including incapacitation for minority status") (citing S. Rep. No. 101–249 at 10–11, n. 28 (1991)).

reached, *id*. at 1258-59, 1265, because until then "the fear of reprisals against the plaintiffs' relatives orchestrated by people aligned with the defendants excused the plaintiffs' delay in prosecuting their claims against the defendants." *Id.* at 1259. The Eleventh Circuit added that "[t]he doctrine of equitable tolling allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations to begin running on the plaintiffs' claims." *Id*. at 1261.

Courts "look to the relevant statute for guidance in determining whether equitable tolling is appropriate in a given situation." *Id.* Equitable tolling is uniquely suited to the legislative purposes behind both the ATS and the TVPA, which were designed to "promote the protection of human rights internationally." *Id.* As the Eleventh Circuit noted in *Jean*, all courts agree equitable tolling is appropriate when a civil conflict puts prospective plaintiffs in danger, and the statute of limitations should be tolled until the conflict abates. 431 F.3d at 780-81; *see also, e.g., Cabello*, 402 F.3d at 1155 (tolling the statute of limitations under the TVPA and ATS "[u]ntil the first post-*junta* civilian president was elected in 1990" for claims brought against a Chilean military officer because "the Chilean political climate prevented the Cabello family from pursuing any efforts to learn of the incidents surrounding Cabello's murder"); *Chavez v. Carranza*, 559 F.3d 486, 494 (6th Cir. 2009) (applying equitable tolling to claims arising from the civil war in El

Salvador because "[w]hether the plaintiffs knew they had an actionable claim under United States law does not change the fact that at least until March 1994, the circumstances in El Salvador were not sufficiently safe for plaintiffs to seek redress in court"); *Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996) (equitably tolling the ATS and TVPA statutes of limitations for claims against former Philippine dictator Ferdinand Marcos until the Marcos regime was ousted); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 482 (D. Md. 2009) (applying equitable tolling where the plaintiffs "pled that until at least the year 2000, the political climate in Peru was unremittingly hostile to any effort on their part to pursue remedies against Rivera Rondon in Peru"); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1147-48 (E.D. Cal. 2004) (applying equitable tolling where "[t]he evidence is that from 1980 to 1994, and even through to the present, any person who leveled allegations against active or former members of the [Salvadoran] military risked reprisal, including death").

Defendants have provided no new arguments in their motion to dismiss to justify this Court reaching a different conclusion concerning equitable tolling of the statute of limitations than it already reached in *Balcero* – Plaintiffs had adequately pled facts supporting their entitlement to equitable tolling at the pleading stage, but the Court reserved final judgment on the matter until after the

completion of discovery.  *Balcero* Order, Doc. 275, at 6.[20]  Regardless, here
Plaintiffs have pled the conditions suitable for equitable tolling.  For example, until
the 2007 demobilization of the AUC in Colombia, and the consequent quelling of
the violent civil conflict, the AUC, along with their collaborators in the Colombian
government, and with the support of Defendants, used violent reprisals against
anyone who sought to hold them accountable for the terror imposed on the civilian
population, including Plaintiffs.  Further, the AUC was able to act with impunity
because it was protected by the Colombian State.  *See* FAC ¶¶ 7-9, 14-16, 179-87.[2]

These very same allegations were enough for this Court in *Balcero* to apply
equitable tolling at the pleading stage and deny Defendants' similar motion to
dismiss. There, this Court held:

> [A]t this stage of the case, the [Complaint] raises allegations that,
> taken in the light most favorable to Plaintiffs, could justify Plaintiffs'
> delay in filing suit.  The situation in Colombia had been one of great
> unrest until at least 2007, when the AUC was demobilized.  Plaintiffs
> have alleged that until the 2007 demobilization, the AUC "along with
> their collaborators in the Colombia government, and with the support

---

[20] For example, Defendants argue that Plaintiffs have not sufficiently alleged equitable tolling
facts simply because Plaintiffs' counsel filed on behalf of other Colombian plaintiffs before
2007.  MTD Doc. 33, at 48.  Defendants previously made this argument in *Balcero*, Doc. 272, at
3, and this Court's ruling necessarily rejected it when it held in analogous circumstances that it
"cannot say . . . the . . . Plaintiffs at issue cannot prove a set of facts that would show their claims
are subject to equitable tolling." *Balcero* order, Doc. 275, at 6; *see also, e.g., Arce*, 434 F.3d at
1264-65 (addressing the individual circumstances of each plaintiff (considering e.g., position
they held in government)); *Cabello*, 402 F.3d at 1154 (equitable tolling "is a fact-specific
determination").

[2] It is axiomatic that in ruling on a 12(b)(6) motion, the court must accept as true all allegations
in the complaint, view those allegations in the light most favorable to the plaintiff, and accept all
reasonable inferences attendant to those allegations.  *Tello*, 410 F.3d at 1288 n.12.

> of the Drummond Defendants, used violent reprisals against anyone
> who sought to hold them accountable for the terror imposed on the
> civilian population."

*Balcero* Order, Doc. 275, at 6 (citations omitted).

Additionally, Plaintiffs' equitable tolling arguments are even stronger now, as more evidence demonstrates Defendants' direct involvement in harnessing the AUC's violence to serve its purposes with impunity during the lawless period of the AUC's open control of the areas surrounding Drummond's operations in Cesar Province.  This further justified Plaintiffs' delay in filing.  For example, Jaime Blanco Maya was recently convicted in Colombia for collaborating with the AUC in executing Drummond's top union leaders.  *See* February 6, 2013 Associated Press article. "Colombian judge convicts ex-contractor in Drummond union leader killing" *available at*: http://www.foxnews.com/world/2013/02/06/colombian-judge-convicts-ex-contractor-in-drummond-union-leader-killing/.  When Blanco provided his declaration in 2012 in which he discussed how he was intimately involved in Defendants' hiring and funding of the AUC, he stated "there is no doubt that through this declaration, I am exposing myself to great risk by linking very powerful people to serious crimes.  These people, in the context of Colombia, will not hesitate to use violence and threats against me and my family to silence me, or kill me." *Balcero,* Doc. 313-1, Declaration of Jaime Blanco Maya, dated February 15, 2012 at ¶ 2.  Blanco described the methods Defendants used to direct

36

AUC actions and deliver money authorized by Drummond CEO Defendant Garry Drummond, through his security adviser, an ex-CIA agent, James Adkins, to the AUC. *Id.* ¶¶ 12, 13, 18, 22, 26. One can scarcely imagine the danger Plaintiffs would have faced by investigating the deaths of their loved ones prior to 2007, if years later Blanco himself was scared of being executed for providing his declaration to this Court. Blanco's testimony does not stand alone, however, as numerous ex-AUC leaders and collaborators have testified concerning the Drummond-AUC relationship, which formed the basis for Plaintiffs' pleadings in this case. *See Balcero* Doc. 407, Pls' Opp. to DLTD's Mot. Summ. J., at 1-2, 14.

In *Arce*, the tolling was held to be in effect until the Peace Accord sponsored by the United Nations in 1992 was signed. 434 F.3d at 1264-65. In *Cabello*, the Eleventh Circuit tolled the statute of limitations "[u]ntil the first post-*junta* civilian president was elected" in Chile. 402 F.3d at 1155. At best, Plaintiffs here were only able to contemplate investigating their claims beginning in 2007, when the Justice and Peace Process of the Colombian government began to convince former members of the AUC to reveal their secrets. *See* FAC ¶ 9-10 ("The key AUC leaders and members who worked directly with Drummond are now in custody or have already served their time as part of the Justice and Peace process in Colombia, and are giving testimony and speaking to government and human rights lawyers about their alliance with Drummond.").

All Plaintiffs' claims are well within the tolling period.  Equitable tolling depends upon the date when Plaintiffs could have safely filed their claims in light of the dangers of the civil conflict and the threat of violent retaliation.  Plaintiffs filed their Complaint on February 26, 2013, so tolling until February 26, 2003 would make all of the claims timely.  But as noted above, 2007 is the earliest date when the Peace Process could be said to have begun and become fully operational, and Plaintiffs filed their Complaint well within the 10-year period following 2007. *Cabello*, 402 F.3d at 1156 ("When a statute is equitably tolled, the statutory period does not begin to run until the impediment to filing a cause of action is removed . . . Since the statutory period began to run in 1990, the Cabello survivors' claim filed in 1999 is timely.").

Just like in *Balcero*, Plaintiffs here have adequately pled equitable tolling, and consequently Defendants' motion to dismiss must be denied.

### B.     The Statute of Limitations Was Also Equitably Tolled by Defendants' Fraudulent Concealment of Payments to the AUC and Responsibility For the Murders of Plaintiffs' Decedents.[3]

Another purpose of equitable tolling is to avoid denying plaintiffs' rights if they have been prevented from timely filing due to inequitable circumstances such as concealment of the wrong.  *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d

---

[3] The Court need not reach Plaintiffs' alternative argument based on fraudulent concealment if it agrees with Plaintiffs' argument based on the internal conflict in Colombia.  *See Balcero* Order, Doc. 275, at 4 n.2 (not reaching plaintiffs' alternative arguments because plaintiffs "raised a factual inquiry on the question of extraordinary circumstances based on the internal conflict in Colombia").

703, 706 (11th Cir. 1998); *see also Arce,* 434 F.3d at 1262.  Additionally, a federal statute of limitations may be equitably tolled when a complaint is untimely "where the defendant misleads the plaintiff, allowing the statutory period to lapse; or when the plaintiff has no reasonable way of discovering the wrong perpetrated against her." *Cabello,* 402 F.3d at 1155.  Because Defendants deliberately misled Plaintiffs as to their relationship with the AUC, and because Plaintiffs had no way to discover that Defendants were responsible for the deaths of their relatives, tolling is appropriate here.

Defendants deliberately concealed Drummond's payments to the AUC, which prevented Plaintiffs' earlier knowledge of Defendants' involvement in the deaths of their relatives.  To this day, Defendants apparently continue to deny their relationship with the AUC, even in the face of extensive deposition testimony from ex-AUC leaders and collaborators. *See generally Balcero*, Doc. 407.  As a result of Defendants' schemes, although Plaintiffs knew their relatives had been killed as part of the civil conflict with the AUC, they did not know and could not discover that Defendants had played a role in those murders until well after 2007, when the first evidence from the demobilized AUC members became available. *See* FAC ¶¶ 8-10.  Indeed, the first concrete evidence of precisely how Defendants hid the payments to the AUC was contained in the Original Blanco Declaration, dated October 14, 2011.

Given Defendants' concealment of their wrongful conduct, they should not be allowed to hide behind the statute of limitations and profit from their intentional concealment of payments made to the AUC and their repeated denials of their relationships with the AUC.

### C.   The Fact-Intensive Inquiry Underlying Application of the Statute of Limitations Is More Appropriately Addressed By a Jury.

As discussed above, there are potential questions of fact concerning the dates that should apply to equitable tolling based on the Colombian civil conflict and the extent of Drummond's fraudulent concealment.  The allegations of the FAC clearly permit the Court to rule that Plaintiffs' claims are timely.  By contrast, before any dismissal could be entered, there should be discovery and a factual assessment.  *Balcero* Order, Doc. 275, at 6 ("The thirty-six Plaintiffs in question are entitled to develop their claims through the agreed-upon process of discovery.").  At the motion to dismiss stage, dismissal "on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred."  *Id*. at 2 (citing *Tello,* 410 F.3d at 1288); *see also La Grasta v. First Union Sec.*, 358 F.3d 840, 845 (11th Cir. 2004) (same).  Statute of limitations motions, therefore, cannot be granted at the dismissal stage if a factual inquiry is required.  *La Grasta*, 358 F.3d at 848.

Of course, with the benefit of facts developed in discovery, "the result at the summary judgment stage may or may not be the same."  *Id.*  Allowing discovery,

40

however, avoids both the inappropriate reliance on facts not yet in evidence and the impermissible construction of factual ambiguities in favor of the defendant. *See Omar ex rel. Cannon v. Lindsey*, 334 F.3d 1246, 1252 (11th Cir. 2003) (affirming the denial of a Rule 12(b)(6) motion on statute of limitations grounds).

To survive a motion to dismiss on statute of limitations grounds, then, Plaintiffs' allegations need only raise an issue of fact as to timeliness. *See Balcero* Order, Doc. 275, at 6 ("The court cannot say that the thirty-six Plaintiffs at issue cannot prove a set of facts that would show their claims are subject to equitable tolling."); *Tello*, 410 F.3d at 1288; *Doe v. Unocal Corp.*, 963 F. Supp. 880, 897 (C.D. Cal. 1997) (denying motion to dismiss ATS and TVPA claims on statute of limitations grounds because "plaintiffs have raised an issue of fact regarding equitable tolling"); *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1549-51 (N.D. Cal. 1987) (same). Plaintiffs here have alleged the same facts which led this Court in *Balcero* to conclude that there were allegations which "could justify Plaintiffs' delay in filing suit." *Balcero* Order, Doc. 275, at 6.

Accordingly, Defendants' motion to dismiss should be denied.

## V.   Colombia's Statute of Limitations Applies to Plaintiffs' Wrongful Death Claims under Colombian Law.

Defendants contend Alabama's two-year statute of limitations applies to Plaintiffs' wrongful death claims under Colombian law.  MTD at 51-54.  There is no dispute that Colombian substantive law governs Plaintiffs' wrongful death

41

claims.  *Id.* at 51.  Federal courts apply the choice-of-law rules of Alabama, which mandates applying the substantive law of the place where the tort occurred and the procedural law of the forum state.  *See Murphy v. McGriff Transp.*, *Inc.*, 2:11-CV-02754-RDP, 2012  WL 3542296, at *1 (N.D. Ala. Aug. 15, 2012).  In Alabama, although statutes of limitations are generally considered to be "procedural," and thus governed by the forum's rules, there are two exceptions to this rule, which Defendants do not dispute.  MTD at 52.  The first exception applies when the cause of action arose in a jurisdiction that has a limitation statute "bound up" in the statute creating the right.  *Murphy*, 2012 WL 3542296, at *1.  In that instance, the statute of limitations is determined to be part of the substantive right itself and governed by the law of the place where the injury occurred, Colombia.  *Id.* at *1-2.  The second exception applies when the foreign state's statute of limitations is part of the "public policy" of the foreign state.  *Id.*  In that situation, the foreign state's limitation period is considered substantive rather than procedural, and is thus applied.  *Id.*; *see also Bodnar v. Piper Aircraft Corp.*, 392 So.2d 1161, 1163-64 (Ala. 1980) (applying the foreign state's two-year statute of limitations, rather than Alabama's statute of limitations, because it was a matter of "public policy" in the foreign state).  Here, Plaintiffs satisfy both of the exceptions to Alabama's general rule that its statute of limitations should be applied as a matter of procedure.

First, although Colombia's statute of limitations provisions are defined in a different part of the Civil Code from the provision creating a wrongful death action, "it is a misunderstanding of Colombian law to infer on this basis that [the statutory limitations] are not 'bound up' with those substantive rights." *See* Declaration of Nelson Camilo Sánchez-León, ("Sánchez-León Decl."), ¶ 5. Indeed, the limitations provisions are contained in the civil code, *not the civil procedure code*. *Id.* ¶7. Moreover:

> Statutes of limitations provisions in Colombian law define the scope of substantive legal rights as well as the associated causes of actions. The Civil Code itself repeatedly specifies that statutes of limitations both eliminate the cause of action and the substantive legal right itself. Article 2512 says that "**[s]tatutes of limitations are a mode . . . of extinguishing the rights and actions of others . . . .**" Cód. Cív. art. 2512 (Col.). Article 2535 reiterates that **"[t]he statutes of limitations that extinguish the actions and rights of others solely require a certain lapse of time in which one has not exercised the actions."** Cód. Cív. art. 2535 (Col.) . . .

*Id.* ¶ 8 (emphasis added).

Additionally, a leading treatise governing jurisprudence confirm the above interpretation of Colombia's civil code.

> [Fernando] Hinestrosa confirms this interpretation: "Concretely, the national legal order does not limit the reach of statutes of limitations to legal actions, rather applies them to 'the actions or rights of others' . . . ." Hinestrosa, *supra*, at 66 (citing Cód. Cív. arts. 2512, 2535 (Col.)); *see also* Hinestrosa, *supra*, at 64 ("the object of statutes of limitations or, in other words, what they extinguish, is the substantive right itself"). The Colombian Supreme Court adds that "statutes of limitations exist as a phenomenon that permits the holder of a specific right to make use of it, subject to the condition that he or she displays

the necessary activity within the period that the same law confers . . .
.” Corte Suprema de Justicia, Sala de Casación Civil, Ref. No. 11001-
3103-028-2004-00605-01 (Oct. 13, 2009) (M.P. César Julio Valencia
Copete).  For these reasons, the scope of the substantive legal right is
defined in part by the statutes of limitations.  *See* Castro, *supra*, at 322
(“what is extinguished is the civil obligation with its associated cause
of action”) . . . .

*Id.*

Notably, the statute of limitations provisions in the Colombian Civil Code,

unlike those in any case Defendants cite, expressly state the statutory limitations

“extinguish the actions and rights,” which has been interpreted as extinguishing

“the substantive right itself.”  *Id.* The fact that the statutory length of time cannot

be changed by simple agreement supports the substantive nature of the statutory

limitations in Colombia.  *See id. ¶¶* 9-10.

Second, and regardless of whether the statute of limitations is “bound up” in

the substantive law in Colombia, Plaintiffs satisfy the policy exception because the

statutory limitations provisions in Colombia are a “matter of public policy.”  *See,*

*e.g., Murphy*, 2012 WL 3542296, at *1 (noting *Bodnar*  applied the foreign state’s

statute of limitations because “the Georgia limitations period was a matter of

Georgia ‘public policy’ even though Georgia’s wrongful death statute did not have

a ‘built in’ limitations period.”).

There is no doubt that Colombia’s statute of limitations provisions are a

matter of public policy.  *Id.* ¶¶ 9-10.  The Colombian courts and the legislature

have held "that the reason why statutes of limitations exist is the necessity of certainty, clarity and security in legal relations that necessarily contribute to social order and peace, since a right that is not exercised timely undermines the public order." *Id.* ¶ 9. The Supreme Court of Colombia has confirmed that "statutes of limitations are a necessary institution for social order and for legal security, introduced to attend to the public good." *Id.* Additionally, "statute of limitations have the length that the law has established in an express and categorical manner . . .." *Id.* The Colombian Supreme Court and legislature have made clear that the Colombian statute of limitations is a matter of public policy. *See id.* ¶ 10 (explaining the Supreme Court has found that statutory periods "have a clear public and social purpose . . ."). Additionally, and unlike any other case Defendants reference, the Justice and Peace Process in Colombia is currently investigating murders committed by the AUC during the civil conflict for the same time period as Plaintiffs' claims. *See* FAC ¶¶ 9-10, 67, 11, 176. Colombia's Justice and Peace Process further demonstrates Colombia's policy of allowing victims to seek reparations.

Although Defendants acknowledge that a "public policy" exception applies in certain circumstances, they contend it does not here "because the general Colombian limitations period is *longer* . . . than the two-year Alabama limitations period." MTD at 53. *Murphy* did not state the foreign statute of limitations must

be shorter than the forum state's statute, but rather that "where the foreign state has a 'public policy' against allowing a plaintiff to bring suit after a certain period of time has elapsed, then the limitations period of the foreign state is considered substantive . . . [and it] would apply rather than Alabama's."  2012 WL 3542296, at *2.  Colombia's statute of limitations provisions are designed to promote public order by ensuring "certainty, clarity and security in legal relations." Sánchez-León Decl. ¶ 9.  Additionally, the Colombian "statutes of limitations are a necessary institution for social order. . ."   Sánchez-León Decl. ¶ 9.  As in *Murphy*, Colombia has a "'public policy' against allowing a plaintiff to bring suit after a certain period of time." 2012 WL 3542296, at *2.  Moreover, *Bodnar* applied the foreign state's statute of limitations because it was a matter of public policy despite the fact that the foreign statute was *longer* than Alabama's statute of limitations.  392 So.2d at 1163.  In any event, Defendants' arguments concerning the policy exception are nonsensical. No Plaintiff could ever avail himself of the public policy exception using Defendants' reasoning.

For all these reasons, Plaintiffs have demonstrated that Colombia's statute of limitations is "bound up" with the wrongful death provisions and thus should be applied to this case.  Additionally, Plaintiffs have shown that Colombia's statute of limitations is a matter of public policy.  Under Colombian law, regardless of whether the 10 or 20 year time frame is applied, Plaintiffs' claims are timely.  As

this Court already held in *Balcero*, because Plaintiffs have sufficiently pled facts supporting tolling, the claims should not be dismissed.  *Balcero* Order, Doc. 275, at 6; *see also supra*, Section IV.A. & B. (addressing allegations supporting tolling). To the extent there is any question concerning tolling, these matters should be decided after discovery, Doc. 275, at 6, and after full briefing on Colombian law.[21]

## VI.    The Three Additional Plaintiffs' Claims Should Not Be Dismissed.

Defendants argue that claims based on two of the decedents and asserted by three Plaintiffs, Alba Luz Cabellero Gomez, Amparo De Jesus Florez Torres, and J.A.G.F., are currently pending in *Balcero*.  MTD at 49.  These three Plaintiffs' claims are in a unique procedural posture because this Court dismissed their claims in *Balcero* for failure to plead Defendants' support to the AUC before November, 1999, but this dismissal undisputedly pertains *only* to Defendant Mike Tracy.  *See Balcero* Order, Doc. 324, at 5-6.  Additionally, the dismissal did *not* state it was with prejudice.  *Id.* at 6; *see also* Fed. R. Civ. P. 41(a)(1) ("Unless the notice or stipulation states otherwise, the dismissal is without prejudice.").  Thus, these three Plaintiffs continue to have pending claims against the corporate Defendants in *Balcero*.

---

[21] If this Court applies Alabama's statute of limitations law, Plaintiffs' claims should be tolled until at least 2007.  *See supra*, Section IV.A.  If the Court applies Alabama's two-year statute of limitations beginning in 2007, their wrongful death claims will have run in 2009.

Defendants capitalize on this unique procedural posture and seek to have these Plaintiffs' claims dismissed from this case.  Plaintiffs, however, have alleged additional facts concerning Defendants' support of the AUC prior to 1999:

> Drummond began paying the AUC through Jaime Blanco no later than early 1997. When Adkins brought Garry Drummond the idea, Garry Drummond  agreed to make payments to the AUC. The payments were first made by Adkins bringing cash payments of $10,000 from Alabama. Blanco would deliver the cash payments from Adkins to the AUC. After some time,  Adkins and Blanco developed another scheme to funnel money to the AUC through Blanco. Blanco would use inflated invoices for services provided to Drummond, and he would provide the overage to the AUC. The evidence of the Drummond Defendants' support dating back to approximately 1997 was not available at the time prior related actions were filed. While the Drummond Defendants used other methods to provide support to the AUC during the relevant time period, they relied on Blanco as described above.

FAC ¶ 91.  Additional evidence presented in Plaintiffs' Oppositions to Summary Judgment in *Balcero* further describes the support Drummond gave the AUC before 1997 and will later be submitted to this Court for consideration in this case. *See* Doc. 407, PSDMF ¶ 1.

A district court should consider the equities of the situation when exercising discretion" in duplicative proceedings.  *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000).  It is, thus, within this Court's discretion to either allow Plaintiffs' claims to proceed in this case or to reinstate their claims against Defendant Mike Tracy and allow them to amend their complaint in *Balcero* to add the above allegation.  *See id.* ("As part of its general power to administer its

docket, a district court *may* stay or dismiss a suit that is duplicative of another federal court suit.") (emphasis added).  There is no requirement that this Court dismiss Plaintiffs' claims from this case or that it do so without allowing Plaintiffs' to reinstate their case against Defendant Tracy and amend their complaint in *Balcero* to add the above allegations.  Indeed, "[t]he complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities." *Id.* (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  Additionally, when a case is dismissed for being duplicative, it is not bound under the doctrine of *res judicata* –and legal action may continue elsewhere as long as statute of limitations do not bar the action.  *See Greene v. H&R Block E. Enterprises, Inc.*, 727 F. Supp. 2d 1363, 1368 (S.D. Fla. 2010).

Furthermore, either allowing the claims to proceed in this case or reinstating the claims against Mike Tracy and amending the complaint in *Balcero* is particularly appropriate because additional information concerning Defendants' support of the AUC before 1999 was unearthed after several depositions were taken in *Balcero.  See* Doc. 407, PSDMF ¶1; *see also SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996) (noting that plaintiff need not file amended complaints to account for subsequent events and a plaintiff may bring a later suit on later arising claims).

In conclusion, it would be an injustice against these plaintiffs to exclude them from the present litigation simply because of their presence in *Balcero*. This is particularly so given that in *Balcero*, Plaintiffs have unearthed evidence of Drummond's support of the AUC before 1999. *See* Doc. 407, PSDMF ¶1. As a result, this court should either deny dismissal or allow Plaintiffs to reinstate their claims against Defendant Mike Tracy in the *Balcero* action, and amend the *Balcero* complaint concerning the pre-1999 allegations. *Id.* Moreover, given the procedural posture of the *Balcero* case, it will not cause Defendant Mike Tracy any prejudice to allow these Plaintiffs' claims to proceed against him, nor will such a limited amendment prejudice the corporate defendants since this evidence has already been submitted to the Court and became known after discovery was conducted.

## CONCLUSION

For all of the above reasons, this Court should deny Defendants' Motion to Dismiss in the entirety.

Dated: June 20, 2013             Respectfully submitted,

/s/ Christian Levesque
Christian Levesque (DC Bar No. 501778)
Terrence Collingsworth (DC Bar No. 471830)
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington D.C. 20005
(202) 543-4001
clevesque@conradscherer.com

50

tcollingsworth@conradscherer.com

***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2013, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of the filing to the following:

William Anthony Davis, III
tdavis@starneslaw.com
H. Thomas Wells, III
twells@starneslaw.com
Benjamin T. Presley
btp@starneslaw.com
STARNES DAVIS FLORIE LLP
PO Box 598512
Birmingham, AL 35259-8512
205-868-6000

William H. Jeffress, Jr.
william.jeffress@bakerbotts.com
Rachel B Cochran
rachel.cochran@bakerbotts.com
Bryan H. Parr
bryan.parr@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington , DC 20004-2400
202-639-7700

/s/ Christian Levesque
_____
Christian Levesque

52