## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARISOL MELO PENALOZA, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:   2:13-CV-00393-RDP** |
| | } | |
| **DRUMMOND COMPANY, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it the Motion to Dismiss the Second Amended Complaint filed by Defendants Drummond Company, Inc., Drummond Ltd., and Drummond USA (Doc. #80) on October 23, 2018 and the Motion to Dismiss the Second Amended Complaint filed by Defendants J. Michael Tracy and the Estate of Garry N. Drummond (Doc. #81) on October 23, 2018.  The Motions (Docs. #80, 81) have been fully briefed (Docs. #82-85, 91) and are properly before the court for review.  For the reasons explained below, the court finds that the Motions (Docs. #80, 81) are due to be granted in part and denied in part.

### I.        Background

This case was filed on February 26, 2013.  (Doc. #1).  After the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co., et. al.*, 569 U.S. 108 (2013),[1] an amended complaint (Doc. #20) was filed.  On February 4, 2014, the case was stayed (Doc. #45) due to

---

[1] *Kiobel* held that the presumption against extraterritoriality applies to claims under the Alien Tort Statute.  569 U.S. at 108.  The parties were directed to brief the impact of *Kiobel* on the complaint (*see* Doc. #19), and in response Plaintiffs filed an Amended Complaint.  (Doc. #20).

1

cases then-pending in the Eleventh Circuit which implicated the claims in the Amended Complaint (Doc. #20). After the Eleventh Circuit issued opinions in *Doe et, al. v. Drummond Company, Inc. et. al.*, 782 F.3d 576 (11th Cir. 2015) ("*Doe/Balcero*")[2] and *Baloco et al. v. Drummond Company, Inc. et. al.,* 767 F.3d 1229 (11th Cir. 2014) ("*Baloco II*"), the court directed the parties to show cause why dismissal was not appropriate in this case. (Doc. #51). Based on the responses to the show cause order and representations by attorneys in conferences, the court dismissed this case in its entirety with prejudice. (Docs. #52, 53, 60).

The dismissal was appealed. On September 27, 2016, the Eleventh Circuit entered an opinion affirming in part, reversing in part, vacating in part, and remanding in part. *Penaloza et al. v. Drummond Company, Inc., et al.*, 662 Fed. Appx. 673 (11th Cir. 2016). After the Supreme Court denied certiorari in the *Doe/Balcero* case and interlocutory appeal was ruled on in the companion defamation case ("*Collingsworth*," 2:11-cv-3695-RDP-TMP), the court directed the parties to meet and confer to determine the status of the case. (Doc. #70). After briefing and a hearing, the court determined that a Second Amended Complaint should be filed in this case. (Doc. #75). That Second Amended Complaint (Doc. #75) is the subject of the pending motions to dismiss (Docs. #80, 81).

## II.     Standard of Review

The Alien Tort Statute is a jurisdictional statute. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712-13 (2004). A challenge to subject-matter jurisdiction under Rule 12(b)(1) may be made either as a facial attack or a factual attack. *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2006). A facial attack -- the type made by Defendants here -- argues that the

---

[2] Because the Eleventh Circuit refers to this case as the *Doe* case, while this court has consistently referred to it as

complaint itself insufficiently alleges jurisdiction and follows the standard for a motion to dismiss under Rule 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A court may dismiss a complaint under Rule 12(b)(6) if a plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). That is, if a plaintiff "ha[s] not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.*; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (complaint must "permit the court to infer more than the mere possibility of misconduct" based upon "judicial experience and common sense").

In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc)). Further, "[a] complaint may not be dismissed because the plaintiff's claims do not support the legal theory [s]he relies upon since the court must determine if the allegations provide for relief on *any* [plausible] theory." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967)).

the *Balcero* case, for ease of reference it will be stated here as the *Doe/Balcero* case.

Nevertheless, conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002); *see Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[A] plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim. We will thus not accept as true conclusory allegations or unwarranted deductions of fact.") (internal citations omitted); *Kirwin v. Price Commc'ns. Corp.*, 274 F. Supp. 2d 1242, 1248 (M.D. Ala. 2003) ("[A]lthough the complaint must be read liberally in favor of the plaintiff, the court may not make liberal inferences beyond what has actually been alleged."), *aff'd in part*, 391 F.3d 1323 (11th Cir. 2004).

### III.     Analysis

Plaintiffs have asserted a number of claims.   The court addresses them below.

### A.     Plaintiffs' Claims Brought Pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350 (First and Second Causes of Action)

Plaintiffs bring two claims against all defendants pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350 – one for war crimes (First Cause of Action), and one for extrajudicial killings (Second Cause of Action).   All defendants seek dismissal of these claims for lack of jurisdiction.  (Doc. #80 at 5-10; Doc. #81 at 3).   For the reasons explained below, the ATS claims are due to be dismissed without prejudice.

The Alien Tort Statute [3] states in its entirety: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of

---

[3] Over time, courts have referred variously to 28 U.S.C. § 1350 as the Alien Tort Statute (hereinafter "ATS"), the Alien Tort Act, and the Alien Tort Claims Act.   In *Sosa*, the Supreme Court referred to § 1350 as the Alien Tort Statute.   542 U.S. 692 (2004); *see Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 113 n. 2 (2d. Cir. 2008).   This court will generally refer to the Alien Tort Claims Act as the ATS.

nations or a treaty of the United States."   28 U.S.C. § 1350.   Therefore, by its terms, the ATS is a "strictly jurisdictional" statute.   *Sosa*, 542 U.S. at 713.   It empowers federal courts to recognize private claims under federal common law, when those claims sufficiently state an international law violation "with the requisite definite content and acceptance among civilized nations."   *Kiobel*, 569 U.S. at 108.

To state a claim for relief under the ATS, a plaintiff must be "(1) an alien, (2) suing for a tort, which was (3) committed in violation of international law."   *Doe/Balcero*, 782 F.3d at 583-84 (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.2d 1242, 1246 (11th Cir. 2005) (per curiam)).   In addressing a motion to dismiss under the ATS, the court must undertake "a more searching review of the merits" than under "the more flexible 'arising under' formula." *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F.Supp.2d 1285, 1292 (S.D. Fla. 2003); *see also Aldana*, 416 F.3d at 1248 (holding than in an ATS case, "[p]leadings must be something more than an ingenious academic exercise in the conceivable"); *In re Sinaltrainal Litig.*, 474 F.Supp.2d 1273, 1284, 1287 (S.D. Fla. 2006) ("heightened pleading standard" is required in ATS case, and court must engage in "a searching review, particularly with regard to allegations concerning conspiracy or joint action").

These statutory requirements are not the only requirements for jurisdiction.   *Id.* at 584. Here, because aspects of Plaintiffs' claims occurred outside of the United States, the jurisdictional predicate of *Kiobel* must also be met.   *Id.*   And, under *Kiobel*, a federal court's jurisdiction under the ATS is subject to the presumption against extraterritoriality.   *Kiobel*, 569 U.S. at 124.   A federal court lacks jurisdiction over an ATS claim with a territorial component unless the claim "touch[es] and concern[s] the territory of the United States … with sufficient

force to displace the presumption." *Id.* *Baloco II* and *Doe/Balcero* each considered *Kiobel* under the lens of ATS claims with domestic and extraterritorial aspects. *Doe/Balcero*, 782 F.3d at 592; *Baloco*, 767 F.3d at 1235-36. In *Doe/Balcero*, the Eleventh Circuit determined that "actions under the ATS with an extraterritorial component must touch and concern the territory of the United States with sufficient force to displace the presumption in order for jurisdiction to be proper. Displacement of the presumption will be warranted if the claims have a U.S. focus and adequate relevant conduct occurs within the United States." 782 F.3d at 592.

Both *Baloco II* and *Doe/Balcero* held that Plaintiffs' allegations failed to overcome the presumption against extraterritoriality and that Plaintiffs had failed to invoke federal court subject matter jurisdiction under the ATS. *See Doe/Balcero*, 782 F.3d at 600; *Baloco II*, 767 F.3d at 1239.[4] Because Plaintiffs conceded that the Amended Complaint in this case was nearly identical to the complaints in *Doe/Balcero* and *Baloco II*, the Eleventh Circuit held that this court properly dismissed Plaintiffs' ATS claims in the Amended Complaint. *Penaloza*, 662 Fed. Appx. at 677-78. Therefore, the only question left for this court to consider is whether the Second Amended Complaint includes new allegations which overcome the presumption against extraterritoriality. It does not.

The Second Amended Complaint contains three new allegations that Plaintiffs contend involve United States conduct.

- The Drummond Defendants used their political power, their significant resources, and their expertise at operating within the corrupt climate of Colombia to avoid

---

[4] *Baloco II* emphasized that "the *Kiobel* issue does not arise in a vacuum. While there has been no discovery in the instant case, there has been a very large amount of discovery over a period of more than ten years in preceding related cases. … These cases … [are] a near mirror image of the instant case … Even with all of this discovery, Plaintiffs have not found evidence of conduct actionable under the ATS because it focused in the United States." 767 F.3d at 1239.

accountability for their crimes going back 20 years or more. Indeed, the Drummond Defendants consistently operate this way, even in their own backyard. On July 20, 2018, an Alabama jury convicted Drummond Vice President, David Roberson, who was acting on behalf of Drummond, as well as Drummond's counsel, of bribing an Alabama state legislator to obtain his assistance in stopping the Environmental Protection Agency from expanding a Superfund toxic cleanup site in North Alabama. The Drummond Defendants have no regard for the law or the public interest if their profit is at stake. (Doc. #78-1 at ¶ 2).

- Virtually every major decision concerning Drummond's Colombian mine operations was made or approved by Garry Drummond. He made these decisions from his headquarters in Alabama. While he did visit Colombia on occasion, he had his main corporate lieutenants, including Defendant Tracy and James Adkins, come to him in Alabama. (Doc. #78-1 at ¶ 3).

- *El Tiempo*, the major Colombian newspaper, reported that Drummond's U.S. attorneys Baker Botts held negotiations in Washington, DC with Commander Barbie (Hugues Rodriguez) to facilitate Drummond's purchase of some of the land taken from the displaced people. (Doc. #78-1, ¶ 153).

These allegations add nothing to overcome the presumption against extraterritoriality. *Doe/Balcero*, 782 F.3d at 599-600 ("[W]e must find that Plaintiffs' allegations regarding Defendants' domestic conduct do not meet the requisite factual predicate or act with the forcefulness envisioned by *Baloco II* to warrant displacement."). They fail to focus the court on actions in Alabama which relate to any plot with the AUC to kill Plaintiffs' decedents in Colombia. *Id.* at 592-93 ("In weighing the pertinent facts, the site of the conduct alleged is relevant and carries significant weight. … When the claim is for secondary responsibility, we must also consider the location of any underlying conduct, such as where the actual injuries were inflicted."). The new allegations reference actions in Washington, DC and conduct surrounding an investigation by the Environmental Protection Agency, which have nothing to do with the killings at issue in this case. Here, as in *Doe/Balcero* and *Baloco II*, the tort at issue occurred abroad, *not* in Alabama. Plaintiffs advance no allegations sufficient to overcome the

presumption against extraterritoriality as required by *Kiobel*.[5]  *Id.* at 598 ("In light of our precedent, the domestic location of the decision-making alleged in general terms here does not outweigh the extraterritorial location of the rest of Plaintiffs' claims.").

Plaintiffs alternatively argue that they should be allowed jurisdictional discovery on the issues surrounding *Kiobel*.  (Doc. #83 at 19-22).  They argue that "there is ample and growing evidence that the Drummond Defendants were major funders of and collaborators with the AUC's war crimes" but that "until *Kiobel*, Plaintiffs were properly indifferent to the key issue of *Kiobel* – whether Defendants' wrongful acts occurred within the territory of the United States." (Doc. #83 at 19-20).

But allowing jurisdictional discovery would "needlessly extend this litigation," which, to be sure, began some fifteen years ago.  *Baloco II*, 767 F.3d at 1239.  Since at least that time, Plaintiffs have pursued cases against Drummond utilizing "similar allegations and identical legal bases" with "the benefit of ten years of evidence obtained from preceding related cases." *Penaloza*, 662 Fed. Appx. at 677-78.  And in fact, the original complaint in this action was filed *after Kiobel* was decided; therefore, it is "telling that the operative complaint continues to plead sparse allegations of U.S.-based conduct and that the Plaintiffs fail to offer any indication that they could in good faith plead additional U.S.-based conduct."  *Id.*; *see also Doe/Balcero*, 782 F.3d 576 (11th Cir. 2015) ("In order for jurisdictional discovery to be appropriate, there must be a genuine issue of fact to be resolved.  Plaintiff's speculative 'hunch' that Adkins might have

---

[5] The ATS focuses on the torts of extrajudicial killings and war crimes.  *See* 28 U.S.C. § 1350.  Plaintiffs argue that facts relevant to the secondary liability theory of aiding and abetting, which constitute a violation of the "law of nations" under the ATS, are sufficient to satisfy *Kiobel*.  (Doc. #83 at 24-27).  Plaintiffs cite to *Doe I v. Nestle USA, Inc.* for the contention that "the focus of the ATS is not limited to the principle offense."  906 F.3d 1120, 1125 (9th Cir. 2018).  While this may be the law in the Ninth Circuit, the Eleventh Circuit has already applied its law to

stayed for longer periods of time in Alabama is simply not enough to open this issue up to discovery.") (internal citation omitted).   Jurisdictional discovery is not appropriate in this case.

For all of the foregoing reasons, the ATS claims outlined in the First and Second Causes of Action of the Second Amended Complaint are due to be dismissed without prejudice.

### B.     Plaintiffs' Claim Brought Pursuant to the Torture Victims Protection Act, 28 U.S.C. § 1350 (Third Cause of Action)

Plaintiffs' Third Cause of Action alleges violations of the Torture Victims Protection Act ("TVPA") under 28 U.S.C. § 1350 by two individual defendants.   The TVPA authorizes a cause of action against "[a]n individual" for acts of extrajudicial killing and torture committed under authority of color or law of any foreign nation.[6]   28 U.S.C. § 1350 Note.   By its terms, the Act contemplates claims based on secondary, or indirect, theories of liability.   *Doe/Balcero*, 782 F.3d at 603; *Sinaltrainal*, 578 F.3d at 1258 n.5.   The Act defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people."   *Id.*   In this case, Plaintiffs allege that each of the killings at issue was an "extrajudicial killing" in "violation of the law of nations" under the TVPA, and that the individual defendants are legally responsible because they conspired with, aided and abetted, or were engaged in joint actions with AUC paramilitaries who carried out the murders.   (Doc. #78-1, ¶¶ 258-267).

### 1.     Plausibility

In the Second Amended Complaint, Plaintiffs allege that Garry Drummond and Michael

---

the facts of this case.   *Penaloza*, 662 Fed. Appx. at 677; *Doe/Balcero*, 782 F.3d at 599-600.

[6] Jurisdiction over TVPA claims under § 1331 is not constrained by the presumption against extraterritoriality. *Doe/Balcero*, 782 F.3d at 602.

Tracy aided and abetted, and conspired with, the AUC to commit extrajudicial killings of innocent civilians. (Doc. #78-1 at ¶¶ 258-67). To survive the motion to dismiss, Plaintiffs must present "more than a sheer possibility that [defendants have] acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence to support the claim." *Twombly*, 550 U.S. at 556. Naked assertions devoid of further factual enhancement are insufficient to state a plausible claim. *Iqbal*, 556 U.S. at 678. Determining whether this standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### a. Defendant the Estate of Garry Drummond

As to Garry Drummond, the Second Amended Complaint alleges:

- Virtually every major decision concerning Drummond's Colombian operations was made by or approved by Garry Drummond. He made these decisions from his headquarters in Alabama. (Doc. #78-1, ¶ 3).

- Garry Drummond approved plans to support and fund the AUC, and gave the approval to Drummond's Security Advisor, Adkins. (Doc. #78-1, ¶ 7).

- Garry Drummond approved a scheme in which Drummond provided funds to Jaime Blanco, who then channeled the funds to the AUC. (Doc. #78-1, ¶ 8).

- Defendant DCI is a closely-held corporation owned by the Drummond family, and, until his death, was controlled in its day-to-day operations by Garry N. Drummond. (Doc. #78-1, ¶ 55).

- Garry Drummond was the Chairman and Chief Executive Officer of DCI until he died on July 13, 2016. … While residing in Alabama, he personally approved the plan proposed by Adkins and others to have Drummond provide material support to the AUC so that the AUC would drive the FARC and other guerilla groups out of the areas of Drummond's

operation in Colombia. Drummond received regular visits from Adkins, often on a monthly basis, in which Adkins briefed him on all security issues, including the progress of the AUC's efforts on behalf of Drummond to drive the guerilla groups out of the areas of Drummond's operations. Defendant [Garry] Drummond also made frequent trips to Colombia and was able to observe first hand the presence of the AUC around the Drummond facilities, and he was briefed by Adkins and others as to all aspects of security in the areas around Drummond's Colombian operations. (Doc. #78-1, ¶ 58).

- During his years of service for Drummond, between 1995-2002, Adkins traveled to Alabama every 4-6 weeks to brief Garry Drummond and other Drummond officials on security issues, including Drummond's support for the AUC. … Adkins told the AUC leaders and their intermediaries that he went to Alabama regularly to brief Garry Drummond and obtain his consent to key strategic issues, including providing support to the AUC. Adkins obtained consent in Alabama from Garry Drummond to provide substantial support to the AUC. (Doc. #78-1, ¶ 59).

- For its part, Drummond financed a significant expansion of the AUC's Northern Block, including the Juan Andres Alvarez Front, based in Cesar Province. Along with providing this Front with significant funds to arm and supply over 165 new soldiers, Drummond provided it with day-to-day operating expenses. Garry Drummond expressly approved this plan, and gave the approval to Drummond's head of security, Adkins. (Doc. #78-1, ¶ 92).

- According to Blanco, who has now admitted his role in arranging for Drummond to finance the AUC, he and Adkins devised a scheme for Adkins to make payments to the AUC through Blanco. When Adkins brought Garry Drummond the idea, Drummond agreed to make payments to the AUC. (Doc. #78-1, ¶ 104).

- Adkins, Defendant Tracy, Drummond Executive Mike Zervos, and Garry Drummond all acknowledged in their depositions that Drummond provided the military with millions of dollars and that they had no idea what the military did with the money. Given that the military specifically asked Drummond for funds to support the AUC, there is no question that these Drummond officials knew that some portion of their 'millions' funded the AUC. (Doc. #78-1, ¶ 107).

- Garry Drummond, the chief executive officer of Drummond, Defendant Mike Tracy, and Augusto Jimenez, among others, participated in security

briefings that included discussions of the activities of the AUC and the FARC as they related to Drummond's area of operation in Colombia. (Doc. #78-1, ¶ 119).

- Adkins went to Alabama and obtained Garry Drummond's agreement in 1996 to start paying El Tigre. This was done at first by Adkins bringing $10,000 cash payments from Alabama to evade the law and Drummond's accounting system. … Blanco and Charris, who worked daily with Drummond management, identified Garry Drummond, Jimenez, Adkins, Tracy, Araujo, and several other Drummond officials as being directly involved in the plan to provide the AUC with substantial resources. (Doc. #78-1, ¶ 139).

- Blanco confirmed 'Adkins told me that Garry Drummond had authorized these payments himself in order to support the AUC … and to minimize these attacks by the guerillas.' (Doc. #78-1, ¶ 140).

- Under the orders of Adkins and Garry Drummond, Drummond's private security contractors coordinated security of Drummond's rail line with the AUC, and alerted the AUC if there were intruders along the rail line so that the AUC could respond and determine whether they were guerillas that required AUC engagement. (Doc. #78-1, ¶ 146).

Many of these allegations are simply conclusory: *e.g.,* "virtually every decision" was made by Garry Drummond in Alabama; Garry Drummond "approved plans to support and fund the AUC;" Adkins briefed Garry Drummond "on all security issues, including the progress of the AUC's efforts on behalf of Drummond to drive out the guerillas;" Drummond "made frequent trips to Colombia and was able to observe first hand the presence of the AUC around the Drummond facilities;" "Drummond financed a significant expansion of the AUC's Northern Block;" and "participated in security briefings that included discussions of the activities of the AUC and the FARC as they related to Drummond's area of operation in Colombia." (Doc. #78-1, ¶¶ 3, 7, 8, 55, 58, 92, 119). Such "naked assertions" contain no "further factual enhancement" to cross the line from possibility to plausibility. *Twombly*, 550 U.S. at 557; *see*

*also Sinaltrainal*, 578 F.3d at 1266 ("in testing the sufficiency of the plaintiff's allegations, we do not credit such conclusory allegations as true").

Having said that, other allegations purport to provide more details: *e.g.*, "between 1995-2002," Garry Drummond was briefed "every 4-6 weeks … on security issues, including Drummond's support for the AUC" (Doc. #78-1, ¶ 59); "Drummond began paying the AUC through Jaime Blanco no later than early 1997" with "payments … first made by Adkins bringing cash payments in increments of $10,000" (Doc. #78-1, ¶ 104); Adkins "brought Garry Drummond the idea" (*Id.*); and "Blanco confirmed 'Adkins told me that Garry Drummond had authorized these payments himself in order to support the AUC … and minimize these attacks by the guerillas.'" (Doc. #78-1, ¶ 140). Later in the Second Amended Complaint, Plaintiffs allege that meetings occurred among paramilitaries in "November 1999 … to discuss a plan to get major Drummond funding for the AUC's Northern Bloc." (Doc. #78-1, ¶ 192). These paramilitaries believed that a staged attack on Drummond's rail lines would compel "Drummond executives in the U.S. to approve significant funding for the AUC." (*Id.*). Although Drummond argues that these allegations are inconsistent (Doc. #81 at 6-7), it is plausible that both conclusions are true – that Drummond began making "small" payments in 1997, and later was tricked into making more "significant" payments to the AUC.

Given the existence of non-conclusory pled facts that are assumed to be true, the court finds that these particular allegations against Garry Drummond are plausible for purposes of the motion to dismiss.

### b.    Defendant Michael Tracy

As to Michael Tracy, in the Second Amended Complaint, Plaintiffs allege:

- Tracy was one of Garry Drummond's main corporate lieutenants. (Doc. #78-1, ¶ 3).

- Defendant Mike Tracy was an executive of DCI or DLTD, and at various times a board member of DUSA. He became the CEO of DCI following Garry Drummond's death on July 13, 2016. Defendant Tracy oversaw the start of operations for Drummond's mine in Colombia. Defendant Tracy was in charge of all aspects of the Drummond mining operation in Colombia and reported directly to Garry Drummond. Defendant Tracy was briefed by Adkins about Drummond contractors who were paying the AUC, the paramilitary presence throughout all of Drummond's area of interest, Adkins' view that the paramilitary presence was not "negative," and requests made to Drummond to support the nascent paramilitary groups, among other matters involving the paramilitaries. Tracy approved and ratified Drummond contractors' payments to the AUC. Tracy also approved payments to the Colombian military after he was notified that the military was controlling and supporting paramilitary groups in the area. Additionally, as one of Adkins' supervisors, Tracy knew or should have known about Adkins' central role in Drummond's payment schemes to the AUC on behalf of Drummond. Tracy socialized with known paramilitaries when he was in Colombia. (Doc. #78-1, ¶ 60).

- Adkins, Defendant Tracy, Drummond Executive Mike Zervos, and Garry Drummond all acknowledged in their depositions that Drummond provided the military with millions of dollars and that they had no idea what the military did with the money. Given that the military specifically asked Drummond for funds to support the AUC, there is no question that these Drummond officials knew that some portion of their 'millions' funded the AUC. (Doc. #78-1, ¶ 107).

- Defendant Mike Tracy approved and ratified Drummond's decision to engage the AUC. Adkins and others have testified that informing Tracy meant informing Garry Drummond. As Adkins was reporting directly to Garry Drummond and Mike Tracy, both must have approved the decision to engage the AUC. (Doc. #78-1, ¶ 182).

- AUC members were given free access to the Drummond port and were waived through the security gates by Drummond Security forces. Defendant Tracy was often there and regularly observed AUC forces at the Drummond facilities. Defendant Tracy also attended a party with AUC commanders. According to Adkins and others, Tracy fully advised Garry Drummond on all aspects of Drummond's Colombia operations. (Doc. #78-1, ¶ 188).

Again, many of these allegations are conclusory: *e.g.,* Tracy was responsible for "all aspects of the Drummond mining operation in Colombia;" Tracy "must have approved the decision;" and Tracy knew Drummond "provided the military with millions of dollars." (Doc. #78-1, ¶¶ 60, 107, 182, 188). These "naked assertions" contain no "further factual enhancement" to cross the line from possibility to plausibility. *Iqbal*, 550 U.S. at 557; *see also Sinaltrainal*, 578 F.3d at 1266 ("in testing the sufficiency of the plaintiff's allegations, we do not credit such conclusory allegations as true").

But, as is the case with the assertions made about Garry Drummond, other allegations contain more detail. Plaintiffs allege that Tracy was told by Adkins that Drummond contractors were paying the AUC, Tracy approved contractors' payments to the AUC, and Tracy regularly observed the paramilitaries throughout Drummond's area of interest. (Doc. #78-1, ¶¶ 60, 188). These alleged facts, while admittedly limited, eke these claims across the line (albeit barely) to plausibility. *See Chiquita*, 190 F. Supp.3d at 1119. The court finds that the allegations against Michael Tracy are sufficient to meet the plausibility standard.

### 2. Secondary Liability

By its terms, the TVPA permits claims based on secondary liability. *Doe/Balcero*, 782 F.3d at 603. Accepting that the claims against the individual defendants are plausible, they nevertheless cannot stand unless there is some basis for individual liability.[7] Secondary liability may attach on any one of the following legal theories: superior liability, aiding and abetting, conspiracy, or agency. *Id.* at 607 (explaining that the TVPA contemplates liability against those

---

[7] There is no allegation that the individual defendants directly or personally engaged in the atrocities alleged in the Second Amended Complaint.

who did not *personally* execute the torture or extrajudicial killing). Each ground for secondary liability is contested in the motion to dismiss (Doc. #81), and each is considered below.

### a.    Command/Superior Responsibility[8]

Three indispensable elements are required to support a claim for liability under the command responsibility doctrine: (1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes. *Doe/Balcero*, 782 F.3d at 609 (citing *Ford ex. Rel. Estate of Ford*, 289 F.3d 1283, 1288 (11th Cir. 2002)).

To establish the first element, Plaintiffs must allege facts plausibly suggesting that the defendants had "effective control" over the AUC. *Ford*, 289 F.3d at 1290. That is, the doctrine is available if the requisite degree of responsibility, authority, or control is present to support liability. *Id.* at 1291 (majority opinion) ("proof is required that the superior has effective control over the persons committing the violations of international humanitarian law in question, that is, has the material ability to prevent the crimes and punish the perpetrators thereof.") (internal quotations omitted).

Here, Plaintiffs have not alleged that Tracy or Garry Drummond had any direct control over any AUC members who might have killed Plaintiffs' decedents as required by the command

---

[8] The Eleventh Circuit uses the phrase "command responsibility doctrine" when discussing this theory. *Doe/Balcero*, 782 F.3d at 609-11.

responsibility doctrine. *Id.* at 1288 (requiring a direct "relationship between the commander and the perpetrator of the crime"). Rather, Plaintiffs attempt to apply this theory is "once removed," in that they assert that Adkins, Araujo, Jimenez, and Blanco had direct control over the AUC. Because those individuals were subordinates of Tracy and Garry Drummond, the theory goes, Tracy and Drummond can be held liable for the acts of Adkins, Araujo,[9] Jimenez, and Blanco.[10] (Doc. #78-1 at ¶ 65; Doc. #82 at 13). The court disagrees. This theory is not supported by case law and therefore cannot be the theory of liability upon which Plaintiffs can advance their claims. It is simply too attenuated to support liability. *Doe/Balcero*, 782 F.3d at 610 n. 47 ("[T]here are additional hurdles that could prove prohibitive for future plaintiffs proceeding on such a theory … [I]f the secondary liability of a superior must rest on another secondary theory of liability, the application of that doctrine may be too attenuated or the act too remote to support liability."). For this reason, Plaintiffs claims for TVPA liability using the command responsibility of secondary liability are not sustainable.

### b.    Aiding and Abetting

In *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), the Eleventh Circuit articulated the basis for finding aiding and abetting liability. *See Doe/Balcero*, 782 F.3d at 608. Indirect liability for aiding and abetting requires plaintiffs to prove "active participation" by a preponderance of the evidence. *Cabello*, 402 F.3d at 1158. Liability for "knowing substantial

---

[9] Plaintiffs argue that Adkins and Araujo were Tracy's subordinates. (Doc. #82 at 16-18). Tracy had "material ability to prevent or punish criminal conduct" by Adkins and Araujo, who purportedly "deal[t] with the AUC on behalf of Drummond, and any willful blindness on Tracy's part is no defense." (*Id.* at 19).

[10] Plaintiffs argue that Jimenez, Adkins, Araujo, and Blanco were Garry Drummond's subordinates. (Doc. #82 at 21-22). Garry Drummond "knew or should have known" of those individuals' alleged role in committing war crimes, and failed to prevent or punish those individuals for their roles in committing war crimes. (*Id.* at 22-25).

assistance" is supported if the wrongful act at the center of the claim is, in fact, committed, and the defendant gave knowing substantial assistance to the persons who committed the wrongful act. *Doe/Balcero*, 782 F.3d at 608 (citing *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (aiding and abetting liability "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct.")). To overcome the motion to dismiss, Plaintiffs must plead both *mens rea* (knowledge) and *actus reus* (substantial assistance). *See Cabello*, 402 F.3d at 1159 ("[T]he statements attributed to [the defendant] reflect his knowledge that he was assisting in wrongful activity."); *id.* at 1158-59 (finding support for knowledge and substantial assistance because the defendant served as the primary perpetrator's bodyguard and was present when the perpetrator selected the files of the victims). *Mens rea* allegations "must contain non-conclusory factual allegations from which it may be reasonably inferred that the individual defendants acted with knowledge that their participation in [Drummond's] support of the AUC would facilitate the commission of human rights abuses by the AUC in the [coal and rail] regions of Colombia where Plaintiffs' decedents resided. *In re Chiquita*, 190 F.Supp.3d at 1117. The *actus reus* element requires sufficient acts of "substantial assistance" to promote the alleged abuses. *Id.* at 1119. Plaintiffs contend that there are sufficient factual allegations to proceed on their claims against Garry Drummond and Michael Tracy. The court addresses the pertinent allegations against each Defendant, in turn.

### i. Garry Drummond

Here, while many of the allegations against Garry Drummond are conclusory, others support a reasonable inference that he approved, and continued to approve, Drummond's support of the AUC. This support allegedly allowed the AUC "to focus on defeating the FARC and

eliminating its supporters and sympathizers from the area of Drummond's railroad line going through Cesar and Magdalena Provinces." (Doc. #78-1, ¶¶ 93, 140, 146). Garry Drummond also allegedly "met with Adkins" about "making payments to the AUC through Blanco" and was briefed "every 4-6 weeks" regarding "Drummond's support for the AUC." (*Id.* at ¶ 59, 104). Garry Drummond allegedly agreed to start paying El Tigre "by Adkins bringing $10,000 cash payments from Alabama to evade the law and Drummond's accounting system." (*Id.* at ¶ 139). Allegations further support the inference that Garry Drummond knew that the AUC operated as a terrorist group, capable of using extreme violence and brutal means to defeat the FARC. (*Id.* at ¶¶ 70, 81). Garry Drummond was allegedly briefed "on all security issues, including the progress of the AUC's efforts on behalf of Drummond to drive the guerilla groups out of the areas of Drummond's operations." (*Id.* at ¶ 58).

These allegations sufficiently state a claim against Garry Drummond for aiding and abetting the extrajudicial killings alleged in this case. *See In re Chiquita*, 190 F.Supp.3d at 1118 (holding that it was a reasonable inference to infer that individual defendants obtained a direct benefit from the commission of violations of international law by the AUC, bolstering the allegation that defendants acted with purpose and knowledge); *id.* at 1119 (holding that decision making caused substantial amounts of money and material support to be supplied to the AUC).

### ii. Michael Tracy

As to Michael Tracy, while the court has determined that Plaintiffs' allegations about his alleged violations of the TVPA eked into plausibility, those same allegations cannot support a theory of aiding and abetting liability. The Second Amended Complaint contains only conclusory allegations that Tracy "approved and ratified Drummond's decision to engage the

AUC." (Doc. #78-1, ¶ 182). There are no allegations that Tracy was involved in any meeting approving payments to the AUC or to the AUC through Drummond's contractors. Instead, Plaintiffs state in conclusory fashion that Tracy "knew or should have known" about payment schemes to the AUC on behalf of Drummond and that Tracy "must have approved the decision to support the AUC." (*Id.* at ¶ 60, 182). These bare allegations of knowledge and approval are insufficient, under *Iqbal*, to plausibly establish the requisite *mens rea* element or *actus reus* element of aiding and abetting liability. *In re Chiquita*, 190 F. Supp.3d at 1119. Thus, Plaintiffs have not stated a cause of action against Michael Tracy for TVPA liability under an aiding and abetting theory.

### c. Conspiracy

To prove an individual defendant directly liable by means of conspiracy, Plaintiffs must allege and prove (1) two or more persons agreed to commit a wrongful act (2) the defendant joined the conspiracy knowing of at least one of the goals of the conspiracy and with the intent to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy. *In re Chiquita*, 190 F.Supp.3d at 1119-20 (*citing Cabello*, 402 F.3d 1148). "[P]arallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557.

For the same reasons analysed in the discussion of the in the aiding and abetting analysis above, the allegations of agreement and intent to accomplish the goal of the conspiracy are sufficiently alleged as to Garry Drummond, but not as to Michael Tracy. The court will not recount that analysis.

###### d. Agency/Ratification

To prove agency, Plaintiffs must show that the paramilitaries acted on Defendants' behalf and under Defendants' control, and that the murders alleged in the operative complaint were within the scope of the relationship. *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 787 (11th Cir. 2005). The mere fact that Drummond is alleged to have paid the AUC, and allegedly shared the same goals as the AUC, "falls short" of plausibly alleging that Drummond "controlled the military campaign of the AUC." *In re Chiquita*, 792 F.Supp.2d 1301, 1352-53 (S. D. Fla. 2011).

Agency arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act." Restatement (Third) of Agency § 1.01. A principal ratifies the acts of his agent when the principal: (1) had actual knowledge of the wrongful conduct; (2) knew or should have known that the conduct constituted a tort; and (3) armed with that knowledge, failed to take adequate steps to remedy the situation. Restatement (Second) of Agency § 94.

For the reasons discussed in the aiding and abetting analysis above, the allegations of assent and ratification are sufficiently alleged as to Garry Drummond, but not as to Michael Tracy. Because there is no secondary theory of liability under which Michael Tracy can be held liable for violations of the TVPA, the cause of action against Tracy is due to be dismissed. However, the cause of action against Garry Drummond may proceed if there are sufficient allegations of state action.

### 3. State Action

The TVPA includes an express requirement that the tortfeasor acted "under actual or apparent authority, or under color of law, of [a] foreign nation." 28 U.S.C. § 1350 Note § 2(a). Defendants argue that the operative complaint fails to sufficiently allege that the AUC acted under color of law or as a state actor in killing Plaintiffs' decedents. (Doc. #81 at 22-29).

In *Doe/Balcero*, this court recognized that for state action to exist, there must be "allegations of a symbiotic relationship that involves the torture or killing alleged in the complaint." *Sinaltrainal*, 578 F.3d at 1266; *see Rayburn ex rel. Rayburn*, 241 F.3d at 1348 ("To charge a private party with state action under this standard, the governmental body and private party must be intertwined in a symbiotic relationship … The Supreme Court has indicated that the symbiotic relationship must involve the specific conduct of which the plaintiff complains."). In that case, factual allegations of a symbiotic relationship survived a motion to dismiss. (*Doe/Balcero*, Doc. #43 at 9-11). And, the symbiotic relationship involved "the torture or killing alleged in the complaint." *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008).

As in *Doe/Balcero*, Plaintiffs here must allege that the AUC members who committed the alleged acts were in an "integral" and "indispensable" relationship with the Colombian government. (*Doe/Balcero*, 2:09-cv-1041-RDP, Doc. #43 at 9-11). By comparison, the allegations in the operative complaint are much the same as they were in *Doe/Balcero* – Colombian political leaders, including former President Uribe, were involved in creating the paramilitary groups (Doc. #78-1, ¶¶ 161, 244), the Colombian government created the Convivir

groups,[11] which eventually morphed into the AUC (*id.* at ¶ 74), payments to the Convivirs were passed to the paramilitaries and used for arms and supplies, Colombian military officers met with the leaders of the Convivirs, who were or became paramilitary commanders (*id.* at ¶¶ 74, 94, 246), Human Rights Watch reported close ties between the military and paramilitaries (*id.* at ¶ 75), Colombian military provided paramilitaries with weapons, intelligence and supplies, paramilitaries conducted missions at the request of the military (*id.* at ¶¶ 9, 94), and the U.S. State Department designated the AUC as a terrorist group and acknowledged collaboration between the AUC and the military (*id.* at ¶¶ 77, 81). As in *Doe/Balcero*, these allegations assert the joint nature of the Colombian government with the paramilitaries. The Colombian government, according to the operative complaint, not only tolerates the paramilitaries, but also encourages, supports, and relies on their existence. There is more than a "formulaic recitation" that the paramilitary forces were in a symbiotic relationship with the Colombian government. *See Sinaltrainal*, 578 F.3d at 1266.

Nevertheless, Plaintiffs' claims cannot survive the motion to dismiss unless there are sufficient allegations that the symbiotic relationship involves "the torture or killing alleged in the complaint." *Romero*, 552 F.3d at 1317. The Eleventh Circuit has approved a district court exercising this standard by inquiring whether "the symbiotic relationship between the paramilitaries and the Colombian military had anything to do with the conduct at issue here …," *i.e.* the murders along Drummond's rail line. *Id.* ("The relationship must involve the subject of the complaint" and "a plaintiff may prove that relationship … by presenting evidence of the

---

[11] Convivirs were composed of civilians who received permission from the government for a license to provide their own security in areas of high risk or in the public interest. Convivirs were permitted to use arms that were otherwise restricted to military use. *In re Chiquita*, 190 F.Supp.3d at 1108, n. 12.

active participation of a single official.").   In an attempt to meet this standard, Plaintiffs advance
the following allegations:

- Adkins reported to Tracy that the Cordoba Battalion Commander of the Colombian military visited him to request funds from Drummond to support the formation of a paramilitary group under the Colombian government's Convivir program to combat the guerillas.   The Colombian military helped launch the AUC, which it expected to be an effective guerilla warfare arm of the military.   (Doc. #78-1, ¶ 87).

- Araujo made the plan with Jorge 40.   He then used his position in the company to get Jimenez and others to agree to the plan to make substantial payments to the AUC.   Araujo, on behalf of Drummond, shared with AUC the goal of eradicating the FARC and other leftist guerillas and prevailing in the ongoing civil conflict.   (Doc. #78-1, ¶100).

- Drummond's payments to the AUC in cash and through front companies are direct evidence of Drummond's knowledge that it was paying for illegal activity.   Drummond also, according to the Popa Battalion's commander Colonel Mejia, began channeling money to Colonel Mejia to distribute to the AUC as a way of hiding and legitimizing payments. (Doc. #78-1, ¶ 121).

- Drummond started making payments to the Colombian military shortly after Adkins advised Defendant Tracy in a September 13, 1995 memo that the Cordoba Battalion Commander visited him and directly requested funds from Drummond to support the paramilitary groups that ultimately became the AUC.   (Doc. #78-1, ¶ 189).

- Drummond intended that, with its funds, the AUC would expand its war effort against the FARC and focus the AUC's military campaign in Cesar in specific areas in or around the Perija Mountains and near or along the Drummond rail line where the FARC had a foothold.   (Doc. #78-1, ¶ 190).

- The area of Drummond's coal mine was protected by a detachment of Colombian military that established a base on Drummond's property. Approximately 300 troops from La Popa Battalion, a military unit based in Valledupar in the province of Cesar, were permanently assigned to Drummond to guard its facilities from any attacks by the FARC.   In addition, Drummond used a private security firm, Viginorte, which was a front group for the AUC but did provide security staff for Drummond's

management personnel and to control access to its facilities. (Doc. #78-1, ¶ 191).

- In November 1999, Alfredo Araujo, on behalf of Drummond, met with Jorge 40 and other AUC members, including El Tigre, "Guerrero," "Kevin," "Cortico," "Pelo de Puya," "El Enano," "Pirulo," and "Cachaco," to discuss a plan to get major Drummond funding for the AUC's Northern Block. Araujo explained to Jorge 40 that there had been a recent FARC attack on the Drummond rail line, but that for the Drummond executives in the U.S. to approve significant funding for the AUC, there had to be another attack, and the AUC had to demonstrate that it could respond effectively with a swift and violent counterattack on the FARC. Araujo directed that the AUC should stage a new attack on the rail line, and make it look like the FARC's 41st Front had attacked the rail line again. This, Araujo assured Jorge 40, would cause the Drummond executives in Alabama to agree to make payments to enhance the AUC's presence in the areas in or around the Perija Mountains and near or along the Drummond rail line. (Doc. #78-1, ¶ 192).

- Adkins reported to Defendant Mike Tracy that he had been approached by a military commander from the Cordoba Battalion to have Drummond join other companies in supporting the formation of a paramilitary unit to pursue guerilla units in the area of Drummond's operations. (Doc. #78-1, ¶ 245).

- The specific AUC units that ultimately formed within the Northern Block and the Juan Andres Alvarez Front were thus initially formed, according to Adkins, through the direct participation of a Colombian military officer, who openly sought the assistance of Drummond to support this special force of the Colombian military. According to several AUC commanders, including El Tigre and Samario, the Colombia military had a direct role in providing funds to the AUC to support AUC operations around the Drummond facility. (Doc. #78-1, ¶ 246).

These allegations present some challenges for Plaintiffs that were not clear in *Doe/Balcero*. Plaintiffs seem to conflate Convivir groups, paramilitaries, and the AUC. The AUC did not exist until 1996, and the Cordova Battalion Commander alleged solicitation of funds from Adkins in 1995 was only for a Convivir group which was alleged to be a "front" for "the AUC and its predecessor organizations." (Doc. #78-1, ¶¶ 67, 74). This muddies the

waters from a pleading standpoint because Plaintiffs seek relief for alleged extrajudicial killings by the AUC (and not by Convivir or other paramilitary groups). *See Rayburn*, 241 F.3d at 1348. Further, during his Letters Rogatory testimony, Colonel Mejia denied that Drummond supplied funds to the AUC and denied that the military, under his command, collaborated with the AUC. (Doc. #81 at 24-25, n. 7). But Plaintiffs counter with allegations that Drummond arranged to pay off Colonel Mejia for disavowing Drummond's involvement with the AUC. (Doc. #82 at 28, n. 11).

It is not for the court, on a motion to dismiss, to decide the organizational structure of the Convivir/paramilitary/AUC groups, nor to decide whether Colonel Mejia may have been paid off for his Letters Rogatory testimony. (Doc. #82 at 28, n. 11). Therefore, the court finds that Plaintiffs have sufficiently pled state action for purposes of the motion to dismiss. The Third Cause of Action as to the Estate of Garry Drummond survives the motion.

### C. Plaintiffs' Wrongful Death Claim Brought Pursuant to Colombian Law (Fourth Cause of Action)

The Second Amended Complaint alleges this court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(2), over the Colombian wrongful death claims brought in the Fourth Cause of Action. (Doc. #78-1 at ¶¶ 13-14). Plaintiffs allege that Defendants "committed acts that constitute wrongful death under the laws of Colombia and the laws of the United States, and that caused the deaths of Plaintiffs' decedents." (*Id.* at ¶ 269). The Drummond Defendants argue that the Colombian wrongful death claims are time barred pursuant to the two-year statute of limitations covering unspecified torts under Alabama law. (Doc. #80 at 10-17).

A federal court sitting in diversity applies the choice of laws of the state in which it sits.

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).   In Alabama, the traditional choice of law rule of *lex loci delicti* governs tort causes of action and requires that the substantive law of the place where the tort occurred be employed, while procedural law of the forum state is applied.   *Alabama Great So. R.R. v. Carroll*, 11 So. 803 (1892).   Accordingly, this court must apply the procedural rules of Alabama, but the substantive law of Colombia.   The question becomes how Alabama regards Colombia's statute of limitations, *i.e.* whether that limitation is substantive or procedural.   *See Murphy v. McGriff Transp., Inc.*, 2012 WL 3542296 at *1 (N.D. Ala. Aug. 15, 2012) (Proctor, J.).

It is generally recognized in Alabama that statutes of limitation are procedural. *See Murphy*, 2012 WL 3542296 at *1; *see also Battles v. Pierson Chevrolet, Inc.*, 274 So.2d 281, 285 (Ala. 1973); *Nichols v. Healthsouth Corp.*, 2018 WL 1443919 at *4 n.4 (Ala. 2018) ("This court has also held that, in most instances, statutes of limitation are procedural matters.").   However, an Alabama court will apply the statute of limitations of a foreign state where the limitation is so inextricably bound up in the statute creating the right that it is deemed a portion of the right itself.   *Murphy*, 2012 WL 3542296 at *1 (*quoting Department of Revenue v. Lindsey*, 343 So.2d 535, 537 (Ala. Civ. App. 1978)).

Applying this rule here, the two-year statute of limitations of Alabama applies unless Colombia's ten-year statute of limitations is "built in" to the statute creating the right or part of Colombia's "public policy."   *Murphy*, 2012 WL 3542296 at *2 (citing *Bodnar*, 392 So.2d 1161; *Sanders v. Liberty Nat'l Life Ins. Co.*, 443 So.2d 909 (Ala. 1983)).   (Doc. #83 at 6).

Article 2341 of the Colombian Civil Code permits civil claims for wrongful death.   That Article does not contain any statute of limitations.   (Doc. #33-1, Decl. of Alejandro Linares

Cantillo at ¶¶ 5-6).[12]  Instead, the statute of limitations applicable to wrongful death claims is contained in Article 2536 of the same Civil Code.  (Doc. #83 at 6-7).  This is the same statute of limitations that governs any ordinary civil claim under Colombian law.  (Doc. #33-1, Decl. of Alejandro Linares Cantillo at ¶ 7).

The fact that Article 2536 does not specifically address wrongful death claims forecloses a finding under Alabama law that the 10-year statute of limitations is substantive.  *See Murphy*, 2012 WL 3542296 at *1-2 (one-year statute of limitations applicable to Tennessee state law claims for wrongful death did not meet the "built in" exception because it was not part of the wrongful death statute).  Foreign statutes of limitation are procedural rules that will not supersede the applicable Alabama limitations period *unless* the foreign statute that creates the right under which the claim is brought also establishes the time limits for bringing suit. *Bachand v. Barden Mississippi Gaming, LLC*, No. CV 08-B-040-NE, 2009 WL 10688961 at *4 (N.D. Ala. Mar. 30, 2009).  That is, Alabama law distinguishes between true statutes of limitations, which it regards as procedural, and statutes of creation.  *Randolph v. Tennessee Valley Auth.*, 792 F.Supp. 1221, 1222 (N.D. Ala. 1992).  Statutes of creation are those which both establish a right and include a "built in" limitations period.  *Id.*  What matters for the "built in" exception is whether the statute of limitations is contained in the statute which creates the right to bring a wrongful death claim in Colombia.  Here, upon review it is clear that the limitations period simply is not "inextricably bound" to the substantive right itself.  *Bachand*, 2009 WL 10688961 at *5; *see also Etheredge v. Genie Indust., Inc.*, 632 So.2d 1324, 1326-27

[12] In presenting their arguments about whether an exception to the procedural rule applies, Plaintiffs and Defendants introduce competing declarations from Colombian lawyers.  (*See generally* Docs. #80, 83, 85, 91).  These declarations are considered as an explanation of the law (in the line of briefs), and not as evidence.

(Ala. 1994) (North Carolina's six year statute of limitations which was located in a separate part of North Carolina's civil code was procedural, not substantive, and therefore Alabama's two year statute of limitations applied); *Gillies v. Areonaves De Mexico S.A.*, 468 F.2d 281, 286 (5th Cir. 1972) ("[T]he lapsing provision of the Mexican Federal Labor Law is substantive and should be applied under the exception to the general rule. The employee's right is created by the Law, the period of limitations is contained in the law, and the lapsing period is specifically made applicable to employees in Gillies' situation.").

Nor is Colombia's ten-year statute of limitations a "matter of public policy" of Colombia. (Doc. #83 at 9-12). The purpose of any statute of limitations is to promote "the necessity of certainty, clarity, and security in legal relations that necessarily contribute to social order and peace, since a right that is not exercised timely undermines the public order." (Sánchez-León Decl. ¶¶ 9-10). The Supreme Court of Colombia has found that "statutes of limitations are a necessary institution for social order and for legal security, introduced to attend to the public good." (*Id.*). This general purpose does not satisfy the "public policy" exception to the procedural rule. "If Alabama courts were to regard the general statutes of limitations of sister states as matters of public policy such that the courts of Alabama should treat those general limitations periods as substantive rather than procedural law, then the exception would quickly swallow the general rule that most statutes of limitation are deemed procedural rather than substantive." *Reece v. Intuitive Surgical Inc.*, 63 F.Supp.3d 1337, 1345 (N.D. Ala. 2014) (citations omitted); *see also Randolph*, 792 F.Supp. at 1223–13 ("The pertinent Tennessee statute

<hr>

[13] "[I]t now seems that the concept of a 'built in' limitation, which acts something like a rope which, when its end if reached, jerks the life out of a cause of action, and a 'public policy' against allowing a plaintiff to sue on a particular cause after a certain period of time has elapsed, have somehow melded and merged as a matter of the Alabama law

is no more and no less than a general limitations statute applicable to all actions arising out of 'injury to the person.'").

The Second Amended Complaint alleges that various wrongful deaths occurred between six and sixteen years *before* this suit was filed. (Doc. #78-1, ¶¶ 7, 10, 22-54, 88-121). The Alabama two-year statute of limitations applies to those claims unless some other exception applies. *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 n. 13 (11th Cir. 1990).

### 1. Whether Wrongful Death Claims Premised on "Crimes Against Humanity" are Subject to Any Statute of Limitations

Plaintiffs attempt another route to have their wrongful death claims deemed timely. They argue that *no* statute of limitation applies to "crimes against humanity." (Doc. #83 at 11-12). In support of this contention, Plaintiffs present the declaration of Dr. Jaime Alberto Arrubla-Paucar attesting to the fact that "at least since 2014 and now as part of Colombia's law, there is a consistent public policy in Colombia to declare imprescriptible the victim's rights that arise from crimes committed against humanity, such as is alleged to have occurred in this case due to the murders of civilians by armed paramilitary groups …". (Arrubla Decl. ¶¶ 30-36, 46).

The problem for Plaintiffs is that this principle applies in Colombia to *criminal* claims for crimes against humanity and *not* to *civil* claims against private parties for alleged crimes against humanity.[14] (Zuleta-Londoño Decl. ¶¶ 13-14). Here, Plaintiffs central allegations are that Drummond provided substantial funding to the AUC, a terrorist paramilitary group which had

---

of conflicts. This court finds it impossible to understand the distinction, if there is any, between a 'built in' limitation and a 'public policy' limitation, much less to apply such a distinction to this particular fact situation." *Randolph*, 792 F. Supp. at 1223.

[14] Plaintiffs argue that no statute of limitations applies to *any* wrongful deaths that constitute crimes against humanity. (Doc. #91 at 7). In support of this argument, Plaintiffs cite the declaration of Dr. Arrubla. (*Id.*; *see also* Arrubla Decl. ¶¶ 41-47). But no Colombian court has ever held that the statute of limitations is inapplicable in cases

ties to the Colombian state. (Doc. #83 at 11-12). In Colombia, "[t]he type of action, and the jurisdiction in which it is brought, determines the applicable statute of limitations." (Zuleta-Londoño Decl. ¶ 6). A civil action brought against private defendants must be brought before the civil courts. (*Id.* at ¶ 4). Civil statutes of limitations apply to private civil claims. (*Id.* at ¶ 14).

For this additional reason, Plaintiffs' wrongful death claims are subject to Alabama's two-year statute of limitations.

## 2.    Equitable Tolling Does Not Apply to the Wrongful Death Claims

Finally, Plaintiffs argue that, even if the Alabama statute of limitations applies, tolling is appropriate because: (1) Plaintiffs experienced dangerous conditions and lack of access to evidence; (2) Drummond fraudulently concealed payments to the AUC and its responsibility for the murders at issue; and (3) minor tolling applies to Plaintiffs who were under the age of 19 when the complaint was filed on February 26, 2013. (Doc. #83 at 13-19). The court disagrees.

Equitable tolling "is an extraordinary remedy which should be extended only sparingly." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993). It is warranted only "when a movant untimely files because of <u>extraordinary circumstances</u> that are both beyond his control and unavoidable even with diligence." *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006) (emphasis in original). Here, the purportedly "extraordinary circumstances" Plaintiffs point to simply do not justify tolling until 2013.

Plaintiffs initially assert that they faced dangerous conditions. But, as noted previously, these conditions extended *until 2007*. (*See Balcero*, 2:09-cv-1041-RDP, Doc. # 275 at 6)

---

where the dispute involves private parties and civil claims. (Zuleta-Londoño Decl. ¶ 15).

(finding that "[t]he situation in Colombia had been one of great unrest until at least 2007, when the AUC was demobilized."). According to Plaintiffs themselves "2007 is the earliest date when the Peace Process could be said to have begun and become fully operational," and "Plaintiffs' claims should be tolled until at least 2007." (Doc. #36 at 38, 47 n.21). When the Justice and Peace Process began, Plaintiffs were no longer "in the dark without any fault or want of diligence or care on [their] part." *In re Chiquita Brands International*, 690 F.Supp.2d 1296, 1306 (S.D. Fla. Feb. 4, 2010) (internal citation omitted).

Plaintiffs fail to allege facts which differentiate their claims from the claims of the Plaintiffs in *Doe/Balcero*. Plaintiffs have pled no facts showing that they were "prevented" from discovering their cause of action, or that Drummond "fraudulently concealed" the cause of action, particularly since their lawyer filed these same allegations in 2009. *See Burr v. Philip Morris USA Inc.*, 559 Fed. Appx. 961, 964 (11th Cir. 2014) ("Burr never explained what Philip Morris did to prevent him from knowing his wife had sustained an injury caused by smoking cigarettes and being able to pursue a claim. Therefore, he has not preserved a tolling claim under fraudulent concealment."). In 2009, two years after the Justice and Peace Process began, this court saw numerous claims brought by Colombians (who were represented by the same counsel) for the same wrongs asserted in the instant complaint. When Plaintiffs sought to file an amended complaint in the *Doe/Balcero* action to add Garry Drummond, they conceded that "[n]o new significant allegations, and no new claims" were added in the proposed amendment. (*Balcero*, 2:09-sc-1041-RDP, Doc. #350 at 3-4). When the court denied the motion to amend, Plaintiffs filed the instant lawsuit naming Garry Drummond as a defendant. The original complaint in this action (and the First and Second Amended Complaints) contain substantively

identical allegations to the operative complaint in *Doe/Balcero*. *Penaloza*, 662. Fed. Appx. at 677-78.

With full knowledge of the Peace Process and with the benefit of the same attorneys, it was nothing other than, at best, "garden variety" excusable neglect for which Plaintiffs are not entitled to equitable tolling. *Justice v. U.S.*, 6 F.3d 1474, 1479-80 (11th Cir. 1993); *see also Covey v. Arkansas River Co.*, 865 F.2d 660, 662 (5th Cir. 1989) ("It is a common maxim that equity is not intended for those who sleep on their rights."). At worst, the late-filing of the Colombian wrongful death claims was the result of "tactical mistakes in litigation." *Menominee Indian Tribe of Wisconsin v. U.S.*, 136 S. Ct. 750, 755 (2016); *see also Scott v. Duffy*, 372 Fed. Appx. 61, 63 (11th Cir. 2010) (refusing to apply equitable tolling where a litigant's delay in filing was due to a tactical decision).

Nor can the statute of limitations be equitably tolled for Plaintiffs who were under the age of 19 when the complaint was filed on February 26, 2013. (See Doc. #83 at 18-19). Although Alabama Code § 6-2-8(a) provides for those below the age of 19 to "have three years … to commence an action," this statute does not apply to wrongful death actions in Colombia. Ala. Code § 6-2-8(a) (indicating the statute's provisions apply only to "actions enumerated in this chapter"). Moreover, Alabama courts have held that wrongful death claims are not subject to minority tolling. *McConico v. Patterson*, 204 So.3d 409, 420-21 (Ala. Civ. App. 2016). Allowing minority tolling in the case of Plaintiffs' Colombian wrongful death claims is contrary to Alabama law, and therefore directly implicates Alabama's choice of law principles set forth in the Alabama Constitution. Ala. Const., § 13.50(c) (Alabama courts "shall not apply or enforce a foreign law if doing so would violate any state law or a right guaranteed by the Constitution of

this state or of the United States.").

For all these reasons, Plaintiffs have not pled facts sufficient to show that they are entitled to equitable tolling in this case and their Colombian wrongful death claims cannot survive the motion to dismiss.

### D. Res Judicata

Plaintiffs Alba Luz Caballero Gomez, Amparo de Jesus Florez Torres, and J.A.G.F. previously asserted claims in the *Doe/Balcero* case against Michael Tracy for the deaths of Jairo de Jesus Ponzon Rua and Engelver Garcia Pallares. They re-assert these claims here, this time against Michael Tracy and the Estate of Garry Drummond. The individual defendants argue that *res judicata* applies and Plaintiffs are precluded from bringing them in this lawsuit. (Doc. # 81 at 29). But, that argument fails.

Most obviously, Plaintiffs have never advanced claims against Garry Drummond (or the Estate of Garry Drummond), so the theory of *res judicata* does not bar those claims. As to Michael Tracy, the claims were dismissed in *Doe/Balcero* because they were based on allegations that their decedents were killed by AUC paramilitaries on January 26, 1997 and September 3, 1999, respectively. (*Doe/Balcero*, Doc. #324 at 5). However, the *Doe/Balcero* complaint clearly set out the allegation that Defendants entered into an arrangement with the AUC in November 1999 with a first payment made sometime in 2000. (*Id.*). Because there was no factual allegation to support a claim against Tracy for actions which occurred prior to November 1999, the claims against Alba Luz Caballero Gomez, Amparo de Jesus Florez Torres, and J.A.G.F. were dismissed. (*Id.* at 5-6). In contrast, the operative *Melo* complaint alleges Defendants' support of the AUC "no later than early 1997." (Doc. #78-1 at ¶ 104). Plaintiffs

now assert that "additional information concerning Defendants' support of the AUC before 1999 was unearthed only after several depositions were taken."   (Doc. #82 at 30).

For these reasons, Plaintiffs Alba Luz Caballero Gomez, Amparo de Jesus Florez Torres, and J.A.G.F. are not precluded from bringing their otherwise viable claims in *Melo*.

**IV.    Conclusion**

The Motions to Dismiss (Docs. #80, 81) are due to be granted in part and denied in part. A separate Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this May 22, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE